UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE M. MILLER BAKER

| | |
|---|---|
| AMERICAN PACIFIC PLYWOOD, INC., U.S. GLOBAL FOREST, INC. and INTERGLOBAL FOREST, LLC, <br>　　　　Plaintiff and Consolidate Plaintiffs, <br><br>and<br><br>LB WOOD CAMBODIA CO., LTD. and CAMBODIAN HAPPY HOME WOOD PRODUCTS CO., LTD., <br>　　　　Plaintiff-Intervenors, <br><br>v.<br><br>UNITED STATES, <br>　　　　Defendant, <br><br>and<br><br>COALITION FOR FAIR TRADE IN HARDWOOD PLYWOOD, <br>　　　　Defendant-Intervenor. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PUBLIC VERSION**

Consol. Court 20-03914

**PLAINTIFF AND CONSOLIDATED PLAINTIFFS AMERICAN PACIFIC PLYWOOD, INC., U.S. GLOBAL FOREST, INC., AND INTERGLOBAL FOREST, LLC RULE 56.2 MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

Gregory S. Menegaz
J. Kevin Horgan
Alexandra H. Salzman
**DEKIEFFER & HORGAN, PLLC**
Suite 410
1090 Vermont Ave, N.W.
Washington, D.C. 20005
*Counsel to Plaintiff and*
*Consolidated Plaintiffs*

Dated: August 5, 2021

# TABLE OF CONTENTS

I.   INTRODUCTION ............................................................. 1

II.  STATEMENT OF THE CASE............................................. 6

III. RULE 56.2 STATEMENT ................................................ 11

   A.   Administrative Determinations Subject to Appeal............ 11

   B.   Issues Presented ................................................... 12

IV.  STANDARD OF REVIEW ............................................. 13

        Arbitrary and Capricious Standard................................. 14

V.   SUMMARY OF ARGUMENT........................................... 15

VI.  ARGUMENT................................................................ 20

   A.   Imposition of Interim Measures ......................................... 20

        1. Facts ..................................................................... 20

        2. TRLED's Interim Measures are Invalid and
           Should Be Rescinded ...................................... 27

           a.  TRLED Provided Plaintiffs with No Notice of
               Allegations or Opportunity to Rebut and
               Defend Against the Allegations................................ 27

           b.  CBP's EAPA Regulations are Only Interpretive
               Rules and Cannot be the Basis for CBP's
               Enforcement Actions .................................... 35

           c.  The APA Provides Specific Protections Due to
               Plaintiffs ...................................................... 40

           d.  Plaintiffs Have Legitimate Interests to be
               Protected by Due Process........................... 44

e.  CBP and TRLED Had No Reasonable Explanation for Denying Plaintiffs Due Process or Denying Access to Confidential Documents Under an APO Before Imposing Interim Measures....................................................... 48

f.  Public Summaries of Confidential Information are Insufficient to Ensure Effective Rebuttal and Defense ................................................. 59

3.  TRELD Failed to Establish a Reasonable Suspicion of Evasion to Justify its Interim Measures ................................................... 65

a.  Reasonable Suspicion Standard........................... 65

b.  The Record Evidence ............................................ 66

i.  General Trade Data and Supply Chain Adjustment ..................................... 66

ii. CBP's September 2019 Memoranda................. 69

B.  TRLED Improperly Applied the Substantial Evidence Standard in their Determinations of Evasion.................................................................. 74

1.  Facts ................................................................ 74

2.  TRLED's Procedures Did Not Establish Substantial Evidence ...................................... 80

3.  Absent Substantial Evidence to Support its Conclusion of Evasion, TRLED's Commingling Theory is Unfounded ...................................... 85

a.  TRLED Based its "Commingling" Theory the Agent's June 6, 2018 Site Visit .............................. 85

b.  The Agency Record Disproves the Accuracy

of CBP's Observations and Conclusions from
the June 6, 2018 Site Visit. ................................... 89

c. TRLED's Analyses of Plaintiffs' and
Plaintiff-Intervenors' Production and Sales
Records are Flawed and Without Merit. .............. 98

  i.   Reconciliation of LB Wood's Payroll
       Sheets with Balance Sheets ......................... 98

  ii.  Reconciliation of LB Wood's Veneer
       Consumption with Production Volume ....... 99

  iii. Selected Entries – Matching LB
       Wood's Purchases of Raw Materials to
       Production Runs ........................................... 99

  iv.  Selected Entries – LB Wood's CARB
       Certifications .............................................. 102

  v.   Happy Home's Reconciliation of
       Payroll with Balance Sheets ...................... 105

  vi.  Happy Home's Reported Entries .............. 105

  vii. Selected USG Entries ................................ 107

d. Plaintiff-Intervenors' Motive and
Opportunity to Produce Plywood in
Cambodia ........................................................... 109

e. TRLED's General Trade Data is Flawed and
Cannot Stand as Substantial Evidence. ............. 111

f. TRLED's Reliance on Secret Information
from an Unrelated Proceeding Must Be
Rejected. ............................................................ 115

C.  ORR Improperly Applied the Substantial Evidence
Standard in its De Novo Review and Final

Determination..................................................................... 117

1. Plaintiff-Intervenors' Right to Comment on
   TRLED's Determination Before ORR. ........................ 117

2. Plaintiffs' Requests for Administrative Review .......... 120

3. ORR's Handling of Plaintiffs' Record Evidence........... 121

4. ORR's Continued Reliance on CBP's Site Visit ........... 123

5. ORR's New Allegations Against Happy Home ............ 124

VII.   CONCLUSION AND PRAYER FOR RELIEF....................... 130

# TABLE OF AUTHORITIES

## CASES

*650 Fifth Ave. v. Alavi Found*, 830 F.3d 66 (2d Cir 2016) ..................... 33

*Advanced Sys. Tech., Inc. v. United States*, 69 Fed. Cl. 474 (2006) .................................................................................... 41

*A. L. Patterson, Inc. v. United States*, 585 F. App'x 778 (Fed. Cir. 2014) .................................................................................... 80

*Al Tech Specialty Steel Corp. v. United States*, 575 F. Supp. 1277 (Ct. Int'l Trade 1983) ..................................................... 65-66

*Am. Frozen Food Inst. v. United States*, 855 F. Supp. 388 (Ct. Int'l Trade 1994) ................................................................ 45

*Am. Standard, Inc. v. United States*, 602 F.2d 256 (Ct. Cl. 1979) ......... 38

*Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343 (D.C. Cir. 2014) ............... 15

*Arjay Assocs., Inc. v. United States*, 891 F.2d 894 (Fed. Cir. 1989) ....... 40

*Armstrong v. Manzo*, 380 U.S. 545 (1965) .............................................. 43

*Arnold P'ship v. Dudas*, 362 F.3d 1338 (Fed. Cir. 2004) ........................ 15

*ASG Indus., Inc. v. United States*, 610 F.2d 770 (C.C.P.A. 1979) .............................................................. 59, 63-64

*Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 745 F.2d 677 (D.C. Cir. 1984) ................................... 83

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984) .................................................................................... 82

*B-West Imports, Inc. v. United States*, 880 F. Supp. 853 (Ct. Int'l Trade 1995) ................................................................ 40

*Biestek v. Berryhill*, 139 S. Ct. 1148 (2019) ........................................... 62

*Bowen v. Am. Hosp. Asso.,* 476 U.S. 610 (1986) ....................................82

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281 (1974) .................................................................... 13-14, 43

*Brock v. Roadway Express,* 481 U.S. 252 (1987) ....................................28

*Changzhou Wujin Fine Chemical Factory Co. v. United States,* 701 F.3d 1367 (Fed. Cir. 2012) ................................................. 13-14

*Chrysler Corp.* v. *Brown,* 441 U.S. 281 (1979) .........................................38

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402 (1971) .......................................................................62, 84

*Cleveland Board of Education v. Loudermill,* 470 U.S. 532 (1985) ...........................................................................29

*Columbia Forest Prods. v. United States,* 399 F. Supp. 3d 1283 (Ct. Int'l Trade 2019). ...............................................................68

*Corus Group PLC v. Bush,* 217 F. Supp. 2d 1347 (Ct. Int'l Trade 2002) ...........................................................................45

*Cowan v. Bunting Glider Co.,* 159 Pa. Super. 573, 49 A.2d 270, (1946) ...................................................................... 88-89

*CPC Int'l v. United States,* 896 F. Supp. 1240 (Ct. Int'l Trade 1995) ...........................................................................45, 46

*CS Wind Vietnam Co. v. United States,* 832 F.3d 1367 (Fed. Cir. 2016) ...........................................................................14

*Department of Commerce v. New York, et al,* 139 S. Ct. 2551 (2019) ...........................................................................33

*Devon Energy Prod. Co., L.P. v. Gould,* 421 F. Supp. 3d 1213 (D. Wy. 2019) ...........................................................................84

*East Bay Sanctuary Covenant v. Trump,* 950 F.3d 1242 (9th Cir. 2020) ...........................................................................50

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ....................53

*Food and Drug Administration v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) .................................................. 51-52

*FTC v. Standard Oil Co.*, 449 U.S. 232 (1980)........................................11

*Fuentes v. Shevin*, 407 U.S. 67 (1972) ............................................... 28-29

*Fuyao Glass Indus. Grp. Co. v. United States*, 27 CIT 1892 (2003) ...........................................................................................66

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997) ...........................................................................................80

*Glycine & More, Inc. v. United States*, 880 F.3d 1335 (Fed. Cir. 2018) ..................................................................................... 36-37

*Gonzales v. Oregon*, 546 U.S. 243 (2006)..........................................84

*Greene v. McElroy*, 360 U.S. 474 (1959) ...................................................30

*Hannah v. Larche*, 363 U.S. 420 (1960) ....................................................44

*Hornsby v. Allen*, 326 F.2d 605 (5th Cir. 1964)........................................44

*Inmax SDN v. United States*, 277 F. Supp. 3d 1367 (Ct. Int'l Trade 2017).......................................................................................68

*Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123 (1951) ........................................................................28, 33, 50

*Joseph v. United States Civil Serv. Comm'n*, 554 F.2d 1140 (D.C. Cir. 1977) ............................................................................36

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019). .....................................................37

*Kwo Lee, Inc. v. United States*, 24 F. Supp. 3d 1322 (Ct. Int'l Trade Oct. 16, 2014)..................................................................46

*Linyi Chengen Imp. & Exp. Co. v. United States*, 487 F. Supp.

3d 1349 (Ct. Int'l Trade 2020) ................................................110

*Londoner v. City and County of Denver,* 210 U.S. 373 (1908)...............41

*Mathews v. Eldridge*, 424 U.S. 319 (1976) .................................. 42-43,50

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ......................................................14

*Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306 (1950)............43

*Myland Indus., Ltd. v. United States*, 31 Ct. Int'l Trade 1696 (2007) ......................................................101

*NEC Corp. v. United States DOC*, 978 F. Supp. 314 (Ct. Int'l Trade 1997)......................................................40

*NLRB* v. *Wyman-Gordon Co.*, 394 U.S. 759 (1969)..............................38

*North American Cold Storage Company v. City of Chicago*, 211 U.S. 306 (1908) ......................................................49

*Novosteel SA v. United States*, 284 F.3d 1261 (Fed. Cir. 2002)............82

*Patrick v. Miller*, 953 F.2d 1240 (10th Cir. 1992). ..................................43

*Pension Benefit Guar. Corp. v. The LTV Corp., Inc,* 496 U.S. 633 (1990). ......................................................10, 41

*Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015)......................... 37-38

*Richardson v. Perales*, 402 U.S. 389 (1971).................................... 16-17

*Royal Brush Mfg. v. United States*, 483 F. Supp. 3d 1294 (Ct. Int'l Trade 2020)......................................................41, 43, 59, 60, 70, 72

*Shalala* v. *Guernsey Memorial Hospital*, 514 U. S. 87 (1995) ...............38

*Shelter Forest Int'l Acquisition, Inc. v. United States*, 497 F. Supp. 3d 1388 (Ct. Int'l Trade 2021)......................................... 46-47, 103

*Sichuan Changhong Elec. Co. v. United States*, 466 F. Supp. 2d

1323 (Ct. Int'l Trade 2006) ................................................................ 59-60

*SolarWorld Ams., Inc. v. United States*, 962 F.3d 1351 (Fed. Cir. 2020) ..............................................................................................114

*South Dakota v. United States DOI*, 787 F. Supp. 2d 981 (D.S.D. 2011) ............................................................................................ 61-62

*Stone v. Heath*, 179 Mass. 385, 387, 60 N.E. 975 (1901) ................ 49-50

*Sumecht NA, Inc. v. United States*, 399 F. Supp. 3d 1370 (Ct. Int'l Trade 2019) ............................................................................ 47-48

*Tarpley v. Hornyak*, 174 S.W.3d 736 (Tenn. Ct. App. 2004) ................89

*Techsnabexport Ltd.* v. *United States,* 795 F. Supp. 428 (Ct. Int'l Trade 1992) ...................................................................................39

*Terry* v. *Ohio*, 392 U.S. 1 (1968) ................................................................66

*Texaco, Inc.* v. *FPC*, 412 F.2d 740 (3d Cir. 1969) ...................................38

*The Abby Dodge*, 223 U.S. 166 (1912) ......................................................40

*Tourus Records, Inc. v. DEA*, 259 F.3d 731 (D.C. Cir. 2001) .................15

*United States v. Curtis-Wright Export*, 299 U.S. 304 (1936) ................18

*United States v. James Daniel Good Real Prop.*, 510 U.S. 43 (1993) .....................................................................................................29

*United States v. Jin Fuey Moy*, 241 U.S. 394 (1916) .............................58

*United States v. Owen*, 415 F.2d 383 (8th Cir. 1969) ............................61

*United States of America v. Nova Scotia Food Products Corporation*, 568 F.2d 240 (2d Cir. 1977) ................................... 52, 60-61

*Universal Camera Corp. v. NLRB,* 340 U.S. 474 (1951) ............. 80, 82-83

*U.S. Steel Corp. v. EPA,* 649 F.2d 572 (8th Cir. 1981) ...........................51

*USX Corp. v. United States*, 655 F. Supp. 487 (Ct. Int'l Trade 1987)................................................................ 80-81, 123

*Utilities Solid Waste Activities Grp. v. EPA*, 236, F.3d 749 (D.C. Cir. 2001) ............................................................................51

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013)...............................................................82

## STATUTES

5 U.S.C. § 552(b)..............................................................61

5 U.S.C. § 553(a)(1) ........................................................18

5 U.S.C. § 553(b).........................................................35, 36

5 U.S.C. § 553(b)(A) ........................................................35

5 U.S.C. § 553(c).........................................................35, 36

5 U.S.C. § 553(d).........................................................35, 36

5 U.S.C. § 553(d)(2) ........................................................35

5 U.S.C. §553 (d)(3) ........................................................50

5 U.S.C. § 555 ........................................................*passim*

5 U.S.C. § 555(b).........................................................41, 42

5 U.S.C. § 556(d)..............................................................81

5 U.S.C. § 704 ................................................................11

5 U.S.C. § 706(2)(A).....................................................13, 53

5 U.S.C. § 706(2)(D) ........................................................36

5 U.S.C. § 706(2)(E)...........................................................8

19 U.S.C. § 1509 ................................................................54

19 U.S.C. § 1509(b)(1) .......................................................54

19 U.S.C. § 1509(b)(2) .......................................................54

19 U.S.C. § 1516a(c)(1) ......................................................48

19 U.S.C. § 1517 ..................................................................6

19 U.S.C. § 1517(a)(3) .....................................................1, 66

19 U.S.C. § 1517(a)(5) .......................................................25

19 U.S.C. § 1517(a)(6)(A)(i) ...............................................6

19 U.S.C. § 1517(b)(1) .......................................................21

19 U.S.C. §1517(b)(2) ........................................................20

19 U.S.C. § 1517(b)(5) .......................................................21

19 U.S.C. § 1517(c)(1) ...........................................7, 77, 80

19 U.S.C. § 1517(e) ................................6, 21, 22, 65

19 U.S.C. §1517(f) ................................................79, 117

19 U.S.C. § 1517(f)(1) ...........................7, 117, 121, 123

19 U.S.C. § 1517(f)(2) ..........................................................8

19 U.S.C. § 1517(g)(2) .................................8, 13, 83

19 U.S.C. § 1671a(e)(2) .....................................................56

19 U.S.C. § 1671b(d)......................................................30-31

19 U.S.C. § 1673a(e)(2). ....................................................56

19 U.S.C. § 1673b(d)......................................................30-31

19 U.S.C. §1677b(f)(1)(A) ................................................101

19 U.S.C. § 1677f(c) ..................................................................34, 64

19 U.S.C. § 1677m(g) ......................................................................59

19 U.S.C. § 2461 ..............................................................................71

## REGULATIONS

19 CFR § 163.11 ..............................................................................86

19 CFR § 163.11(a)(1) ......................................................................54

19 C.F.R. § 163.11(a)(2) ..................................................................54

19 CFR § 163.11(a)(4) ......................................................................54

19 CFR Part 165 ..............................................................................37

19 CFR § 165.1 ..............................................................................117

19 CFR § 165.4 ................................................................................60

19 CFR § 165.4(a)(2) ........................................................................59

19 CFR § 165.4(e) ............................................................................59

19 CFR § 165.15 ..............................................................................48

19 CFR § 165.15(d)(1) ......................................................15, 31, 36

19 CFR §165.23(a)(3) ....................................................................118

19 CFR § 165.24 ..............................................................................48

19 CFR § 165.41(a) ........................................................................117

19 CFR § 207.30 ..............................................................................59

19 CFR § 351.203(c) ........................................................................55

19 CFR § 351.225(l)(2) ....................................................................46

## ADMINISTRATIVE DECISIONS

*Certain Hardwood Plywood Products from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 83 Fed. Reg. 504 (Dep't Commerce Jan. 4, 2018) ........................................................ *passim*

*Certain Hardwood Plywood Products from the People's Republic of China, Countervailing Duty Order*, 83 Fed. Reg. 513 (Dep't Commerce Jan. 4, 2018) .................................................................. *passim*

## OTHER AUTHORITIES

CBP, *Investigation of Claims of Evasion of Antidumping and Countervailing Duties, Interim Regulations; Solicitation of Comments*, 81 Fed. Reg. 56,477, 56,479 (Aug. 22, 2016) .... 34, 35, 48, 118

Executive Order, Promoting the Rule of Law Through Transparency and Fairness in Civil Administrative Enforcement and Adjudication, 84 Fed. Reg. 55,239 (Oct. 15, 2019) .......................... 19

Popper, Andrew F., *et al., Administrative Law, A Contemporary Approach*, 4th ed. (2021) ........................................................... 89

Statement of Administrative Action (To accompany H.R. 826(I), H.R. REP. 103-316, H.R. Rep. No. 316, 103rd Cong., 2nd Sess. 1994, 1994 WL 16137731, 1994 U.S.C.C.A.N. 4040 (Leg. Hist.) P.L. 103-465, The Uruguay Round Agreements Act House Report No. 103-316 (December 8, 1994) ................................................................. 56, 57

Trade Agreements Act of 1979 (Public Law 96-39, 93 Stat. 144 (July 26, 1979) ................................................................................ 64

# I.   INTRODUCTION

Plaintiffs American Pacific Plywood, Inc. ("APPI"), U.S. Global

Forest, Inc. ("USG"), and InterGlobal Forest, LLC. ("IGF") (collectively,

"Plaintiffs") are U.S. importers of hardwood plywood.  Historically,

Plaintiffs purchased hardwood plywood from manufacturers in China.

On January 4, 2018, however, the U.S. Department of Commerce (the

"Department") imposed an antidumping duty order and a

countervailing duty order on U.S. imports of such Chinese hardwood.

*See Certain Hardwood Plywood Products from the People's Republic of*

*China*, 83 Fed. Reg. 504 (January 4, 2018) (the "AD Order"); *see also*

*Certain Hardwood Plywood Products from the People's Republic of*

*China*, 83 Fed. Reg. 513 (January 4, 2018) (the "CVD Order")

(collectively, the "Orders").  The merchandise that is subject to the

Orders is referred to herein as "Covered Merchandise."  *See* 19 U.S.C.

§1517(a)(3).

Following the hallowed traditions of enterprising American

capitalism, the Chinese plywood manufacturers who produced Covered

Merchandise responded by moving plywood production to Cambodia,

beyond the geographic scope of the Orders.  For example, prior to the

1

entry of the Orders, [

] sold finished plywood

products directly to IGF and shipped them from China.  **Appx08981-08982**.  Anticipating the adoption of the Orders, [         ] formed and

funded a Cambodian company, LB Wood Cambodia Co., Ltd. ("LB") in

2017.  **Appx30891-30892**.  LB leased factory space in Cambodia,

purchased and assembled equipment, and installed manufacturing

lines.  Over time, LB purchased more than [

], (**Appx29806-30881; Appx26646-26659**), [


]. *See* Chart titled

"Imported Raw Material Purchases" from April 13, 2018 Through

September 8, 2019, attached hereto as **Attachment 4**, **Appx29806-29810**. [


].  **Appx30891-30892**, **Appx44263-44264**.  In turn,

those managers and supervisors hired local Cambodian labor and

taught their new workforce how to compose, layup, fill the voids in the

veneer sheets, glue, and press together vast quantities of veneer sheets,

2

and trim the veneers which had been transmuted into plywood.  At the height of its operations LB had [                              ] employees (**Appx.30897; Appx.29521-29803; Appx44262-44276**) who would then go on to cut, sand, finish, coat, package, and ship "Chinese quality" plywood to the U.S.

The [          ] ownership of LB and the [          ] sourcing of virtually all of the imported veneers it utilized ***are entirely irrelevant to the analysis of whether Plaintiffs violated the Orders*** by allegedly purchasing finished plywood from China and transshipping it to the United States.  Indeed, the U.S. Customs and Border Protection ("CBP") agent ("Agent") on whose emails CBP's Trade Remedy Law Enforcement Directorate ("TRLED") rests its entire case acknowledged that, even if the veneers were imported from China, the resulting plywood produced in Cambodia would not constitute "Covered Merchandise."  The Agent unequivocally stated in her email to TRLED that, [

                                                          ]  (Emphasis added.)

**Appx07019**.

PUBLIC VERSION

Once they verified the manufacturing capacity of the newly

formed Cambodian companies for themselves by making onsite visits,

[          ]'s U.S. customers turned to LB for quality plywood.  IGF

and APPI purchased hardwood plywood from LB.  Similarly, USG

purchased hardwood from Cambodian Happy Home Wood Products Co.,

Ltd. ("Happy Home").  **Appx01021-01026**. As discussed below, such a

change in supply chains is both expected and legal.  Apparently

frustrated that its plans to crush foreign competition had been

thwarted, the self-styled *Coalition for Fair Trade of Hardwood Plywood*

("Coalition") responded by charging without evidentiary foundation that

Plaintiffs must have been selling Chinese hardwood plywood which had

been transshipped via Cambodia.

The administrative record in this case is replete with extensive

and detailed documentation of the large quantities of equipment

purchased by the Cambodian companies, their purchases of vast

quantities of veneers from both domestic and international [          ]

sources, their large local payrolls, and photographs of the production

processes at their factories as evidenced by six different site visits

during the period from January 2018 to December 2019.  Despite

TRLED's exhaustive demands for records which the Cambodian companies readily provided, TRLED could not point to one single scintilla of direct or indirect evidence in the record that Plaintiffs or the Cambodian manufacturers ever transshipped Covered Merchandise to the U.S.  Confidential Document No. 204, **Appx01033-01050.**  Indeed, the only plywood of foreign manufacture which CBP could identify at the premises of either of the Cambodian manufacturers was [


].  **Appx07020.**  [              ] plywood, however, would not constitute Covered Merchandise because the Orders encompass only Chinese-made plywood.

Notwithstanding the dearth of evidence, the TRLED issued a final determination concluding that the "Chinese quality" hardwood plywood which the Cambodian companies manufactured and exported to Plaintiff's must have been Covered Merchandise transshipped from China.  For the reasons articulated above and based upon the further facts and legal arguments detailed below, the findings of the TRLED lack foundation and must be reversed.

## II.   STATEMENT OF THE CASE

Plaintiffs were parties to EAPA Inv. 7321, an investigation conducted by CBP under 19 U.S.C. §1517, the Enforce and Protect Act ("EAPA") which provides procedures for investigating claims of evasion of antidumping and countervailing duty orders.  As U.S. importers of hardwood plywood, Plaintiffs are interested parties in accordance with 19 U.S.C. §1517(a)(6)(A)(i).  Defendant is the United States of America, acting by and through CBP.

CBP initiated EAPA Inv. 7321 on June 26, 2019, and TRLED conducted the investigation.  EAPA Inv. 7321 concerns the allegation that Plaintiffs evaded the antidumping and countervailing duty orders on hardwood plywood from China by transshipping Covered Merchandise (Chinese hardwood plywood) through Cambodia for import into the United States in violation of the Orders.

TRLED imposed interim measures on Plaintiffs 90 days after initiation in accordance with 19 U.S.C. §1517(e) (*i.e.*, presumably on September 24, 2019), but did not notify Plaintiffs of either the initiation of the investigation or the interim measures until October 1, 2019.

TRLED elected to ignore the uncontroverted evidence that

Plaintiffs' Cambodian suppliers had purchased over [          ] pieces

of Chinese and domestic veneers at a cost of approximately

[                    ].  This was more than enough material to produce over

[                              ] cubic meters of finished plywood

which the suppliers ultimately shipped to Plaintiffs.  TRLED also chose

to ignore the fact that there was not one single scintilla of direct or

indirect evidence that Plaintiffs ever purchased any Chinese-

manufactured plywood. Nevertheless, TRLED issued its determination

of evasion on June 29, 2020, stating that substantial evidence supported

a finding that Plaintiffs had evaded the Orders by entering Chinese-

origin hardwood plywood subject to the Orders while declaring that

Cambodia was the country of origin of the merchandise. *See* 19 U.S.C.

§1517(c)(1).

Plaintiffs timely filed their requests for an administrative review

of TRLED's final determination with CBP's Office of Trade, Regulations

& Rulings ("ORR") in accordance with 19 U.S.C. §1517(f)(1).  ORR

issued the results of its administrative review on November 5, 2020 and

concluded, after a de novo review of the administrative record, that

7

substantial evidence supported TRLED's findings of evasion of the
Orders.  *See* 19 U.S.C. §1517(f)(2).

Plaintiffs challenge TRLED's and ORR's findings and
determinations, which were arbitrary, capricious, an abuse of
discretion, and otherwise not in accordance with law.  19 U.S.C.
§1517(g)(2)(B).  Further, TRLED's and ORR's conduct of EAPA Inv.
7321 and the administrative review did not comply with procedures
under subsections (c) and (f) of the EAPA statute that could result in
determinations based on substantial evidence and otherwise without
observance of procedure required by law.  19 U.S.C. §1517(g)(2)(A) and
5 U.S.C. §706(2)(E).  Specifically, Plaintiffs challenge (i) TRLED's
imposition of interim measures without allowing Plaintiffs the
opportunity to be heard and defend against the evasion allegations;
(ii) TRLED's determination of evasion; and (iii) ORR's affirmation of
TRLED's determination of evasion.

At its core, this case is about two things.  The first is TRLED's
single-minded, obdurate reliance on three emails dated July 18 and 26,
2019 (the "Secret Memoranda") which described an unannounced visit

to the Cambodian companies made by the Agent on June 6, 2018 (more than thirteen months earlier). **Appx07017-07038**. The Agent provided photographs of [



]. All of these photographs were consistent with the overwhelming evidence that the Cambodian companies were importing veneers and generating plywood in Cambodia.

The Agent asserted that she saw [




]

**Appx07020,Appx07024,Appx07027**. She did not claim that there were containers of finished plywood being unloaded at the facilities of either of the Cambodian companies and being repackaged. The Agent's observations are completely consonant with the overwhelming evidence that Chinese veneers were being shipped to Cambodia and were being used to fashion quality plywood by a Cambodian workforce working under the gimlet eye of Chinese managers and supervisors who had

been imported from China where they had honed their talents manufacturing "Chinese quality" plywood in China. **Appx30891-30892**.

The second fatal failing is the denial of notice and opportunity to be heard, rudimentary due process, the right to the presence of counsel, availability of evidence and information used against a party, and the existence, or lack thereof, of coherent and enforceable standards. Having placed almost total reliance on the Agent's emails, TRLED persistently refused to provide Plaintiffs or their counsel with a copy of the Agent's emails for three years.  Such conduct on the part of TRLED runs afoul of our most basic beliefs regarding fairness, notice, and the opportunity to present an explanation and defense.  Whether these values (notice and an opportunity to be heard) are founded in the Constitution or the Administrative Procedures Act ("APA") is immaterial.  The Supreme Court has made clear that "{a}s a matter of administrative law, the protections afforded by Section 555 of the APA correspond to procedural due process." *Pension Benefit Guar. Corp. v. The LTV Corp., Inc.*, 496 U.S. 633, 655, (1990).

## III.   RULE 56.2 STATEMENT

### A.   Administrative Determinations Subject to Appeal

The Administrative Procedures Act ("APA") specifically provides
that a "preliminary, procedural, or intermediate agency action or ruling
not directly reviewable is subject to review on the review of the final
agency action," 5 U.S.C. §704.   *See FTC v. Standard Oil Co.*, 449 U.S.
232, 245 (1980).

1. TRLED, Notice of Initiation of Investigation and Interim
   Measures – EAPA Cons. Case 7321 (October 1, 2019); not
   published in the Federal Register; available at
   https://www.cbp.gov/document/guidance/eapa-cons-
   investigation-number-7321-interglobal-forest-llc-american-
   pacific; **Appx01020-01029** ("Interim Measures Notice").

2. TRLED, Notice of Determination as to Evasion (June 29, 2020);
   not published in the Federal Register; available at
   https://www.cbp.gov/document/guidance/eapa-cons-
   investigation-number-7321-interglobal-forest-llc-american-
   pacific, **Appx01034-01050** ("TRLED Determination").

3. ORR, Ltr. re: EAPA Case Number 7321; *Certain Hardwood Plywood from the People's Republic of China: Antidumping Duty Order*, 83 FR 504 (January 4, 2018) and *Certain Hardwood Plywood from the People's Republic of China: Countervailing Duty Order*, 83 FR 513 (January 4, 2018); U.S. Global Forest, Inc., Interglobal Forest LLC, and American Pacific Plywood, Inc.; 19 U.S.C. §1517; Administrative Review Decision (Nov. 5, 2020); (not published in the Federal Register; not available on CBP website); **Appx01052-01074** ("ORR Decision").

## B. Issues Presented

1. <u>Issue One</u>: Whether CBP's EAPA reliance on 19 CFR §165.15(d)(1) to impose interim measures without prior and timely notification to Plaintiffs violates Plaintiffs' due process rights under 5 U.S.C. §555.

2. <u>Issue Two</u>: Whether the record evidence supports a reasonable suspicion that Plaintiffs entered "Covered Merchandise" into the U.S. through evasion and justifies TRLED's imposition of interim

measures on such products.

      3.    <u>Issue Three</u>: Whether TRLED's non-disclosure of confidential data and information upon which TRLED justified its imposition of interim measures violated Plaintiffs' due process rights under 5 U.S.C. §555.

      4.    <u>Issue Four</u>: Whether TRLED's final determination in EAPA Inv. 7321 and ORR's final results of its administrative review relying on general and discredited trade information and undisclosed documents which speculated without any substantive foundation that the hardwood plywood in question was transshipped from China are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## IV.  STANDARD OF REVIEW

      The EAPA provides for the standard of judicial review in 19 U.S.C. §1517(g)(2). Federal courts have recognized that the standard of review for international trade cases also encompasses the standards established under the APA, 5 U.S.C. §706(2)(A). *Changzhou Wujin Fine Chemical Factory Co. v. United States*, 701 F.3d 1367, 1377 (Fed. Cir.

2012) (*citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 284 (1974)).

## Arbitrary and Capricious Standard

"Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983 (citations omitted). Internal inconsistency and self-contradiction do not satisfy this requirement. There must be "a rational connection between facts found and choices made," *Motor Vehicle Mfrs*, at 43. Quite simply, there were no "facts found" as is required.

Further, the agency's rationale must address the parties' principal arguments. *See CS Wind Vietnam Co. v. United States,* 832 F.3d 1367, 1375-1381 (Fed. Cir. 2016) (analyzing in detail an agency's obligation to set forth a comprehensible and satisfactory justification for its determinations "as a reasonable implementation of statutory directives

14

supported by substantial evidence").  In *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350-52 (D.C. Cir. 2014) the Court underscored the importance of an agency's obligation to "articulate an explanation for its action," stating that "a fundamental requirement of administrative law is that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action'"), citing *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001).  Finally, an abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are unsupported by substantial evidence, or represents an unreasonable judgment in weighing relevant factors. *Arnold P'ship v. Dudas*, 362 F.3d 1338, 1340 (Fed. Cir. 2004).

## V.   SUMMARY OF ARGUMENT

EAPA regulation 19 CFR §165.15(d)(1) allows CBP to impose interim measures without prior and timely notification to Plaintiffs, as TRLED did in this case, thereby violating Plaintiffs' due process rights under 5 U.S.C. §555.  19 CFR §165.15(d)(1) does not provide a legal basis for TRLED's enforcement action, however, because CBP issued its

EAPA regulations as interpretative rules, which lack the force and effect of law and are not accorded that weight in the adjudicatory process.  5 U.S.C. §555 provides minimum-due process protections such as the right to legal counsel, timely notification of impending enforcement actions, and to bring argument and objections before an agency takes enforcement actions.  Plaintiffs suffered injury to their businesses, losses for breach of contracts with their U.S. customers, and injury to their reputations and relations with U.S. customers that could have been avoided if CBP had timely notified Plaintiffs of the pending EAPA investigation.  Plaintiff likewise had no opportunity to rebut and defend against the allegations of evasion so as to avoid enforcement measures altogether.

Further, the record evidence that TRLED cited as establishing a reasonable suspicion of evasion is not specific to Plaintiffs and does not document any instance of Plaintiffs' evasion of the Orders.  TRLED also failed to disclose other record evidence that the agency claims to have relied upon.  Even after the interim measures were in place, Plaintiffs had no opportunity to rebut and defend against the purported record

16

evidence to which Plaintiffs lacked access. *Richardson v. Perales*, 402 U.S. 389 (1971) (at minimum, any process affecting a cognizable interest should include a meaningful opportunity to confront the evidence or testimony to be used against that party). No rational basis exists for not disclosing a party's own confidential information to that party and for not providing legal counsel access to confidential information under an administrative protective order ("APO") or similar protocol to adequately safeguard Plaintiffs' rights to be confronted with the evidence that was used to support the affirmative evasion decision.

TRLED's and ORR's determinations of evasion were arbitrary and capricious because they continued to rely on discredited and unreliable trade data as substantial information that was not in any respect specific to plaintiffs or their Cambodian suppliers. TRLED's and ORR's decision to rely on undisclosed documents to find evasion was not in accordance with law and prevented Plaintiffs from developing a record of substantial evidence on critical issues for TRLED and ORR to consider in their determinations. TRLED's and ORR's refusal to allow disclosure of confidential information under an administrative protective order was an abuse of discretion.

17

The procedural failures in this case involve actions that contravene inarguably well-established parameters for governmental action.  This is not simply a mistake in process, a "gotcha" procedural misstep that requires a remand.  The actions of the government reveal failure after failure of essential process that led to profound harm.  In fact, the actions described in this brief would be unacceptable in any country that prides itself on democratic process – and for the United States, they are a travesty.

That the alleged activity in question occurred outside the borders of the United States plays no role in assessing the misconduct of the governmental entities in question.  To be sure, were this a matter of national security, foreign affairs, or a threat to the safety and well-being of the populace, different considerations apply and greater deference is due. *United States v. Curtis-Wright Export*, 299 U.S. 304 (1936); 5 U.S.C. 553(a)(1).  This is not, however, a case involving foreign affairs or national security – nor anything remotely close.  It involves, instead, a straightforward matter of countervailing duties, anti-dumping provisions, in short, the business of import and export.

While in office, President Trump issued E.O. 13892 on October 9, 2019 (revoked by President Biden in January 2021) providing a clear and uncontroversial statement on the rules executive agencies must follow.  Executive Order, *Promoting the Rule of Law Through Transparency and Fairness in Civil Administrative Enforcement and Adjudication*, 84 Fed. Reg. 55,239 (Oct. 15, 2019).  That Order was in force when the facts in this case took place.  It directs that no "person should be subjected to a civil administrative enforcement action … absent prior public notice of … the legal standards applicable to that conduct."  The Order states explicitly that it applies to "actions involving the import or export of non-defense articles and services" and commands compliance with the APA, the Constitution, and decades of caselaw.  TRLED did exactly the opposite.

This brief provides a description of actions that ignore the necessity of notice and opportunity to be heard and the obligation to set forth a credible record to support actions an agency will take.   These are not difficult, unusual, or aspirational standards; they are the bedrock of fairness, applicable in this case, and ignored almost completely by the agency.

19

It is inconceivable that a court would find the complete denial of the predicates of fairness to be perfectly acceptable.  Hiding information, maintaining secret records, imposing sanctions before allowing a meaningful process to take place, may be how other countries choose to behave. It is hardly part of our legal heritage, our rules, and our process.  The actions undertaken are not just procedural errors.  They are illegal.

## VI.   ARGUMENT

### A. Imposition of Interim Measures

#### 1.  Facts

On May 1, 2019 and May 10, 2019, the Coalition for Fair Trade of Hardwood Plywood (the "Coalition") submitted to CBP allegations that Plaintiffs were engaged in the evasion of the AD/CVD Orders on hardwood plywood from China.  *See* 19 U.S.C. §1517(b)(2).  The Coalition alleged that Plaintiffs were evading the Orders by transshipping Chinese hardwood plywood through Cambodia for import into the United States.  *See Interim Measures Notice,* note 7, **Appx01021**.  TRLED acknowledged receipt of the Coalition's allegations on June 5, 2019 and initiated EAPA investigations against each

Plaintiff on June 26, 2019.  **Appx01021**, notes 4 & 6.  *See* 19 U.S.C. §1517(b)(1).

For the following three months, TRLED conducted undisclosed investigations against Plaintiffs.  TRLED also targeted in its secret investigation the Cambodian producers of hardwood plywood, LB Cambodia Co., Ltd. ("LB"), who sold and exported plywood to APPI and IGF, and Cambodian Happy Home Wood Products Co., Ltd. ("Happy Home"), who sold and exported plywood to USG.  **Appx01021-01026**.

On October 1, 2019, TRLED informed Plaintiffs that, during its secret investigations, TRLED had developed a record giving rise to a "reasonable suspicion" of evasion of the Orders by the Plaintiffs and consolidated the three initiated EAPA investigations into EAPA Inv. 7321.  *Interim Measures Notice*, **Appx01020 & Appx01028-01029**.  19 U.S.C. §1517(e) & 19 U.S.C. §1517(b)(5).  Also, on October 1, 2019, TRLED notified Plaintiffs that it had imposed interim measures on them by suspending liquidation of Plaintiffs' entries of hardwood plywood from Cambodia, rate-adjusting entries as subject to the Orders, requiring cash deposits from Plaintiffs of 194.53% *ad valorem* on

unliquidated entries as of June 5, 2018, and extending the suspension for all unliquidated entries.  *See* 19 U.S.C. §1517(e).  *Id.*, **Appx01021 & Appx01026-01028.**

Only after TRLED released its Interim Measures Notice on October 1, 2019, did TRLED release to Plaintiffs just the public versions of the letters from the Coalition alleging Plaintiff's' evasion of the Orders and TRLED's June 26, 2019 Initiation Memoranda.  *See* Coalition, Revised Allegation & Exhibits re: IGF, APPI, and USG (May 1 & 10, 2019), **Appx01474-01599** (complete allegation against IGF as an example); **Appx01601; Appx01672;** TRLED Initiation Memoranda re: APPI, IGF & USG, (June 26, 2019), **Appx01001-01005; Appx01007-01012; Appx01014-01018.**

TRLED claimed that the following record evidence supported a reasonable suspicion that Plaintiffs evaded the Orders as provided by 19 U.S.C. §1517(e):

i.  General trade data with no connection to Plaintiffs, including import and export trends in China, Cambodia, and the United States, claiming that trade data *from 2016*, two years prior to the Orders,

reasonably suggested that some Chinese exports of plywood pass through Cambodia by transshipment to the U.S. *Interim Measures Notice*, **Appx01021-01022, Appx01025** (N.b., Plaintiffs imported all their Cambodian plywood *in 2018 and 2019*).  TRLED also claimed that general trade data on plywood production and consumption of plywood in Cambodia in *2016* when compared to Plaintiffs' *2018* imports from their Cambodian suppliers reasonably suggested transshipment. *Id.*, **Appx01022**.  Based on the Cambodian trade data, which Plaintiffs demonstrated to be unreliable, TRLED claimed that *in 2018*, Plaintiff IGF imported one-third of Cambodia's total plywood production *in 2016*; and USG's shipments *in 2018* accounted for 50% of Cambodia's total plywood production *in 2016*; *id.* **Appx01023-01025**.  In its conclusion of reasonable suspicion as to USG, TRLED misleadingly states "{t}he volume of U.S. Global's imports as a proportion of Cambodia's domestic plywood production, *i.e.*, about 50 percent . . ."  *Id.*, **Appx01025***.  To be accurate, TRLED's statement would have to cover the same time span or at least reconcile the production figures from 2016 with the export figures from 2018.

ii.   <u>Plaintiffs' supply chain shift from China to Cambodia</u>.

TRLED also alleged that Plaintiffs' shift from Chinese suppliers of

plywood to Cambodian suppliers after imposition of the Orders supports

a reasonable suspicion of evasion.  **Appx01023, 01025**.  Both Cambodian

suppliers, LB and Happy Home, are located in Cambodia's

Sihanoukville Special Economic Zone ("SSEZ"), an economic trade zone

constructed by Chinese and Cambodia enterprises.  **Appx01022,**

**Appx01024, Appx01025**.  TRLED notes further that after adjusting its

supply chain, IGF also revised its website to inform its customers that it

was selling "Asian Plywood" instead of the "Chinese Plywood" IGF had

formerly advertised.  **Appx01023**.  TRLED characterizes IGF's honest

and true information to the public as "irregularities" that "reasonably

suggest evasion."  **Appx01025**.

iii.   <u>IGF and USG CF-28 Responses</u>.  *See id.* at 7-8.  CBP uses its

Customs Form 28 or "CF-28" as a formal request for information that

typically arises during CBP's processing of an entry for final assessment

of duties and liquidation of the entry.  When CBP deems entry

paperwork insufficient and cannot finally assess the duties owed on an

entry, CBP will send a CF-28 to the importer of record for information

and clarification.  TRLED confirms that IGF provided all of the information that CBP requested, and USG provided most of the requested information, except for descriptive literature of the entered merchandise, such as sales flyers, brochures, catalogs, and specifications sheets.  *Id.*, **Appx01026**.  *See also* IGF, Refiled CF-28 Response (Oct. 21, 2019), **Appx07188**; and USG, Refiled CF-28 Response (Nov. 15, 2019), **Appx31044**.  In its Interim Measures Notice, TRLED used the information in IGF's CF-28 response to confirm that LB exported plywood from its manufacturing facility in the SSEZ to IGF.  TRLED used the information in USG's CF-28 response to confirm that Happy Home exported plywood from its manufacturing facility in the SSEZ to USG.  **Appx01026-01027**.  TRLED did not find that the production and sales documentation for the specific entries addressed in CBP's CF-28 questionnaires indicated specific instances of evasion or that any document, data, statement, or act connected with the entries was material and false or any omission material.  *See* 19 U.S.C. §1517(a)(5) (evasion defined).

    iv.   <u>Other record evidence,</u> the details of which remained undisclosed to Plaintiffs throughout the EAPA investigation.  *See*

*Interim Measures Notice,* **Appx01027-01028**.  CBP added the

documents composing this "other record evidence" to the EAPA 7321

record on September 12-13, and 16, 2019.  **Appx01027**.  *See* TRLED,

Memo to File re: June 6, 2018 Site Visit (Sept. 12, 2019), **Appx07018-**

**07038** ("June 2018 Site Visits"); TRLED, Memo to File re: [

                                                                    ]

(Sept. 13, 2019), **Appx07040-07131**; and TRLED, Memo to File re:

[

               ] (Sept. 16, 2019), **Appx07133-07176**.  TRLED

acknowledges that CBP's site visits and third-party documents had

nothing to do with EAPA 7321 or with Plaintiffs and concerned

engineered wood flooring, not plywood.  *Interim Measures Notice,*

**Appx01027**.

        CBPs site visits were made to Plaintiffs' suppliers LB and Happy

Home, over a year before TRLED initiated EAPA 7321.  TRLED did not

disclose to Plaintiffs the photographs referenced in its Interim

Measures Notice.  Also, the contents of CBP's Customs Form 29, or "CF-

29" – Notice of Action – were not disclosed to Plaintiffs.  Plaintiffs were

only privy to TRLED's conclusion that something was broken up into

26

multiple pieces and that something is not typical of Cambodian plywood

production, "indicating these pallets of plywood were not produced in

Cambodia." **Appx01027.** TRLED did not discuss what or why

something was "typical" or atypical of Cambodian plywood production

or the scientific or comparative basis for claiming that a certain

production process or production result was, or was not, "typical."

TRLED also did not explain how logically the observation that a certain

atypical production process or production result should lead to a

conclusion of evasion.

### 2. TRLED's Interim Measures are Invalid and Should Be Rescinded.

#### a. TRLED Provided Plaintiffs with No Notice of Allegations or Opportunity to Rebut and Defend Against the Allegations.

TRLED's interim measures are invalid because TRLED neither

gave timely notice to Plaintiffs of the ongoing EAPA investigation and

impending interim measures nor provided Plaintiffs a timely

opportunity to rebut and defend against the evasion allegation and

imposition of the interim measures.

Notice prior to adverse action is at the heart of fairness. Without

notice, the right to counsel becomes meaningless and an opportunity to

be heard nonsensical.  The origins of this right are familiar. *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 169-170 (1951) "This Court … shows consistent respect for a requirement of fair procedure before {one is} denied or deprived of rights.… {F}airness can rarely be obtained by secret, one-sided determination of facts decisive of rights."  Secret, one-sided determination is exactly what happened in this case.

In *Brock v. Roadway Express.*, 481 U.S. 252, 264-265 (1987), the Court required, "a meaningful opportunity to respond before a temporary deprivation may take effect … the right to be informed not only of the nature of the charges but also of the substance of the relevant supporting evidence."  Again, the complainants in this case were not given notice, allowed to know – much less confront – relevant evidence, and temporary or "interim" measures, a deprivation, were in fact taken.

This is not a minor flaw in the government's behavior – it demonstrates instead complete indifference to our system of laws.  In *Fuentes v. Shevin*, 407 U.S. 67 (1972), the Court found that notice and

an opportunity to be heard, is "embedded in our constitutional and political history…."  In *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993) the Court held that "{t}he right to prior notice and a hearing is central to the Constitution's command of due process."

The method to decide if the existing process (the process used in this case) is appropriate is fairly simple: (a) identify the interest of the individual (here, harsh and disproportionate sanctions), (b) the governmental interest (here, nothing but moving quickly as an expedience – and certainly not national security, public safety, or anything remotely resembling justifiable urgency), and, (c) assess the risk of error (here, the risk is vast and unjustified – adverse action without notice and an opportunity to be heard are, quite literally, the definition of arbitrary and capricious action).  *Matthews, Secretary of Health, Education, and Welfare v. Eldridge*, 424 U.S. 319 (1976). Applying those tests, the absence of a pre-deprivation process is wrong at a most fundamental level.

Notice and an opportunity to be heard in a meaningful time and manner permeates our jurisprudence (*Cleveland Board of Education v.*

*Loudermill*, 470 U.S. 532 (1985) (rudimentary notions of fairness require notice and an opportunity to be heard prior to the imposition of a sanction)).  Surely, secret investigations resulting in penalties before the sanctioned party had notice and a right to seek counsel cannot be how we conduct our affairs unless there is a highly compelling reason to act summarily – and that reason does not exist in this case.

Nothing about the government action in question conforms with basic notions of fairness.  "Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." *Greene v. McElroy*, 360 U.S. 474, 496 (1959).  That did not happen here.

The EAPA statute's interim measures in accordance with 19 U.S.C. §1517(e), taken by themselves, are not problematic and echo the measures that the U.S. Department of Commerce ("Commerce") imposes after its AD and CVD determinations.  *See* 19 U.S.C.

§§1671b(d) and 1673b(d).  The EAPA is silent, however, on when CBP must give notice of allegations of evasion filed with the agency and CBP's decision to initiate an EAPA investigation.  CBP therefore filled this gap with its agency regulations and decided to wait 95 calendar days after initiation to notify all parties of its decision, or no later than five days after CBP imposes interim measures.  19 CFR §165.15(d)(1).  Thus, TRLED initiated EAPA 7321 on June 26, 2019 and gave notice of the initiation and interim measures already imposed on October 1, 2019.  *Interim Measures Notice,* **Appx01021, Appx01026, Appx01028**.

Because 19 CFR §165.15(d)(1) allows CBP to wait until after interim measures are imposed to give targeted parties notice of the enforcement action, Plaintiffs had no opportunity to engage legal counsel, to answer, to rebut, or to defend against the allegations before TRLED imposed the injurious measures.  Plaintiffs had no opportunity to protect their interests in the imported merchandise and their contractual relations and obligations with downstream U.S. customers before CBP demanded cash deposits of almost 200% on their current and past imports.  Plaintiffs were not afforded the opportunity to renegotiate their surety bonds or consult their banks for loans for cash

flow or liquidity.  Thus, Plaintiffs' challenge is not to the interim
measures provided in the EAPA statute per se.  Rather, Plaintiffs
challenge CBP's imposition of those measures without proper notice of
the evasion allegations against them and without the opportunity to
defend against those allegations so that the allegations could be
reasonably rebutted prior to CBP's enforcement action imposing
burdensome measures.

Plaintiffs' proper and timely defense against TRLED's interim
measures includes legal counsel's access to confidential information.  As
indicated above, even after TRLED disclosed the Coalition's allegations
and information that CBP collected allegedly supporting a reasonable
suspicion of evasion, TRLED made only public versions of these
materials available to the parties.  Thus, a timely notice of the initiation
of the investigation and engagement of legal counsel would not have
sufficed for effective rebuttal and defense against the allegations.  *See*
public versions of TRLED's Notice of Interim Measures and, in
particular, CBP's Secret Memoranda.  **Appx01020-01029; Appx07018-
07038; Appx07040-07131; Appx07133-07176**.

If the basis or record for an action is little more than pretext, an after-the-fact concocted explanation, the Court has held that is insufficient and could be evidence of bad faith on the part of the agency. When the government's actions boil down to making up an excuse after-the-fact, that is unacceptable pretext. *See Department of Commerce v. New York, et al,* 139 S. Ct. 2551 (2019). Agency actions must be judged on the basis an agency puts forward at the time it acts. *650 Fifth Ave. v. Alavi Found*, 830 F.3d 66 (2d Cir 2016) (there is "a need to guard against government actions taken "as an after the fact insurance policy to validate an unlawful {action}.")

A "record" produced after actions have been taken is not a record – it is an excuse and a poor one at that.  "{W}hen a person has an opportunity to speak up in his own defense, and when the State must listen to what he has to say, substantively unfair and simply mistaken deprivations of property interests can be prevented. . . . No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it." *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 170-172 (1951).

33

As with the time for notice to the parties of the allegations and initiation of an investigation, the EAPA statute is also silent on a procedure for allowing access to confidential information under an APO. By contrast, the AD/CVD statute includes specific instructions on making confidential information available to legal counsel under a protective order. *See* 19 U.S.C. §1677f(c). In its explanatory comments to its regulations, CBP explained that because the EAPA statute did not require the release of confidential information under an APO, it did not provide for any such procedure. CBP then advised parties to not submit information to CBP that they obtained "exclusively under a protective order from another agency, court, or proceeding" and "exercise caution when submitting information to CBP in an EAPA proceeding." CBP, *Investigation of Claims of Evasion of Antidumping and Countervailing Duties, Interim Regulations; Solicitation of Comments*, 81 Fed. Reg. 56,477, 56,479 (August 22, 2016) ("CBP Intro to EAPA Regs"). CBP's explanation for precluding the parties' access to confidential information under an APO is unconvincing since CBP did not hesitate to fill the statute's gap in specifying notification times despite the EAPA statute's silence on notification requirements.

34

### b. CBP's EAPA Regulations are Only Interpretive Rules and Cannot Supply the Basis for CBP's Enforcement Actions.

The Administrative Procedures Act ("APA") provides procedures for informal rulemaking in 5 U.S.C §553 and requires (i) a general notice of proposed rulemaking, (ii) an opportunity for interested parties to file written comments, (iii) agency consideration of submitted comments, and (iv) publication no less than 30 days before the effective date if the regulation is a substantive rule. 5 U.S.C. §§553(b),(c)&(d). The requirements of notice for proposed rulemaking and publication of the final rule at least 30 days before the effective date does not apply to interpretive rules.  5 U.S.C. §§553(b)(A) & (d)(2).

Despite CBP's title of "interim regulations" and announcement of "solicitation of comments," CBP clarifies in the published Federal Register notice of its EAPA regulations that the notice and comment requirements for formal rulemaking do not apply to its CBP's EAPA regulations.  Under the section "Inapplicability of Notice and Delayed Effective Date Requirements," CBP explains that it considers its regulations to be merely rules of procedure covered by the exception found in 5 U.S.C. §§553(b)(A) & (d)(2).  *CBP Intro to EAPA Regs* at

56,481.  Although several interested parties submitted comments to CBP on its "interim" EAPA regulations, CBP never issued a final rule with its consideration of all comments received.  *See* docket at https://www.regulations.gov/search/comment?filter=USCBP-2016-0053.

Therefore, even if CBP's interim measures regulation, 19 CFR §165.15(d)(1), might be a substantive rule, the Court would be compelled to hold the regulation unlawful and set it aside because CBP issued the regulation without observing the procedure required by law. 5 U.S.C. §§706(2)(D), 553(b),(c)&(d).  Nonetheless: "{i}nterpretative rules may be substantive in the sense of addressing a substantive rather than procedural issue of law and legislative rules may be procedural. The relevant distinction between legislative and interpretative or any other non-legislative rules is not the nature of the questions they address but the authority and intent with which they are issued and the resulting effect on the power of a court to depart from the decision embodied in the rule." *Joseph v. United States Civil Serv. Comm'n*, 554 F.2d 1140, 1153 (D.C. Cir.1977). *See also Glycine & More, Inc. v. United States*, 880 F.3d 1335, 1345 (Fed. Cir. 2018) ("the 2011 Notice was intended to effectively rewrite the substantive meaning of

the regulation without going through the necessary notice-and-comment rule-making, it has no legal standing, and thus provides no basis upon which the Secretary could make his decision.")

Accordingly, due to CBP's designation of its interim regulations as only interpretive, TRLED cannot rely on 19 CFR Part 165 to launch an enforcement action such as the interim measures in EAPA 7321. Interpretative rules such as 19 CFR Part 165 do not impose any "legally binding requirements" on private parties. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2420 (2019) (holding, *inter alia*, that those affected by agency action are entitled to notice of the standards to be applied and that those subject to an enforcement action should not be informed after the fact or surprised by the government's actions). Enforcement actions "must instead rely on a legislative rule, which (to be valid) must go through notice and comment." *Id.* As the U.S. Supreme Court stated in *Perez v. Mortg. Bankers Ass'n*: "{t}he absence of a notice-and-comment obligation makes the process of issuing interpretive rules comparatively easier for agencies than issuing legislative rules. But that convenience comes at a price: Interpretive rules do not have the force and effect of law and are not accorded that weight in the adjudicatory process.'"

*Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96-97 (2015), *citing Shalala* v. *Guernsey Memorial Hospital*, 514 U. S. 87, 99 (1995).

Therefore, this Court should find that TRLED's interim measures imposed without observance of due process are void.  CBP's decision to designate its EAPA regulations as "interpretive rules" stymied the normal rulemaking process, the purpose of which is "'to assure fairness and mature consideration of rules of general application,' *NLRB* v. *Wyman-Gordon Co.*, 394 U.S. 759, 764 (1969), and to give affected members of the public an opportunity to comment. *See Texaco, Inc.* v. *FPC*, 412 F.2d 740, 744 (3d Cir. 1969).  A substantive rule is invalid if it is not promulgated in accordance with the notice requirements of the APA. *See Chrysler Corp.* v. *Brown*, 441 U.S. 281 (1979)." *Am. Standard, Inc. v. United States*, 602 F.2d 256, 267 (Ct. Cl. 1979).  For instance, almost all commentators on CBP's EAPA regulations urged CBP to include an APO procedure in its final rule to enable interested parties to participate meaningfully in EAPA procedures.  Counsel for Defendant-Intervenors in the instant action persuasively stated the problems arising from the lack of an APO process in EAPA investigations:

This is likely to complicate the TFTEA evasion investigation process and make it far less administrable and effective for all parties involved. In the absence of access to information filed by other parties, each interested party's ability to represent its interests will be compromised. Importers may be left unaware of the bases for the allegations filed against them; likewise, allegers may be left unaware of the full nature of importers' responses. . . .

The problems inherent in the lack of an APO process will be particularly noticeable upon judicial review. The courts have the power to provide appellants and appellees with access to the full information on the CBP record, through judicial protective order. At that time, parties may realize that they have misunderstood significant aspects of the agency's decision and the agency may then see its decisions remanded almost immediately, even under the relatively deferential "arbitrary and capricious" standard of review, because of the procedural due process concerns arising from preventing parties to an investigative proceeding from accessing the information being used to affect their rights. As the U.S. Court of International Trade has opined, the "essential elements of due process are notice and the opportunity to be heard." But where parties are not able to access the full information that CBP has used to make a decision, it is difficult to see how any "opportunity to be heard" is meaningful and thus lawful.

Wiley Rein LLP, Ltr to CBP re: Docket No. USCBP-2016-0053:

Comments on Interim Final Regulations Regarding Investigation of

Claims of Evasion of Antidumping and Countervailing Duties (Dec. 20,

2016) at 7-8, *citing to Techsnabexport Ltd.* v. *United States,* 795 F.

Supp. 428, 436 (Ct. Int'l Trade 1992) ("Wiley Cmts").  Wiley also noted

that CBP was not constrained in establishing an APO procedure in

EAPA investigations by the EAPA statute's silence on this issue,

pointing out that other agencies such as the Federal Communications

Commission implemented APO procedures despite no statutory

provision prescribing an APO process.  Wiley Cmts. at 9.  This is but

one example of the relevant suggestions from interested parties that

CBP could have considered to address due process concerns in its

regulations.

### c.  The APA Provides Specific Protections Due to Plaintiffs.

It is axiomatic that no one has a vested right to engage in

international trade.  *See, e.g., NEC Corp. v. United States DOC*, 978 F.

Supp. 314, 325-27 (Ct. Int'l Trade 1997), *citing to The Abby Dodge*, 223

U.S. 166, 176-77 (1912); *Arjay Assocs., Inc. v. United States*, 891 F.2d

894, 896-98 (Fed. Cir. 1989); and *B-West Imports, Inc. v. United States*,

880 F. Supp. 853, 863-64 (Ct. Int'l Trade 1995).

The absence of a constitutional claim, however, does not foreclose a

statutory claim.  Indeed, even though the EAPA statute itself contains

no procedures for timely notice of interim measures or access to

confidential information, TRLED and CBP are nevertheless bound by

40

the minimum dictates of due process as set forth in the APA and case law establishing the fundamental rights of interested parties in agency proceedings under U.S. law and the U.S. Constitution. *See, e.g., Londoner v. City and County of Denver,* 210 U.S. 373 (1908) (in assessing the power of government and the rights of those affected by it, the Court held explicitly that prior to the imposition of an individual sanction, basic fairness demands notice and an opportunity to be heard); *Royal Brush Mfg. v. United States*, 483 F. Supp. 3d 1294, 1305-1306 (Ct. Int'l Trade 2020). For informal proceedings and adjudications such as EAPA investigations that do not require a formal hearing under the APA, 5 U.S.C. §555 is applicable. *Advanced Sys. Tech., Inc. v. United States*, 69 Fed. Cl. 474, 484 (2006), *citing to Pension Benefit Guar. Corp. v. The LTV Corp., Inc.*, 496 U.S. 633, 655 (1990).

The fundamental requirements of due process in accordance with 5 U.S.C. §555(b) require that TRLED ensure that every interested party have an opportunity for *effective* legal representation. ("A person compelled to appear in person before an agency or representative thereof is entitled to be accompanied, represented, and advised by counsel or, if permitted by the agency, by other qualified

41

representative.")  Effective legal representation can be had only when the allegations against an interested party are known.  Thus, TRLED's failure to provide Plaintiffs or their legal counsel with confidential versions of the allegations against them under an APO or otherwise from the outset of CBP's investigation denies the Plaintiffs their right to effective legal representation.  Further, all interested parties compelled to appear before the agency and provide information for adjudication, including the foreign producer and exporter in EAPA cases, have the right to be heard for "presentation, adjustment, or determination of an issue, request, or controversy in a proceeding."  5 U.S.C. §555(b).

TRLED's reliance on undisclosed information as a basis for its interim measures prevents the Plaintiffs' right to be heard and respond to the allegations against them and present evidence that rebuts the allegations.  Undisclosed information also cannot meet the requirements of substantial evidence in the proceeding in which they were generated because the full record of that proceeding cannot be reviewed.  The essence of procedural due process is fair play; hence, the fundamental due process requirement is "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v.*

*Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380

U.S. 545, 552 (1965)). *Patrick v. Miller*, 953 F.2d 1240, 1244 (10th Cir.

1992).  "Due process 'forbids an agency to use evidence in a way that

forecloses an opportunity to offer a contrary presentation,' *Bowman*

*Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 289

n.4 (1974). Thus, to comply with due process, Customs' procedures must

afford adequate opportunity for importers to respond to the evidence

used against them." *Royal Brush Mfg. v. United States*, 483 F. Supp.

3d 1294, 1306 (Ct. Int'l Trade 2020).  Further,

> {a}n elementary and fundamental requirement of due
> process in any proceeding which is to be accorded finality is
> notice reasonably calculated, under all the circumstances, to
> apprise interested parties of the pendency of the action and
> afford them an opportunity to present their objections. . . .
> The notice must be of such nature as reasonably to convey
> the required information, . . . and it must afford a reasonable
> time for those interested to make their appearance.

*Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).

Articulating the standards to be applied and allowing for an

opportunity to be heard is not asking for much – this is the essential

element of fundamental fairness.  Absent those simple measures,

arbitrary decisions, capricious actions, abuse of discretion, and even

race-based decisions can occur without a party or a reviewing court having any understanding of that level of misconduct. *Hornsby v. Allen*, 326 F.2d 605 (5th Cir. 1964) (finding that prior to adverse action, at a minimum, the government should articulate the standards and provide notice and an opportunity to be heard).

TRLED utterly failed to consider any of these due process principles or justify its actions in imposing interim measures against Plaintiffs without observation of Plaintiffs' legitimate interests.

### d. Plaintiffs Have Legitimate Interests to be Protected by Due Process.

As the Supreme Court articulated in *Hannah v. Larche*:

> "{d}ue process" is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts. Thus, when governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process.

*Hannah v. Larche*, 363 U.S. 420, 442 (1960). TRLED's imposition of interim measures was an affirmative action that affected Plaintiffs' legal rights. With no notice, Plaintiffs were unable to plan for TRLED's demand for cash deposits amounting to almost 200% of the value of the

PUBLIC VERSION

merchandise. Plaintiffs were unable to consult their banks or liquidate assets in time to meet CBP's demand for cash deposits. CBP's demand imposed overnight without notice, left Plaintiffs unable to negotiate with its surety the terms and conditions for single entry bonds, resulting in loss of bond coverage for their imports. Plaintiffs had no opportunity to renegotiate contracts with their customers to cover the cost of importing the goods. They were forced to breach their contracts with both suppliers and U.S. customers by sending back ordered merchandise that was already shipped. TRLED's interim measures therefore rendered Plaintiffs liable for breach of contract damages vis-à-vis their trading partners and U.S. customers.

The Courts have recognized that when a party is required to fundamentally alter its business operations in order to comply with a challenged Government action, that party suffers irreparable harm. *Corus Group PLC v. Bush*, 217 F. Supp. 2d 1347, 1354 (Ct. Int'l Trade 2002) *citing CPC Int'l v. United States*, 896 F. Supp. 1240, 1243-45 (Ct. Int'l Trade 1995); *Am. Frozen Food Inst. v. United States*, 855 F. Supp. 388, 393-94 (Ct. Int'l Trade 1994). Protected interests include goodwill, reputation, and freedom to take advantage of business opportunities.

45

*See Kwo Lee, Inc. v. United States*, 24 F.Supp. 3d 1322, 1327 (Ct. Int'l

Trade 2014).

> Where an importer demonstrates that compliance with a
> ruling of Customs regarding country of origin marking would
> cause the importer to incur costs, expenditures, business
> disruption or other financial losses, for which the importer
> has no legal redress to recover in court, even if the importer
> ultimately prevails on the merits in contesting the ruling,
> the importer suffers irreparable harm….

*CPC Int'l, Inc.,* 896 F. Supp. at 1243.  Plaintiffs were forced to

fundamentally alter their business operations in order to comply with

CBP's demands.  It is unreasonable to inflict such irreparable harm on

Plaintiffs with no notice and opportunity to defend themselves or even

plan for TRLED's impending action to minimize the harm they might

possibly suffer because of TRLED's initiation of EAPA Inv. 7321.

For instance, in *Shelter Forest*, an anticircumvention case

concerning the hardwood plywood orders, Commerce preliminarily

found circumvention of the Orders and instructed CBP to suspend

liquidation of relevant entries from "the date of initiation" as provided

in 19 CFR §351.225(l)(2).  In determining the effective date of initiation,

the court stated:

> Under 19 C.F.R. §351.225(l)(2), "the date of initiation"
> cannot be the internal signature date of September 18, 2018
> because the parties were not provided with adequate notice
> until the Initiation Notice was published in the Federal
> Register on September 21, 2018. . . .  As Commerce cannot
> suspend liquidation prior to providing parties with notice
> and the Government provides nothing to show the parties
> received adequate notice prior to publication, the date of
> initiation in this case must refer to the date of publication in
> the Federal Register. *See Tai-Ao Aluminium*, 391 F. Supp.
> 3d at 1313-14 ("Commerce cannot suspend liquidation until
> the date at which it provided the parties notice that their
> products could be subject to the administrative action.")

*Shelter Forest Int'l Acquisition, Inc. v. United States*, 497 F. Supp. 3d

1388, 1404 (Ct. Int'l Trade 2021).  *Shelter Forest* disapproved an

attempt to give ***three days'*** retroactive effect,  In this instant case,

TRLED's suspension of liquidation of Plaintiffs' entries and demand for

cash deposits and single-entry bonds could not be effective until CBP

notified Plaintiffs of the initiation of EAPA Inv. 7321 on

October 1, 2019.  Nevertheless, CBP applied its interim measures

retroactively to Covered Merchandise entered ***sixteen months*** earlier in

clear violation of the due process notice requirement articulated in

*Shelter Forest*.

As the *Sumecht* Court stated "retroactive application of the

changed duty rate would affect Plaintiff's ability to make appropriate

business decisions and take actions with the benefit of information required by a statutorily-mandated notice. *See* 19 U.S.C. §1516a(c)(1); . . . . The court concludes that Defendant's actions prejudiced the Plaintiff and amounted to more than harmless error." *Sumecht NA, Inc. v. United States*, 399 F. Supp. 3d 1370, 1379 (Ct. Int'l Trade 2019).  In EAPA 7321, without reasonable explanation, CBP failed to consider Plaintiffs' interest in due process and timely notice of CBP's impending enforcement actions.

> **e.   CBP and TRLED Had No Reasonable Explanation for Denying Plaintiffs Due Process or Denying Access to Confidential Documents Under an APO Before Imposing Interim Measures.**

CBP did not address due process concerns in its comments included in the publication of its regulations.  *See* CBP Intro to EAPA Regs, 81 Fed. Reg. at 56,480 and 56,481 discussing 19 CFR §§165.15 and 165.24.  CBP maintains that the designated period of 95 days after initiation of the investigation before notifying the parties of the initiation "takes into account the dual considerations of transparency and the need to provide adequate time for CBP's investigative process." *Id*. at 56,480.  CBP does not explain why secrecy during its 90-day

investigative phase is necessary or even reasonable.  CBP's EAPA

investigation concerns Covered Merchandise that was already

produced, shipped, entered into the U.S., and distributed to customers.

The documentation to prove its country of origin was already written

and generated, and the documentation on the country of origin follows

the Covered Merchandise on its shipment from the country of origin to

the United States.  CBP does not need to utilize secretive methods to

prove culpability of any kind on the part of any of the parties related to

the Covered Merchandise transactions because culpability is not an

element of an evasion finding under the statute CBP applied for this

investigation.

Proceeding summarily, without notice or a fair hearing, is and

should be reserved for emergencies.  In this case, there is nothing to

suggest such a risk. "The right to so seize {to take summary action} is

based upon the right and duty of the state to protect and guard, as far

as possible, the lives and health of its inhabitants … ." *North American*

*Cold Storage Company v. City of Chicago*, 211 U.S. 306, 315 (1908).

However, Governmental entities "act at their peril if it turns out …

there was in fact … no nuisance … ." *Stone v. Heath*, 179 Mass. 385,

387, 60 N.E. 975, 976 (1901). Fundamental fairness requires that "a person in jeopardy of serious loss {be given} notice of the case against him and opportunity to meet it." *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) *citing Joint Anti-Fascist Comm. V. McGrath*, 341 U.S. at 171-172.

This is the legal heritage we are charged to protect. It is and should be nothing new to this agency. And yet, in the name of some form of efficiency, the government proceeded summarily. This agency is rewriting core doctrines and is effectively repealing the APA.

This is not one of those rare instances where the government can establish "good cause" to take summary action. (5 U.S.C. §553 (d)(3). For that exception to apply, the government must demonstrate the "existence of an exigency justifying good cause," something the government has utterly failed to do. *East Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242 (9th Cir. 2020). This record is devoid of any evidence demonstrating that the government would be meaningfully disadvantaged by employing procedures consistent with standards of fairness.

Rudimentary due process, regardless of whether it has a constitutional or statutory foundation, is a fair expectation for anything our government does. Granted, there are cases where a threat to safety, health, or welfare might justify summary action, but collecting fines based on anti-dumping law or countervailing duties and export fines, fees, or taxes scarcely fits into that category. *Utilities Solid Waste Activities Grp. v. EPA*, 236, F.3d 749, 754 (D.C. Cir. 2001) (the good cause exception should be "narrowly construed and only reluctantly countenanced."); *U.S. Steel Corp. v. EPA,* 649 F.2d 572, 575 (8th Cir. 1981) ("The mere existence of deadlines for agency action, whether set by statute or court order, does not in itself constitute good cause).

The agency used a method of investigation, fact-finding, and decision making that appears nowhere in the statute. It thereby expanded its jurisdiction and became a roving agency of government, acting without constraint. Promulgating regulations that purport to permit any of this is irrelevant; agencies are not free to promulgate regulations that appear to justify actions beyond their statutory authority. *Food and Drug Administration v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) (an agency cannot expand its

51

authority or invent new procedures or otherwise act in a manner that exceeds its delegated authority).  Notice reasonably calculated to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections is a fundamental requirement of due process.

None of the evidence collected and put on this administrative record merited secrecy.  The default position in all federal agencies is transparency, not secrecy.  *United States of America v. Nova Scotia Food Products Corporation*, 568 F.2d 240 (2d Cir. 1977).  Even CBP's unannounced site visit in this case was made *before* CBP initiated EAPA 7321 and concerned an *unrelated* inquiry.  No agency interest is discernable in keeping CBP's investigative actions secret for 95 days in EAPA 7321.  The only measurable effect was to catch Plaintiffs unawares with TRLED's enforcement action of implementing interim measures, which harmed and punished Plaintiffs only for engaging in international trade.  Notably, even acting under this cloak of secrecy, CBP uncovered no smoking gun.  It did not catch Plaintiffs transshipping any Covered Merchandise.  CBP's denial of basic due

process and without a legitimate reason cannot stand.  The rule of

reason requires every law or policy to be rational.

> The statutory provision applicable here is the
> Administrative Procedure Act's (APA) prohibition of agency
> action that is "arbitrary, capricious, [or] an abuse of
> discretion," 5 U.S.C. §706(2)(A). . . .
>
> The law has also recognized that it is not so much a
> particular set of substantive commands but rather it is a
> *process*, a process of learning through reasoned argument,
> that is the antithesis of the "arbitrary." This means agencies
> must follow a "logical and rational" decisionmaking
> "process." *Allentown Mack Sales & Service, Inc.* v. *NLRB*,
> 522 U.S. 359, 374 . . . (1998).

*FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 548 (2009).  CBP's rationale

for not disclosing confidential documents under an APO is equally thin.

CBP's procedures do not comport with Custom's own traditional

investigative procedures nor the AD/CVD law it is meant to enforce.

Rather, the professed purpose of CBP's EAPA enforcement actions is to

circumvent the legal restrictions of the AD/CVD law and its own

Customs' laws.  CBP avers: "{f}or years, CBP's enforcement actions

against antidumping evasion schemes were stymied by legal

restrictions, but after the passage of the Enforce and Protect Act of

2015, everything changed."  https://www.cbp.gov/frontline/hanging-

tough (last accessed June 9, 2021).

CBP investigations or inquiries initiated for the same purpose as the enforcement of AD/CVD duties, *i.e.*, "conducted for the purpose of ascertaining the correctness of any entry, for determining the liability of any person for duty, fees and taxes due or duties, fees and taxes which may be due the United States, for determining liability for fines and penalties, or for insuring compliance with the laws of the United States administered by the United States Customs Service," are governed by 19 U.S.C. §1509 which compels CBP to give reasonable notice before it examines books and records or questions witnesses or undertakes any enforcement actions. *Id.* In particular, CBP must provide notice of the audit, telephonically and in writing, to the person to be audited (19 U.S.C. §1509(b)(1); 19 CFR §163.11(a)(1)); inform the person to be audited of the subject of the audit and the person's right to an entrance conference (19 U.S.C. §1509(b)(2); 19 CFR §163.11(a)(2)); and schedule a closing conference to explain the preliminary results of the audit (19 U.S.C. §1509(b)(2); 19 CFR §163.11(a)(4)).

The U.S. Department of Commerce ("Commerce") and the U.S.

International Trade Commission ("ITC") are responsible for determining whether the U.S. industry is injured due to unfairly or subsidized imports. All AD/CVD petitions are announced on the ITC's website within a day of receipt and before the institution of the ITC's preliminary injury investigation. *See* https://www.usitc.gov/petitions_and_complaints (last accessed June 7, 2021). Although the AD/CVD statute is silent on the publication of initiation of AD/CVD investigations in the Federal Register, 19 CFR §351.203(c) provides that the initiations must be published in the Federal Register and the petition distributed to all known exporters that export the subject merchandise to the U.S. In practice, on the 20-day deadline for initiating AD/CVD investigations, Commerce posts its initiation notices on its electronic notice website, and the notices are then published in the Federal Register 5-7 days thereafter.

Commerce's and the ITC's public notifications on petitions and investigation initiations enable implicated foreign exporters and U.S. importers to ascertain their position relative to the allegations, engage legal counsel, review and prepare their books and records for agency review, and actively participate in the preliminary phase of the

investigations before any preliminary measures are imposed on their U.S. imports.  Implicated foreign producers and exporters can also actively protect their interests in the subject merchandise by reducing or cancelling shipments of subject merchandise that might be subject to preliminary measures.  U.S. importers have the time and opportunity to renegotiate and adjust their sales contracts to downstream U.S. customers in consideration of anticipated preliminary measures.  Even in instances in which Commerce may have "a reasonable basis to believe or suspect" that critical circumstances exist, the only authorized measure under the AD/CVD statute is to retroactively suspend liquidation of U.S. entries of subject merchandise at the earliest *from the date on which initiation of the investigation is published in the Federal Register*.  19 U.S.C. §§1671a(e)(2) and 1673a(e)(2).

The U.S. Statement on Administrative Action explains with authority[1] the minimum requirements on preliminary investigations and determinations in trade cases.  *See* H.R. REP. 103-316, H.R. Rep.

---

[1] *See* SAA preamble at 4040 ("this Statement represents an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements, both for purposes of U.S. international obligations and domestic law.").

No. 316, 103RD Cong., 2ND Sess. 1994, 1994 WL 16137731, 1994

U.S.C.C.A.N. 4040 (Leg.Hist.) P.L. 103-465, THE URUGUAY ROUND

AGREEMENTS ACT HOUSE REPORT NO. 103-316 (December 8,

1994) Statement of Administrative Action [To accompany H.R. 826(I)]

("SAA").

> Article 7 specifies rules for the application of provisional
> measures (*i.e.*, under U.S. law, the suspension of liquidation
> of entries of merchandise subject to an antidumping
> proceeding and the imposition of a security requirement for
> potential antidumping duties). Article 7 allows national
> authorities to apply provisional measures if: (1) an
> investigation, with public notice, has been properly initiated
> and interested parties have been given adequate
> opportunities to submit information and make comments; (2)
> there is a preliminary affirmative determination of dumping
> and injury; (3) provisional measures are judged necessary to
> prevent injury during the investigation; and (4) at least sixty
> days have passed from the date of initiation of the
> investigation. The sixty-day rule was added because some
> countries imposed provisional measures only a few days after
> initiating an investigation, thereby depriving exporters of
> any opportunity to defend their interests. Other rules
> regarding the application of provisional measures generally
> follow the 1979 Code.

SAA at 4157. The SAA, in essence, is a proclamation of basic minimum

worldwide accepted norms of due process of law.

Plaintiffs had no such notice of the Coalition's allegations or CBP's

initiation of EAPA 7321. Plaintiffs had no opportunity to engage legal

counsel, to answer the allegations, and rebut and defend against the allegations before CBP imposed injurious measures against their imported merchandise. Plaintiffs thus had no possibility to protect their interests in the imported merchandise and their contractual relations and obligations with downstream U.S. customers before CBP imposed interim measures and demanded cash deposits of almost 200% for their current and past imports. Plaintiffs were not afforded the opportunity to renegotiate their surety bonds or consult their banks for loans to avoid bankruptcy.

A statute "must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score. *United States v. Jin Fuey Moy*, 241 U.S. 394, 401 (1916). CBP must therefore ensure that it administers the EAPA law in such a manner as to not violate due process rights guaranteed by 5 U.S.C. §555 or the U.S. Constitution. In light of the procedural deficiencies pervading EAPA Inv. 7321 and the legal constraints on applying any undisclosed information against Plaintiffs, this Court should find that TRLED's imposition of interim measures in this case, indeed its entire investigation, is invalid and unlawful.

### f. Public Summaries of Confidential Information are Insufficient to Ensure Effective Rebuttal and Defense.

The Court in *Royal Brush* found that CBP had not complied with its regulations to provide adequate summarization of confidential information as required in 19 CFR §§165.4(a)(2) and (e). *Royal Brush*, 483 F. Supp. 3d at 1306-1307. The *Royal Brush* Court found that CBP's proper summary of the confidential information on record according to its regulations could have been a reasonable means to bring the administrative procedure to closure. *ASG Indus., Inc. v. United States*, 67 C.C.P.A. 11, *citing to Sichuan Changhong Elec. Co. v. United States*, 466 F. Supp. 2d 1323, 1327-29 (Ct. Int'l Trade 2006).

*Sichuan Changhong* concerned an AD/CVD injury investigation conducted by the U.S. International Trade Commission ("ITC"). It addressed whether four days were sufficient for the plaintiff to respond to new information that the U.S. industry put on the record at the ITC's request. *Sichuan Changhong Elec. Co.*, 466 F. Supp. 2d at 1326. The court found the time sufficient because the ITC's investigation schedule had been long established and "the statutory and regulatory provisions set forth in 19 U.S.C. §1677m(g) and 19 CFR §207.30 are a reasonable

means to bring an administrative procedure to closure." *Sichuan Changhong Elec. Co.*, 466 F. Supp. 2d at 1329. Since *Sichuan Changhong* concerned an antidumping investigation, legal counsel for the plaintiff, of course, had access to all information considered confidential contained in the new information. Plaintiffs' situation in the instant case is fundamentally different because Plaintiffs and their counsel were given ***no time whatsoever*** to comment on the confidential information upon which TRLED based its decision to impose interim measures and its other determinations challenged in this action. CBP denied Plaintiffs all access to confidential information throughout the entire EAPA 7321 proceeding.

In *Royal Brush*, the Court remanded the issue to CBP with the instruction "to comply with the public summary requirement set forth in 19 CFR §165.4 and afford Royal Brush an opportunity to present arguments based on that information." *Royal Brush*, 483 F. Supp. 3d at 1307. As discussed above, however, this Court is not bound by CBP's EAPA regulations because they are only interpretive rules that do not merit the Court's deference. For proper agency adjudication that does not violate the due process rights of the parties, full disclosure of

confidential information is required.  *United States of America v. Nova Scotia Food Products Corporation*, 568 F.2d 240, 251 (2d Cir. 1977) ("We can think of no sound reasons for secrecy or reluctance to expose to public view (with an exception for trade secrets or national security) the ingredients of the deliberative process.")  Public summaries will never include information that cannot be disclosed to the general public for reasons of confidentiality owed to private parties and the agency.  *See* 5 U.S.C. §552(b), which excludes certain information such as commercial and financial information of private parties and intra- and inter-agency memoranda from FOIA requests.  The rules governing FOIA requests, however, do not govern the rights of parties in agency adjudication.

> The Supreme Court of the United States has made clear that:
>
> [a] party is entitled . . . to know the issues on which decision will turn and to be apprised of the factual material on which the agency relies for decision so that he may rebut it. Indeed, the Due Process Clause forbids an agency to use evidence in a way that forecloses an opportunity to offer a contrary presentation.
>
> [Citations omitted.] ("It is a fundamental proposition of administrative law that interested parties must have an effective chance to respond to crucial facts."); *United States v. Owen*, 415 F.2d 383, 388 (8th Cir. 1969) ("Inherent in the most narrow view of due process is the right to know of

adverse evidence and the opportunity to rebut its truth and
relevance.").

*South Dakota v. United States DOI*, 787 F. Supp. 2d 981, 996 (D.S.D.
2011).

It is one thing for a decision to be based in part on confidential
information to which neither the reviewing court nor the parties have
access, so long as there is substantial, reliable, and probative other
evidence that can be revealed that support the decision. *Biestek v.
Berryhill*, Acting Comm'r of Social Security, 139 S. Ct. 1148 (2019) (a
decision is not inherently flawed when some information in the record is
confidential so long as other data/evidence is substantial and supports
the agency action).  It is quite another thing when neither the parties
nor the court have access to the record – that is, for all practical
purposes, not a record at all.  *Citizens to Preserve Overton Park, Inc. v.
Volpe*, 401 U.S. 402 (1971) (after-the-fact explanations even in the form
of affidavits do not constitute a record that can support agency action).

Here, TRLED relied on a report and photographs of Plaintiffs-
Intervenors' premises, which cannot be disclosed to the general public.
Also, the third-party data that TRLED put on the record concerning

PUBLIC VERSION

U.S. importers not parties to EAPA Inv. 7321, but which TRLED claims support its interim measures against Plaintiffs would also necessarily remain confidential.

Without CBP's disclosure of confidential information at the administrative level in EAPA Inv. 7321, however, this Court will ultimately have to decide whether it must conduct a de novo review of the administrative record that contains the confidential documents that CBP did not disclose to Plaintiffs and legal counsel during the agency proceeding.  This was the predicament for courts in AD/CVD litigation before the Trade Agreements Act of 1979, which provided for an APO process, became effective.  As the former U.S. Court of Customs and Patent Appeals commented on the 1979 rules governing disclosure of information in AD/CVD proceedings:

> Under section 1002(b) of the 1979 act, the new provisions have no retroactive effect upon the case before us. However, we note the emphasis placed by the Congress on the fact that the new provisions "have eliminated any need for *de novo* review" by providing "all parties with greater rights of participation at the administrative level" and, further, by providing "increased access to information upon which the decision of the administering authority * * * are based * * * along with the new requirement for a record of the proceeding.

*ASG Indus., Inc. v. United States*, 67 C.C.P.A. 11, 22, 610 F.2d 770, 780

(C.C.P.A. 1979); *see* Sec. 777(c) of the Trade Agreements Act of 1979 (Public Law 96-39, 93 Stat. 144 (July 26, 1979), providing for "limited disclosure of certain confidential information under protective order," codified as 19 U.S.C. 1677f(c)).

*ASG Industries* involved a CVD decision rendered before the Trade Act of 1979 became effective.  The court in *ASG Industries* concluded that it must conduct a de novo review of the Secretary's decision:

> Accordingly, and in furtherance of the administration of justice, we conclude that a trial *de novo* is indicated in this case so that the merits of the issue of the amount of the net bounty herein involved can be fully developed.

*ASG Indus.,* 610 F.2d at 780.

Because the EAPA statute does not provide for the Court's de novo review.  Plaintiffs request that the Court declare CBP's enforcement measures and conduct of EAPA Inv. 7321 to be null and void for failure to provide Plaintiffs the opportunity, through legal counsel, to be informed of, consider, and defend against the confidential portions of the administrative record that CBP used against Plaintiffs in the underlying EAPA investigation as it unfolded.

### 3. TRLED Failed to Establish a Reasonable Suspicion of Evasion to Justify its Interim Measures.

#### a. Reasonable Suspicion Standard

The EAPA statute requires that CBP's imposition of interim measures be based on a "reasonable suspicion" that Covered Merchandise was entered into the U.S. by evasion.  19 U.S.C. §1517(e). A "suspicion" by itself, is merely doubt without evidence, a hunch. Merriam Webster's online dictionary defines "suspicion" as: "the act or an instance of suspecting something wrong without proof or on slight evidence"; "state of mental uneasiness and uncertainty." https://www.merriam-webster.com/dictionary/suspicion (last accessed June 5, 2021).  The EAPA statute requires, however, that TRLED's decision to impose interim measures be based on a "reasonable suspicion."  A "reasonable suspicion," as understood in U.S. international trade law, requires "a particularized and objective basis for suspecting the existence of proscribed behavior, taking into account the totality of the circumstances."  *United States* v. *Cortez*, 449 U.S. 411, 417 (1981); *United States* v. *Merritt*, 695 F.2d 1263, 1268 (10th Cir. 1982), *cert. denied*, 103 S. Ct. 1898 (1983); *see also, Al Tech Specialty Steel Corp. v. United States*, 575 F. Supp. 1277, 1279-80 (Ct.

Int'l Trade 1983), *citing to Terry* v. *Ohio*, 392 U.S. 1 (1968) and *Fuyao Glass Indus. Grp. Co. v. United States*, 27 Ct. Int'l Trade 1892, 1902-03 (2003) (applying the same standard to Commerce's "reason to believe or suspect" analysis).

As explained below, TRLED had no specific evidence that Plaintiffs were importing Covered Merchandise into the U.S. by means of false statements or documents.

### b. The Record Evidence

#### i. General Trade Data and Supply Chain Adjustment

Only hardwood plywood meeting the scope definition of the Orders *and produced in China* qualifies as "Covered Merchandise" under the EAPA Statute. 19 U.S.C. §1517(a)(3).  TRLED's general trade data may show that Commerce's levy of AD/CVD duties of approximately 200% dampened imports of hardwood plywood from China as U.S. businesses, importers, distributors, and consumers changed their global supply chains.  *Compare* **Appx01021-01022, Appx01025.**  If the Coalition members cannot adjust their business practices to meet the supply and demand of the U.S. market and supply sufficient hardwood plywood to U.S. consumers and enable downstream producers and consumers to

survive economically and continue to operate their enterprises, then economic imperatives require that these companies seek competent suppliers elsewhere. The general trade data that TRLED has considered reflects only economic realities. It provides no indication whatsoever that Plaintiffs' imported plywood was not produced in Cambodia. Finally, during the course of EAPA Inv. No. 7321, and discussed further below, Plaintiffs showed that TRLED's various sources for trade statistics contradict one another and are unreliable. *See* Respondents' Written Argument (May 14, 2020), **Appx44395-44398** ("Wr. Arg."); and USG, Request for Administrative Review (August 10, 2020), **Appx44456-44457** ("USG/HH Rev. Req.).

Further, the fact that Cambodia established the SSEZ as an economic zone to encourage manufacturing in the country, and Plaintiffs' suppliers took advantage of the opportunity to establish their manufacturing facilities in the SSEZ exactly at a time when trade opportunities arose, reflects only the dictates of free market economics. The SSEZ was not the "Forbidden City" with Chinese guards posted to deter close inspection. TRLED's observations on Plaintiffs' suppliers' motives and opportunities to produce plywood in Cambodia and export

their finished merchandise to the U.S. do not amount to any logical conclusion that Plaintiffs evaded the Orders and do not satisfy a reasonable suspicion standard. *See* **Appx01022, Appx01024, Appx01025**. The fact that manufacturers and traders generally take advantage of profitable business opportunities is acknowledged in court decisions of the U.S. Court of International Trade. *See Columbia Forest Prods. v. United States*, 399 F. Supp. 3d 1283, 1295 (Ct. Int'l Trade 2019) (finding that increased imports of the inquiry merchandise since the initiation of the relevant AD and CVD investigations are not sufficient cause for Commerce to even initiate a circumvention inquiry); and *Inmax SDN v. United States*, 277 F. Supp. 3d 1367, 1372-1373 (Ct. Int'l Trade 2017) (recognizing that production and exports naturally flow to companies with lower AD tax rate burdens, even when affiliated: "The court would go one step further and add that not just "some" but <u>all</u> would view such a production change as a reasonable corporate resource decision."

As detailed in the Court's *Columbia Forest* and *Inmax* decisions, it is perfectly normal for production and exportation to flow from a company with high AD rates to a company with low AD rates.

Likewise, it is normal for production and exportation to flow from a country (China) with high AD duties to a country (Cambodia) with low AD duties. The Coalition's simplistic import and export data provide no evidence that Plaintiffs and their suppliers transshipped Covered Merchandise to the United States. It does not identify the who, what, when, where, and how of the charged evasion.

The only information specific to Plaintiffs that TRLED possessed were the CF-28 responses from IGF and USG. TRLED found no indication of evasion from this detailed information concerning the production, export, import, and sale of the plywood. TRLED confirmed only that LB exported plywood from its manufacturing facility in the SSEZ to IGF and Happy Home exported plywood from its manufacturing facility in the SSEZ to USG. **Appx01026-01027**.

### ii. CBP's September 2019 Memoranda

The essence of the public version of the internal email exchange detailing CBP's June 2018 site visit to LB and Happy Home is a conclusory statement that something {"what" was not disclosed} "is not typical of Cambodian plywood production; thus, indicating these pallets of plywood were not produced in Cambodia." **Appx01027**. CBP's

69

visiting Agent also allegedly gave TRLED photographs that claim to support his or her statement. *Id.* Both the content of CBP's conclusions and the basis on which they were made remained unknown to Plaintiffs and legal counsel throughout EAPA 7321. *See Interim Measures Notice*, **Appx01027-01028**. Further, CBP did not invite Plaintiffs' legal counsel to its June 6, 2018 visit nor disclose to Plaintiffs or legal counsel the identity of the Agent, the Agent's report, or source documentation contemporaneous with the June 6, 2018 visit, the amount of time the Agent spent at Plaintiffs' suppliers' facilities, the extent of the Agent's examination, details on the methodology by which the Agent reached her conclusions, or any corroboration that the Agent's conclusions were valid. CBP's email exchange, the documents upon which the email exchange is based, and the circumstances of CBP's visits to the Cambodian suppliers consisted of the suppliers' own business proprietary information that CBP and TRLED should have disclosed to the suppliers, but did not. *See Royal Brush*, 483 F. Supp. 3d at 1306 (discussing, without deciding the issue that no reason existed to withhold photographs from the Philippine Shipper since the photographs pertained to that company's business information). There

is also no evidence that the suppliers were provided with adequate
advance notice of the site visit or the opportunity to retain legal counsel
and competent translators.

TRLED also incorrectly claims in its Interim Measures Notice that
the September 13 and 16, 2018 documents pertain to supplier LB.
**Appx01027.**  These memoranda make no mention of LB.  **Appx07040-
07131; Appx07133-07176.**  The actual context in which the documents
contained in CBP's September 2019 memoranda were created remained
unclear throughout EAPA Inv. 7321.  Whereas in its Interim Measures
Memo, TRLED claimed that the documentation was created in the
context of a GSP[2] review of Cambodian plywood, TRLED claimed in its
Determination of Evasion that the documentation was generated in a
review of whether Cambodian engineered wood flooring was subject to
the antidumping and countervailing duties on *Multilayered Wood
Flooring from China*.  Compare Interim Measures Notice, **Appx01027**
with TRLED Determination, **Appx01045**.  Neither CBP nor TRLED

---

[2] GSP = Generalized System of Preferences, authorized by 19 U.S.C. 2461 et seq.,
pertaining to the eligibility of certain goods from eligible low-income countries for
reduced tariffs upon import into the United States.

disclosed the outcome of either a GSP review of Cambodian plywood or an AD/CVD review of Cambodian engineered wood flooring or demonstrated the precedential value of these documents for the EAPA investigation and imposition of interim measures.

The context, parties, and statements from the unrelated proceedings upon which TRLED relied to support its conclusions in EAPA 7321 remained unknown to Plaintiffs because TRLED did not offer Plaintiffs or their legal representatives an opportunity to review the confidential contents of these documents.  Plaintiffs unequivocally contest any relevancy or truth vis-à-vis themselves of alleged statements from an unidentified person in a murky context that has nothing to do with EAPA Inv. No. 7321.

Only now has legal counsel had the opportunity to view the confidential versions of the September 2019 Memoranda. Plaintiffs' opportunity to rebut TRLED's conclusions passed years ago.  It cannot be remedied at this stage.  "{A}ccess to the complete record on judicial review cannot cure improper withholding of information by Customs . . . ." *Royal Brush Mfg. v. United States*, 483 F. Supp. 3d 1294, 1307 n.20

(Ct. Int'l Trade 2020).  Insofar as TRLED failed to disclose the information included in the Coalition's allegations, TRLED's research, and CBP's site visit and GSP inquiry, TRLED's suspicion of evasion is unsustainable because Plaintiffs had no opportunity to rebut or defend themselves against such allegations.  The record remains fatally incomplete because it lacks Plaintiffs' responses to the so-called evidence that TRLED withheld.  The investigation should be declared null and void.

In conclusion, TRLED and CBP are bound by the minimum dictates of due process set forth in the APA and case law establishing the fundamental rights of interested parties in agency proceedings. TRLED violated Plaintiffs' due process rights by imposing interim measures without notice to Plaintiffs and without allowing Plaintiffs the opportunity to rebut and defend against the imposition of interim measures.  Further, TRLED cited no evidence that supported a reasonable suspicion that Plaintiffs evaded the Orders.  General trade data, information showing that Plaintiffs adjusted their international supply chains, and secret information to which Plaintiffs or their legal counsel are not privy are not reasonable grounds for establishing a

suspicion of evasion against Plaintiffs.

## B. TRLED Improperly Applied the Substantial Evidence Standard in their Determinations of Evasion.

### 1. Facts

After TRLED's October 1, 2019 Interim Measures Notice, TRLED issued "Requests for Information" ("RFI") questionnaires to Plaintiffs and Plaintiff-Intervenors.  Those parties provided TRLED with all documents requested, including Plaintiff-Intervenors' business and financial records which documented purchases of raw materials, production processes, and sales to Plaintiffs; and Plaintiffs' business and financial records including documentation of sales transactions with Plaintiff-Intervenors and their own U.S. customers.  Plaintiffs and Plaintiff-Intervenors subsequently submitted timely and complete responses to TRLED's single round of supplemental questionnaires. *See* APPI, RFI Questionnaire Response (Oct. 28, 2019), **Appx07392** ("APPI Qre Rsp."); IGF RFI Questionnaire Response (Oct. 28, 2019) ("IGF Qre Rsp."), **Appx08971**; USG RFI Questionnaire Response (Oct. 30, 2019) ("USG Qre Rsp."), **Appx18202**; Happy Home, RFI Questionnaire Response (Nov. 9, 2019), **Appx20368** ("HH Qre Rsp.");

LB, RFI Questionnaire Response (Nov. 8, 2019), **Appx26619** ("LBW Qre Rsp."); APPI, Supplemental Questionnaire Response, (Dec. 9, 2019), **Appx31167** ("APPI Supp. Rsp.");  USG, Supplemental Questionnaire Response, (Dec. 12, 2019), **Appx31235** ("USG Supp. Rsp."); Happy Home, Supplemental Questionnaire Response, (Dec. 16, 2019), **Appx31396** ("HH Supp. Rsp."); IGF, Supplemental Questionnaire Response, (Dec. 16, 2019), **Appx32985** ("IGF Supp. Rsp."); and LB, Supplemental Questionnaire Response, (Dec. 16, 2019), **Appx33178** ("LBW Supp. Rsp.").

Plaintiffs and Plaintiff-Intervenors prepared comprehensive responses anticipating TRLED would verify their accuracy through on-site audits in Cambodia.  TRLED initially scheduled verification at Plaintiff-Intervenors' manufacturing facilities for February 17-22, 2020. On February 11, 2020, TRLED postponed its verification of Plaintiff-Intervenors due to the Coronavirus outbreak ("COVID-19").  *See* TRLED Memorandum re: Extension of Written Arguments (Feb. 11, 2020), **Appx45131**.  TRLED ultimately cancelled verification altogether due to COVID-associated travel restrictions.

After its initiation notice, TRLED also added two documents to the record: (i) data concerning U.S. entries of goods from LB and Happy Home, which were completely confidential and not disclosed to Plaintiffs, and (ii) the 2017 FAOStat[3] Yearbook on Forest Products. *See* TRLED, Memorandum re: Entries from Happy Home and LB (Jan. 6, 2020), **Appx44365**; and TRLED, Memorandum re: 2017 FAOStat Yearbook, Forest Products (Jan. 9, 2020), **Appx44693**.

Plaintiffs and Plaintiff-Intervenors jointly filed their written argument on May 14, 2020. *See* Wr. Arg., **Appx44384-44421**. Notably, during the five months between Plaintiffs' and Plaintiff-Intervenors' last questionnaire responses their written argument, TRLED neither asked further questions nor sought clarification of any purported discrepancy in the responses.

Plaintiffs' written argument challenged the trade information put on the record by the Coalition and TRLED put on the record because it was inconsistent, unreliable, and unspecific to Plaintiffs or their suppliers.  Wr. Arg., **Appx44395-44401**.  Plaintiffs and Plaintiff-

---

[3] FAO = Food and Agricultural Organization of the United Nations.

Intervenors then set forth the record evidence showing that Plaintiff-Intervenors produced all of the plywood shipped to the United States at their production facilities in Cambodia.  *Id.*, **Appx44401-44405**.  Finally, Plaintiffs discussed TRLED's procedural irregularities in administering the EAPA law in this instance, including the lack of transparency and defense opportunities for Respondents due to TRLED's reliance on secret documents in its decision to initiate EAPA Inv. 7321 and impose interim measures on Plaintiffs.  *Id.,* **Appx44405-44420**.

TRLED issued a public version of its final determination of evasion on June 29, 2020, claiming that substantial evidence supported a finding that Plaintiffs evaded the Orders by entering Chinese-origin hardwood plywood while declaring the country of origin of the merchandise as Cambodia. 19 U.S.C. §1517(c)(1).  *See* TRLED, Notice of Determination as to Evasion (June 29, 2020), **Appx01034-01050**. ("TRLED Determination").  TRLED did not issue a confidential version of its final determination that would have allowed Plaintiffs to see their own business proprietary information used in TRLED's findings concerning the reliability and consistency of the parties' record evidence.

TRLED presumed and ascribed base motives to Plaintiffs before citing the Coalition's flawed trade statistics and the Secret Memoranda as supposed substantial evidence of APPI's evasion of the Orders. TRLED could not, however, point to even one specific instance of actual transshipment of Chinese plywood through Cambodia to Plaintiffs in the United States.  *See* TRLED Determination, **Appx01038-01040, Appx01043, Appx01044-01045, Appx01048-01049**.  Nevertheless, TRLED falsely alleged that "the record evidence shows that some portion of the Cambodian-origin plywood was comingled *[sic]* with Chinese-origin plywood . . . ." *Id.*, **Appx01043** for LB; **Appx01050** for Happy Home. {Emphasis added.}  That latter assertion was transparently contrived in an attempt to impose penalties universally on all imports notwithstanding that TRLED implicitly acknowledged that it could not identify even one transshipment of a single sheet of Chinese hardwood plywood.

TRLED's final determination included numerous new allegations of perceived inconsistencies in the record documents.  **Appx01041-01043; Appx01045-01048**.  Notably, TRLED never asked the parties to explain any perceived discrepancies.  TRLED relied heavily on the

Secret Memoranda regarding CBP's GSP audit of Happy Home and the Agent's unannounced visits to LB and Happy Home.  Nothing in TRLED's September 2019 memoranda or elsewhere on the record indicates that CBP was auditing LB for GSP claims at the time of the Agent's visit or at any other time or for any other reason.  The purpose of the Agent's visit to LB is not discernable from the public record.  *See id.*, **Appx01039-01040, Appx01044-01045.**  *See also* CBP's Secret Memoranda, **Appx07018-07038; Appx07040-07131; Appx07133-07176**. Plaintiffs had no role in CBP's audit of [

] and, throughout EAPA Inv. 7321, remained completely in the dark as to the context, parties, and statements from the unrelated proceeding referenced in the September 2019 memoranda, and upon which TRLED relied in its initial and final conclusions in EAPA 7321.

On August 10, 2020, Plaintiffs and Plaintiff-Intervenors timely requested an administrative review of TRLED's final determination.  19 U.S.C. §1517(f).  *See* USG/HH Rev. Req., **Appx44423-44459**; InterGlobal Forest and American Pacific Plywood Request for Administrative Review (Aug. 10, 2020), **Appx44461-44497** ("APPI/IGF Rev. Req."); and

LB Request for Review (Aug. 10, 2020), **Appx44499-44539** ("LBW Rev. Req.").

## 2. TRLED's Procedures Did Not Establish Substantial Evidence

TRLED disregarded the EAPA's mandate to base the agency's evasion determination on "substantial evidence." 19 U.S.C. §1517(c)(1)(A). Instead, TRLED defines the standard as an image of its own "reasonable mind" and whatever TRLED's mind might consider adequate to support a conclusion. TRLED Determination, **Appx01038**, n.32, *citing to A. L. Patterson, Inc. v. United States*, 585 F. App'x 778, 781-82 (Fed. Cir. 2014). TRLED did not consider the neutral, objective facets of "substantial evidence" that the Federal Circuit requires – a standard that is clearly more than the agency's subjective impression of adequate evidence. The substantial evidence standard "requires more than mere assertion of 'evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (*quoting Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951). The agency's determination cannot be based on "isolated tidbits of data

PUBLIC VERSION

which suggest a result contrary to the clear weight of the evidence.
*USX Corp. v. United States*, 11 CIT 82, 84, 655 F. Supp. 487, 489
(1987).

This case required a decision on the record.  For such cases, the
APA provides the following:  "A sanction may not be imposed or {an}
order issued except on consideration of the whole record or those parts
thereof cited by a party and supported by and in accordance with the
reliable, probative, and substantial evidence. . . ."  In such cases, "{a}
party is entitled to present his case or defense by oral or documentary
evidence, to submit rebuttal evidence, and to conduct such cross-
examination as may be required for a full and true disclosure of the
facts. . . ." APA, (5 U.S.C. §556(d)).  None of these standards were met.

The evidence on which the government's case is founded is based
on a patently incomplete observation, undertaken in a clandestine
manner, and uncorroborated by any concrete facts.  This is scarcely
"reliable, probative, and substantial," and, of course, there was no
timely opportunity to "submit rebuttal evidence" or otherwise
undertake steps to assess the veracity of the observation and falls short,

dramatically, of actual evidence.  As this Court has summarized:
"{t}heory will not suffice. The Court of Appeals has underscored this
principle, explaining that '{i}t is well established that speculation does
not constitute 'substantial evidence.'"" *Novosteel SA v. United States*,
284 F.3d 1261, 1276 (Fed. Cir. 2002). The Court of Appeals continued:
"As the Supreme Court noted in *Bowen v. American Hospital Ass'n*,
'agency deference has not come so far that agency action is upheld
whenever it is possible to conceive a basis for administrative action.'"
*Id., citing to Bowen v. Am. Hosp. Asso.,* 476 U.S. 610, 626 (1986); *see
also, e.g., Yangzhou Bestpak Gifts & Crafts*, 716 F.3d 1370, 1378 (Fed.
Cir. 2013) (noting that Commerce determinations cannot be based on
"mere conjecture or supposition").

Indeed, substantial evidence is measured by a review of the record
as a whole, "including whatever fairly detracts from the substantiality
of the evidence." *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556,
1562 (Fed. Cir. 1984).  Thus, a court is not barred from setting aside an
agency decision "when it cannot conscientiously find that the evidence
supporting that decision is substantial, when viewed in the light that
the record in its entirety furnishes, including the body of evidence

opposed to the {agency's} view." *Universal Camera Corp. v. NLRB*, 340

U.S. 474 (1951). In EAPA 7321, TRLED did not develop a complete

record to consider because Plaintiffs had no opportunity to comment on

and rebut the secret information that TRLED put on the record. Thus,

the process by which TRLED collected evidence that the agency deems

substantial is inherently and fatally flawed.

Although the EAPA statute indicates that this court apply the

"arbitrary and capricious" standard of review, the court is also asked to

review whether CBP's decisions are supported by substantial evidence.

19 U.S.C. §1517(g)(2)(A)&(B). The difference between an "arbitrary and

capricious" standard and "substantial evidence" standard of review is

difficult to discern. As Justice Scalia stated prior to his tenure on the

Supreme Court:

> {I}n their application to the requirement of factual support
> the substantial evidence test and the arbitrary or capricious
> test are one and the same. The former is only a specific
> application of the latter . . .. {I}t is not uncommon for parties
> to expend great effort in appeals before us to establish which
> of the two standards is applicable *where in fact their
> operation is precisely the same.*

*Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed.*

*Reserve Sys.*, 745 F.2d 677, 683 (D.C. Cir. 1984). {Emphasis added.}

83

The distinction between the substantial evidence test and the arbitrary and capricious test becomes unimportant in this case. The agency's failure to put forward, in advance, the potential of adverse action, any record of any kind, substantial or otherwise, is a fatal flaw. Adverse action without any meaningful record is by definition arbitrary and insubstantial. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971). Simply parroting a statute or regulation cannot and is not a "record" under any review standard where a record is required, *Gonzales v. Oregon*, 546 U.S. 243 (2006). The record in this case, like the process used, fails under any review standard. In *Devon Energy Prod. Co., L.P. v. Gould,* 421 F. Supp. 3d 1213, 1222 (D. Wy. 2019), the court found that "{b}ecause the arbitrary and capricious standard is 'a catch-all…' it enlists the substantial evidence test to analyze informal agency actions that are challenged for lacking substantial evidence."

The record of EAPA 7321 is devoid of any evidence that Plaintiff-Intervenors transshipped plywood from China and sold Chinese plywood to Plaintiffs or that Plaintiffs commingled Chinese plywood with Cambodian plywood. There's no evidence that Plaintiffs entered Covered Merchandise into the United States by false documents or

statements to evade the Orders.

### 3. Absent Substantial Evidence to Support its Conclusion of Evasion, TRLED's Commingling Theory is Unfounded.

TRLED bears the burden to prove, by substantial evidence, that Plaintiffs transshipped Covered Merchandise from China through Cambodia and on to the United States. This record fails to satisfy TRLED's burden. TRLED admitted that it could not show evasion. Rather, TRLED speculated that Plaintiff-Intervenors "likely" commingled Chinese plywood with their own plywood manufactured in Cambodia. TRLED Determination, **Appx01043, Appx01045, Appx01048, Appx01050**. TRLED's speculation that Plaintiff-Intervenors transshipped some plywood from China leads TRLED to speculate that Plaintiffs imported transshipped plywood, even though TRLED cited no specific entry of plywood, or entry document which supports TRLED's conclusion.

### a. TRLED Based its "Commingling" Theory on the Agent's June 6, 2018 Site Visit.

TRLED places undue weight in EAPA Inv. 7321 on the Secret Memoranda of the Agent who visited Plaintiff-Intervenors' manufacturing facilities on June 6, 2018. **Appx01039-01040,**

**Appx01043-01045, Appx01048-01050,** and **Appx07018-07038**. TRLED also put on the record requests for information and notices of action addressed to U.S. importers – NOT Plaintiffs - of engineered wood flooring. **Appx07040-07131; Appx07133-07176**. Plaintiffs and LB had no role whatsoever in CBP's GSP audit underlying the Secret Memoranda. The GSP audit was addressed to [     ] U.S. importers that [                                                                                    ]. The Agent evidently decided to drop in unannounced on LB. Plaintiffs cannot ascertain whether CBP conducted its GSP audit in accordance with 19 CFR §163.11 (CBP audit procedures).

Even now, when legal counsel has finally secured the opportunity to review CBP's confidential record of EAPA 7321, Plaintiffs' observations on the lack of substantial evidence remain valid. Moreover, the evidentiary value of CBP's June 6, 2018 site visit now appears even more dubious than before. As Plaintiffs IGF and APPI laid out in their request for administrative review:

> Notably, TRLED provides not one iota of evidence that substantiates the Agent's observations on the sophistication and production capacity of LB's plywood factory. . . . Respondents do not know what the Agent was looking at or

how the Agent came to the false conclusion that LB Wood's facilities, machinery, and labor force were too unsophisticated to produce the finished plywood that the CBP Agent observed on the companies' premises. *See* Resp. Case Br. at 17-19. Rather than disclose further details that could substantiate the veracity of any of the statements of the Agent, TRLED maintains that *further details or corroboration is not necessary because "[      ]'s position as CBP's [          ] for wood products utilizes her subject matter expertise on wood products. This position carries with it the ability to make authoritative pronouncements pertaining to whether wood products are in or out of scope."* Final Det. at 6, note 45. Holding forth such conclusory remarks as substantial evidence is unacceptable.

APPI/IGF Rev. Req., **Appx44484-44486**; full argument, **Appx44481-44487** citing to TRLED Determination, **Appx01039**; *see also* USG/HH Rev. Req., **Appx44443-44447,** and LBW Rev. Req., **Appx44519-44526**. The record is devoid of any information about the Agent's education, experience, cognitive ability, research, corroboration, reliance on outside sources, objectivity, and attention to detail. The Secret Memoranda offer no insight about the Agent's research on the equipment required for the production of plywood during and after her visit or sources to corroborate her conclusions.

The Agent does not claim to have reviewed any source documentation to support her conclusions about LB's machinery, work

force, production capacity, or the quality of the finished plywood she

observed.  The Agent did not assert that she observed any defects or

shortcomings in the plywood Happy Home was coating or in the flooring

they were making which would support a claim that Happy Home was

incapable of producing the "Chinese [        ]" plywood which is shown

being loaded in the photograph.  Similarly, when the Agent reportedly

visited LB's premises at an undisclosed time of day, the factory

reportedly "barely had any employees or much manufacturing" from

which she might determine the competence of LB's workforce.

**Appx07031**.

Cowan v. Bunting Glider is a case on point for considering the

evidentiary value of similar limited observations.  *Cowan v. Bunting*

*Glider* hinged on observations that the Workmen's Compensation Board

of Pennsylvania made on a site visit to the employer's premises.  The

court stated:

> Triers of fact, be they judges, jurors, viewers, board or
> commissions, may always visit and inspect the locus in quo to
> secure a better understanding of the evidence and to enable them
> to determine the relative weight of conflicting testimony. But a
> view cannot replace testimony; the visual observations of the trier
> cannot be substituted for testimony; and the only legitimate

purpose of an inspection is to illustrate the evidence and provide a base for understanding and comprehending testimony upon the record. When the arbiter becomes a witness without testifying, the purpose of the view is prostituted. . . .

It is a fundamental right, without which the prime essentials of a fair trial, according to Anglo-American standards of justice, are not preserved. The board, not less than the courts, must obey the indispensable basic mandates of our jurisprudence.

*Cowan v. Bunting Glider Co.*, 159 Pa. Super. 573, 575-76 (1946).

{Citations omitted.}  *See* discussion in Popper, Andrew F., *et al.*, *Administrative Law, A Contemporary Approach*, 4th ed. (2021) at 498-499; *see also Tarpley v. Hornyak*, 174 S.W.3d 736, 749 (Tenn. Ct. App. 2004) ("Any determination of factual issues in a case where a judge has taken an on-site view must be supported by significant and material evidence in the record.")  The administrative record in EAPA 7321 holds no significant or material evidence to support the Agent's observations. The Agent's "position" is not enough.

### b.  The Agency Record Disproves the Accuracy of CBP's Observations and Conclusions from the June 6, 2018 Site Visit.

Plaintiffs and Plaintiff-Intervenors submitted voluminous evidence for the record of EAPA 7321 documenting that both LB and Happy Home purchased sufficient raw materials, possessed sufficient

machinery, and hired sufficient employees to produce at their Cambodian plants the volume of plywood sold to Plaintiffs.  The photographs that LB provided to TRLED to demonstrate the company's production process and capacity show a sophisticated, fully operational plywood manufacturing plant.  *See* LBW Qre Rsp. at Ex. 14, **Appx27757-27773**.  Exhibit 14 provides 15 pictures of LB's plant and machinery.  Each picture represents one production step, showing the machinery used for each step together with a caption stating the production volume of each machine involved in that particular step for one shift, one day, and one month.  *See also* LBW Ex. 15 & 16, **Appx27774-27786**, showing the company's factory layout and production instructions; *and* APPI Qre Rsp. at 3-4 and Ex. 4 & 5, **Appx07399-07400, Appx07441-07449**, documenting APPI's visit to LB in October 2018, including photographs; *and* IGF Qre Rsp. at 3-4 & Ex. 2, **Appx08979-08980, 09001-09020**, documenting IGF's visits to LB in March, July, and December 2018.  LB's production facility and capacity are also documented in the report and photographs by an independent consultant in IGF's Supp. Rsp. at Ex. SQ1-5, **Appx33164-33176**.  Happy Home likewise fully documented its production process and capacity in

text and photographs, demonstrating its capacity to produce sufficient plywood to meet its U.S. customer needs.  *See* HH Qre Rsp. at Ex. 13, **Appx22977-22995**.

To substantiate the actual production of the plywood sold to Plaintiffs, LB and Happy Home submitted their monthly trial balances and financial statements, bank statements, payroll sheets, all raw material and packing purchases, payments to suppliers, warehouse-in tickets, production reports, lists and number of employees, and raw material standard consumption calculations.  *See* LBW Qre Rsp. at Ex. 4-7, 10-16, **Appx30901**, **Appx29307-29516**, **Appx29521-30880**, **Appx27337-27787**; LBW Supp. Rsp. at Ex. SQ1-1, SQ1-2, SQ1-9 through SQ1-12, **Appx44363; Appx33178-33753, Appx38338-38800, Appx41036-44261, Appx33755-38336, Appx38802-40690, Appx40978-41034**; HH Qre Rsp. at Ex. 4-7 & 10-15, **Appx20442, Appx25269-25410, 25415-26617, 21538-33008**; HH Supp. Rsp. at Ex. SQ1-1, SQ1-2, SQ1-3, SQ1-7 through SQ1-10, **Appx32986, Appx31396-32692, Appx32784-32917**.

TRLED claims that LB and Happy Home each failed to thoroughly

document its production and capacity to produce plywood in the volume

exported to the United States.  TRLED Determination, **Appx01040,**

**Appx01045**.  TRLED rejected the companies' documentation and

production capacity calculation for each production step because "{*d}ue*

*to the significant incentive for bias*, machinery production figures are

unreliable when they originate from company personnel estimates and

lack substantiating evidence." **Appx01040, Appx01045.** {Emphasis

added.}  TRLED's conclusions are arbitrary and capricious because it

did not consider the calculations in connection with the actual

machinery pictured in Plaintiff-Intervenors' photos.  TRLED never even

mentioned the photos of Plaintiff-Intervenors' machinery in use during

the production of plywood, much less pointed out exactly what feature

of the machines led TRLED to believe that the companies' capacity

calculations were off the mark.

TRLED's presumption of bias and unreliability ignored the

documented proof that the companies purchased sufficient raw

materials, hired personnel, performed the production process, and

packaged the merchandise sufficient to produce the volume of

merchandise sold.  The production documents confirm that the

companies possessed sufficient manufacturing capacity and quality to produce all of the merchandise sold to the U.S.

Finally, Plaintiff-Intervenors had no incentive whatsoever to provide erroneous production and capacity figures. Plaintiff-Intervenors furnished their calculations and photographs expecting TRLED to audit their data during an on-site verification in Cambodia. Meanwhile, TRLED had it completely in its own power to compare the observations and photographs it received from the Agent about the June 6, 2018 visits to Plaintiff-Intervenors and compare them with the photographs and data that Plaintiff-Intervenors provided to TRLED. Plaintiffs and Plaintiff-Intervenors never saw the Agent's photographs, lacked access to the Secret Memoranda, and had no opportunity to rebut or explain what the Agent was looking at, the purpose of her visit, or the [in]accuracy of her conclusions.

The difference between Plaintiff-Intervenors' photos of their production operations and the photos that TRLED put on the confidential record from CBP's June 6, 2018 visit is startling. *Compare* LBW Qre Rsp at Ex. 14, **Appx27758-27773** *and* HH Qre Rsp at Ex. 13,

**Appx22977-22995** *with* TRLED's Sept. 12, 2019 Memo, **Appx07018-07038**.  For ease of reference, Plaintiffs have attached the Secret Memoranda as **Attachment 1,** LB's Exhibit 14 as **Attachment 2**, and Happy Home's Exhibit 13 as **Attachment 3**.

As will be detailed in Plaintiff-Intervenors' brief, before the Agent's whirlwind visit, LB had acquired, installed, and utilized four hot press machines, four cold press machines, one edge cutting machine, two layup lines, two sanding machines, one polishing machine, several glue machines, two rotary cut machines, one boiler, two dry lines, one UV line, and many smaller machines and pieces of equipment.  Yet, the photographs from CBP's site visits suggest that the only machinery or equipment the Agent was interested in and photographed was the UV coating equipment at each facility.  It appears that the Agent either (1) viewed only one small workshop at LB's premises or (2) if the Agent took more photographs at both factories, the Agent selectively delivered to TRLED only those photographs which might support TRLED's hypothesis that LB could not produce "Chinese quality" plywood.  Concepts of ordinary fairness and procedural due process require that Plaintiffs have access to each,

every, and all other photographs which the Agent may have taken while visiting the factories.

Moreover, the photographs purporting to show deficiencies in the UV line at LB and the Agent's characterization of the equipment fail to support TRLED's narrative that the LB was incapable of producing "Chinese quality" hardwood plywood.  The Agent mischaracterized LB's UV line as being "broken up into multiple pieces" and "covered in a thick layer of dust." **Appx07031**.  The Agent's disingenuous description makes the LB's UV line sound like a pile of junk.  In reality, rather than having continuous conveyor belts, there were merely small gaps between units which were easily bridged when a piece of plywood was slid from one piece of equipment to another. **Appx07032-Appx07035**. The thin layer of sawdust is merely the residue from polishing one piece of plywood before moving it on to the next station.

The Agent's photographs of the operating Happy Home UV line which are supposed to support the Agent's assessment actually undermine TRLED's ultimate conclusion.  Close comparison of the photographs from Happy Home (**Appx07021, Appx07022**) and LB

PUBLIC VERSION

(**Appx07032-Appx07035**) shows that both UV lines are virtually identical in terms of the type of equipment they utilize and the condition and status of that equipment. LB's equipment appears to be just as serviceable as that of Happy Home. The only difference is that the Happy Home UV line was *operating* at the time of the visit. While the LB UV line was *operational* at the time of the visit, it was just not *operating* when the Agent took her picture.

The unannounced visit to LB occurred months before LB had notice of any transshipment claim by the Coalition or any investigation by TRLED. While the surprise visit found ample quantities of veneers ready for processing, it found no smoking gun in the form of plywood from shipping containers received from China being unpacked only to have their contents repackaged to show Cambodian origin before being sent to the U.S.

The mere composition of plywood does not determine the country of origin. By acknowledging that she did not observe employees actively working at LB, the Agent necessarily concedes that she lacks any foundation to comment on the quality of the UV plywood being

produced at LB precisely because she visited the factory in between production runs requiring the operation of the UV line.

Moreover, the Agent did not assert that she possessed experience in operating the machinery in question or managing a plywood plant, unlike the foreign producers, who operated that very equipment and provided probative data on their production capacity.  Indeed, the Agent admitted that "[

].”

**Appx07021-07022**.

During the EAPA 7321 administrative proceeding, TRLED was the sole participant privy to all of the record evidence on Plaintiff-Intervenors’ production capacity, and it was incumbent upon TRLED to weigh the evidence and present a rational justification for its conclusions.  The mere claim that Plaintiff-Intervenors were "biased" because they reported on their own production process and capacity, as they were asked to do, cannot stand as ipse dixit substantial evidence of bias.  CBP failed to advise Plaintiff-Intervenors that their own statements and documentation concerning their production operations

would be given no credence in the investigation—an arbitrary proposition indeed.  TRLED's presumptions of bias and unreliability are not only arbitrary and capricious, but they are also egregious in this case.

### c. TRLED's Analyses of Plaintiffs' and Plaintiff-Intervenors' Production and Sales Records are Flawed and Without Merit.

TRLED contended that Plaintiffs and Plaintiff-Intervenors' production and sales documents revealed discrepancies which allegedly rendered the respondents' documentation unreliable, yet TRLED never sought clarification.  *See* TRLED Determination, **Appx01040-01043, Appx01044, Appx01045-01049**.  Plaintiffs and Plaintiff-Intervenors subsequently responded to and explained each and every one of TRLED's perceived discrepancies in their briefs requesting administrative review of TRLED's determination.  *See* APPI/IGF Rev. Req., **Appx44487-44495**; USG/HH Rev. Req., **Appx44447-44456**; LBW Rev. Req., **Appx44526-44531**.

### i. Reconciliation of LB's Payroll Sheets with Balance Sheets

TRLED claims that that LB's payroll sheets do not match its balance sheet.  **Appx01041**.  Although Plaintiffs and LB do not know

from the public version of TRLED's determination exactly what TRLED

was comparing, LB responded in its request for administrative review

that the figures found on LB's monthly payroll sheets reconcile with the

current credit amount of the salary payable account in LB's monthly

trial balances found in LB's Supp. Rsp. at Ex. SQ1-3, **Appx40691-40789**.

*See* LBW Rev. Req., **Appx44527-44529** and **Att. 1**, **Appx44536-44539**.

LB provided a full reconciliation of its payroll sheets to its trial balances

in the attachment to its brief.

### ii. Reconciliation of LB's Veneer Consumption with Production Volume

TRLED questioned how LB's consumption of veneer reconciled

with the company's production volume. **Appx01041**. Again, it was not

clear from TRLED's public determination exactly what TRLED was

looking at, but LB explained at length the process of adding veneer to

its inventory and selecting veneer sheets for production and its

recordkeeping with warehouse-in and warehouse-out tickets. LBW Rev.

Req., **Appx44529-44531**.

### iii. Selected Entries – Matching LB's Purchases of Raw Materials to Production Runs

TRLED then selected six specific entries of merchandise that LB

produced and Plaintiffs APPI and IGF imported into the U.S. for closer analysis.  TRLED Determination, **Appx01042-01043**.  Plaintiffs APPI and IGF answered every question regarding these entries, matching LB's production documents according to Plaintiffs' purchase orders.  TRLED also expressed disgruntlement that Plaintiffs did not tie specific purchases of raw materials to the production of plywood for a specific purchase order.  **Appx01042-01043**.  Plaintiffs explained that LB purchased raw materials in bulk to cover its anticipated requirements for future plywood orders, placed the raw materials into its general inventory, and withdrew the inputs as needed without recording the purchase details of the veneer, glue, sandpaper, or coating for a particular production run.  LB's standing inventory of raw materials ensured that it could timely deliver plywood in response to customers' purchase orders.  It is standard practice for companies that manufacture such generic merchandise as plywood.  APPI/IGF Rev. Req., **Appx44487-44488**.

CBP's theories and conclusions regarding manufacturers' normal practices concerning input and raw material inventory movement suggest that CBP may lack basic expertise in manufacturing practice.

Because Commerce must deal with costs of production in almost every antidumping proceeding, it has a regulation and standard practice of allocating input and raw material costs among similar products. 19 U.S.C. §1677b(f)(1)(A) provides special rules for calculation of cost of production and for calculation of constructed value, which states "{c}osts shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise. . . ." CBP failed to identify any GAAP rule in Cambodia or elsewhere which precluded such operational and accounting procedures. Furthermore, as this court sets forth in its analysis of allocated costs in *Myland* "{c}onsumption is theoretically determined by examining opening materials inventory, adding materials purchased during the period, and then subtracting the closing materials inventory. *Myland Indus., Ltd. v. United States*, 31 Ct. Int'l Trade 1696, 1697 (2007). *See also* LB's raw material standard consumption calculation in LBW Supp. Rsp at Ex. SQ1-12, **Appx41033-41034**.

CBP unreasonably demanded that LB's records trace each one of eighteen million veneers to its incorporation in a particular plywood panel.  LB submitted for the record of EAPA 7321 all of its veneer purchase documents, its warehouse-in tickets for inventory, warehouse-out tickets for consumption, and the company's financial statements recorded its total raw material costs.  LBW Qre Rsp. at Ex 4, 6, 12.1, 12.2, **Appx30901**, **Appx29307-29432**, **Appx29444-29495**, **Appx29806-30880**, **Appx27337-27706**; LBW Supp. Rsp. at Ex. SQ1-1 through SQ1-4, and SQ1-12, **Appx44363**, **Appx33178-33753**, **Appx38338-38800**, **Appx41036-44261**, **Appx33755-38336**, **33802-40820**, **Appx41033-41034**.  CBP never claimed that LB failed to keep its books and records in accordance with Cambodian GAAP.  CBP's claim that it was unable to tie LB's production records to its raw material records is immaterial, not an indication of the reliability of the company's books and records, and not proof of evasion of the Orders.

### iv. Selected Entries – LB's CARB Certifications

TRLED was also concerned that LB's CARB certification dates did not match the company's production dates.  TRLED Determination, **Appx01042-01043**.  In fact, most CARB certification dates did overlap

with LB's production dates.  Production of a complete purchase order

generally takes from 5 to 15 days.  LB usually takes a sample plywood

sheet from a production lot at the beginning of production and must

send it to the testing agency for CARB certification.  Sometimes, if a

purchase order is a rush job, LB must segregate its veneer and glue and

prepare a sample board for inspection and certification before actual

production begins.  *See* APPI/IGF Rev. Req., **Appx44488-44494**.  In

*Shelter Forest*, the court rejected a similar demand from Commerce

that the foreign producer prove that each plywood board imported

during the period of inquiry bore a CARB certified label.  *Shelter*

*Forest,* 497 F. Supp. 3d at 1396-1397.  The court reasoned: "Commerce

has not provided a sound basis for why it is reasonable to require

evidence of the actual labels or why it cannot accept other evidence that

a producer is certified and able to fulfill sales requests with CARB

compliant labels."

Similarly, CBP has not offered a sound reason as to why it would

expect Plaintiffs' CARB certifications from an outside testing facility to

overlap exactly with LB's production time to fulfill a complete

production order.  Plaintiffs' CARB certificates each bear the production

lot number for the certified production run.  *See* APPI Supp Rsp at Ex.

SQ1-7, **Appx31221-31233** and IGF Supp. Rsp. at Ex. SQ1-4, **Appx33062-33163**.  LB's production documents for each run match exactly with the

CARB certificates.  *See* LBW Supp. Rsp. at Ex SQ1-2, **Appx33386-33753, Appx38338-38800, Appx41036-44261, Appx33755-38336, Appx33802-40690**.  LB produced a sample board from the inputs for

each production run, sent it to an outside testing agency, which

returned its report and certification as filed on the agency record.

There is no reason to expect that the date on which an outside agency

tests a sample board would overlap entirely with the multi-day

production run for a large production order. The CARB certifications

demonstrate that the producer produced CARB certified material from

glues that enable production to meet such standards.

TRLED also questioned Happy Home's payments and invoices,

attempted a reconciliation of Happy Home's payroll, and looked closely

at four USG entries of merchandise produced by Happy Home.  TRLED

Determination, **Appx01046-01048**.

### v. Happy Home's Reconciliation of Payroll with Balance Sheets

Happy Home first clarified the proper reconciliation of its payment records and invoices and of its payroll sheets, trial balances and monthly financial reports. USG/HH Rev. Req., **Appx44447-44449**. In particular, for the company's payroll reconciliation, Happy Home does not know what figures TRLED was looking at in finding discrepancies. Happy Home explained that the proper comparison was Happy Home's payroll sheets with the current credit column in the company's trial balances. *Id.*, **Appx44448-44449**.

### vi. Happy Home's Reported Entries

Regarding USG's entries, TRLED first claimed that USG did not report all of its entries of plywood manufactured by Happy Home. TRLED Determination, **Appx01046**. TRLED relied on entry data that TRLED did not disclose to Plaintiff USG or legal counsel under an APO. USG declared unequivocally that it had reported all of its imports of plywood manufactured by Happy Home. USG/HH Rev. Req., **Appx44449**. USG explained that it had entries of other merchandise from other producers and other countries, so perhaps CBP's entry data

105

included such imports.  Because TRLED did not make CBP's entry records for USG available to legal counsel under an administrative protective order, USG and legal counsel had no way to review CBP's records relevant to USG's entries.  *Id.*  Legal counsel knows for a fact, however, that CBP's entry records sometimes contain errors that might lead CBP to believe that certain entered shipments contained certain merchandise from a certain supplier, or that CBP interprets the entry information incorrectly, which a closer look at the entry documents reveals to be untrue.  As Plaintiffs mentioned in their written argument, this is a common occurrence in AD and CVD proceedings, where Commerce must solicit CBP for entry data to establish whether an administrative review should be continued or rescinded for exporters alleged to have made sales during the period of review.  *See* USG/HH Rev. Req., **Appx44449-44450**, referring to Plaintiffs Wr. Arg. at 26, **Appx44416**.  Without an APO in EAPA 7321, TRLED should have assumed that its records on the number of USG entries of plywood manufactured by Happy Home were not accurate.  TRLED erred in basing its decision on secret, unconfirmed, information and allegations.

### vii. Selected USG Entries

TRLED's main focus on the four USG entries reviewed were the following issues: (a) TRLED cannot tie Happy Home's payments received with USG's payment information or to the invoice; (b) Happy Home's monthly production records cannot be tied to a particular shipment or to the payment information; (c) the production records do not identify the manufacturer's name; and (d) the production records do not tie to raw material purchases.  TRLED Determination, **Appx01046-01048**.  Regarding the payment questions, USG explained that, in agreement with Happy Home, it made regular payments in lump sums on a rolling basis rather than against specific invoices, as is a common practice between a manufacturer and its customers to ensure that the producer has adequate funds to purchase raw materials and complete the production process before the finished merchandise is shipped. USG/HH Rev. Req., **Appx44451-44452**.

Concerning (b), TRLED's difficulty in tying particular production runs with specific purchase orders, Happy Home explained that it does not produce the plywood according to individual purchase orders. Rather, for efficiency, it produces larger production runs of a single type

of plywood with certain dimensions for finished plywood inventory.

Happy Home then produces a different plywood type with certain

dimensions for inventory, and so on.  When Happy Home receives a

purchase order for different types of plywood with specified dimensions,

Happy Home can quickly fill the order from its finished product

inventory.  *Id.,* **Appx44452-44453**.  Regarding TRLED's concerns under

(c) regarding Happy Home's name on its own production records,

TRLED did not explain why the company's *own* internal records must

all bear the company's name.

Regarding (d) on matching specific raw material purchases with

specific production runs, as explained above, USG confirms that Happy

Home's practice of taking inputs from inventory without recording the

purchase information or documentation for the specific input used is the

same as LB's discussed above.  As discussed, CBP was unreasonable in

assuming that Happy Home's records should trace a single purchased

veneer sheet to its incorporation in a particular plywood panel.  Happy

Home submitted for the record of EAPA 7321 all of its purchase

documents for wood materials, its warehouse-in tickets for inventory,

warehouse-out tickets for consumption, the company's financial

statements recording its total raw material costs, and its standard raw material consumption calculation.  HH Qre Rsp. at Ex 4, 6, and 11, **Appx25269-25343, Appx25359-25403, Appx25581-26617, Appx21538-22789**; LBW Supp. Rsp. at Ex. SQ1-1 through SQ1-4, and SQ1-10, **Appx33178-33753, Appx38338-38800, Appx41036-44261, Appx33755-38336, Appx33802-40820, Appx41017-41030**.  CBP never claimed that Happy Home failed to keep its books and record in accordance with Cambodian GAAP.  CBP's claim that it was unable to tie Happy Home's production records to its raw material records is immaterial, not an indication of the reliability of the company's books and records, and not proof of evasion of the Orders.

In sum, all of the issues that TRLED discussed in its determination could have been resolved during the investigation if TRLED had timely informed the parties of its concerns.

### d.  Plaintiff-Intervenors' Motive and Opportunity to Produce Plywood in Cambodia

TRLED speculates that AD/CVD duties on Chinese plywood, the location of Plaintiff-Intervenors' manufacturing facilities, the Chinese ownership (LB), and purchase of raw materials from Chinese suppliers

(Happy Home) indicate evasion of the Orders.  TRLED Determination,

**Appx01038, Appx01044**.  None of these factors lead to a conclusion of

evasion.  Commerce's high dumping margins are on appeal at this

court, which has found Commerce's high AD margin calculation to be

unlawful and unsupported by substantial evidence. *See Linyi Chengen*

*Imp. & Exp. Co. v. United States*, 487 F. Supp. 3d 1349, 1358-1359 (Ct.

Int'l Trade 2020) (sustaining a 0.00% AD margin for the mandatory

respondent in the AD investigation of hardwood plywood from China

and remanding for consideration a third time the reduced margin of

57.36% for cooperating respondents not controlled by the Chinese

government).  Further, TRLED's enforcement actions based on

disapproval of Chinese ownership of enterprises in foreign countries or

of third-country manufacturers sourcing their raw materials from

China (as do many U.S. enterprises) is an unconscionable overreach of

U.S. agency authority.  *See also* Plaintiffs and Defendant-Intervenors

rebuttal of TRLED's arguments on motive and opportunity in their

requests for administrative review.  USG/HH Rev. Req., **Appx44439-**

**44442**; APPI/IGF Rev. Req., **Appx44477-44481**; LBW Rev. Req.

**Appx44516-44519**.  Nation bias does not equate to evasion.

**e. TRLED's General Trade Data is Flawed and Cannot Stand as Substantial Evidence.**

In their case brief, Plaintiffs demonstrated that the trade data that the Coalition and TRLED put on the record, and upon which TRLED relied in its Initiation Notice is unreliable.  *See* Coalition re: Request for an Investigation of U.S. Global Forest, Inc. Under the Enforce and Protect Act (May 10, 2019) at 8-10 and Ex. 5 (UN FAOStat Forestry Yearbook 2016); Ex. 6 (Chinese Export Statistics); and Ex. 7, (USITC Data); **Appx01679-01680, Appx01686, Appx01710-01726** and CBP Memorandum, Adding Information to the Administrative Record of EAPA Cons. Case 7321, 2017 Forestry Yearbook (Jan. 9, 2020) ("2017 FAOStat YB"), **Appx44693**.  *See also* Interim Measures Notice, **Appx01021-01025** and Wr. Arg., **Appx44395-44398**.  Plaintiffs pointed out that the 2017 FAOStat Yearbook reports Cambodia's total plywood exports to the entire world in 2017 as 4,000m$^3$, whereas the ITC's trade statistics report 20,452m$^3$ for plywood imports from Cambodia just to the United States in 2017.  *Compare* 2017 FAOStat YB, **Appx44933** *with* Coalition Ex. 7, **Appx01726**.  The 2017 Forestry Yearbook also reports a much lower figure of plywood imports from the whole world at

70,000 m$^3$ than the Chinese statistics[4] on exports from China alone to Cambodia reports at 106,267 m$^3$.  *Compare* 2017 FAOStat YB, **Appx44931** *with* Coalition Ex. 6, **Appx01721**. Concerning exports of plywood from China to the United States in 2018, the Coalition's Exhibit 6 shows that China exported far more plywood to the U.S. at 1,137,071 m$^3$ than the U.S. imported: 151,288 m$^3$.  *Compare* Coalition's Ex. 6, **Appx01721**, *with* the Coalition's Ex. 7, **Appx01726**.  Wr. Arg., **Appx44397-44398**.

In its Final Determination, TRLED remained steadfast, clinging to its Cambodian production data, which shows total production of plywood in both 2016 and 2017 as 27,000 m$^3$.  TRLED stated that "{w}hether some of its {FAOStat's} figures are identical to Chinese export statistics or United States' import statistics does not necessarily indicate unreliability but rather another data source. Because the FAO's Forestry Yearbook sources its production figures directly from the Cambodian government, and the Cambodian government possesses the expertise and geographic proximity to most efficiently collect

---

[4] The Coalition's Chinese Export Statistics provided no source citation.

Cambodian plywood production figures, the figures are authoritative and reliable for our investigation's purposes."  TRLED Determination, **Appx01049**.

Regarding the official nature of the Cambodian statistics, the UN FAOStat online database indicates that plywood production and other trade data for Cambodia are *unofficial* and NOT from the Cambodia Government but rather represent FAO's own estimates.  *See* FAOStat webpage: "Forestry Production and Trade, available at "http://www.fao.org/faostat/en/#data/FO" (last accessed June 23, 2021). As shown on FAOStat's webpage, all of the Cambodian import and export data for 2016-2019 are unofficial figures and cannot be reconciled with the Chinese trade data or the U.S. trade data from the ITC.  Such statistics cannot be the basis for concluding that Plaintiff-Intervenors could not have produced plywood in the quantities on the record of EAPA 7321.  Such generic information, and, in particular, fatally flawed trade data, can never serve as an indictment of an individual company's production and sales practice.  CBP cannot rely on this data as substantial evidence of evasion.

Moreover, the trade courts do not condone an agency's refusal to

consider conflicting information in its determinations.  In *Solar World Ams.*, for instance, the U.S. Court of Appeals for the Federal Circuit overturned Commerce's antidumping administrative review decision in *Crystalline Silicon Photovoltaic Cells from China*, where Commerce found the Thai import data published by the Global Trade Atlas (GTA) reliable even though it did not reconcile with other data placed on the record.  *SolarWorld Ams., Inc. v. United States*, 962 F.3d 1351 (Fed. Cir. 2020).  The Court of Appeal stated:

> Commerce has also failed to explain how the Thai GTA data can be reconciled with data from the United States International Trade Commission's ("ITC") Dataweb website, which records exports from the United States to other countries. …

> The ITC data and the Thai GTA data cannot both be correct, as Commerce appears to admit. Commerce has not explained why the Thai GTA data is a more accurate record of these transactions than the ITC data, admitting that it "just do[es]n't know" which is accurate. …

> [] Commerce's preference for GTA data does not excuse its failure to reconcile the admitted inconsistency.

*See id.*, 962 F.3d 1351, 1358 (internal citation omitted).  As in *SolarWorld*, TRLED made no attempt to reconcile the plywood production, import, and export data where each source conflicts with every other source.  It only arbitrarily cherry-picked the source that

appeared to support its position in this instance. **Appx01049**.

Furthermore, critically missing from the data and TRLED's calculation is Cambodian domestic consumption. Without that figure, neither the Alleger (whose entire allegation is based on the flawed data) nor TRLED can draw any reasonable conclusion that any transshipment was occurring, much less transshipment by LB or Happy Home.

     **f.  TRLED's Reliance on Secret Information from an Unrelated Proceeding Must Be Rejected.**

Respondents strenuously object to TRLED's reliance on undisclosed statements from unknown parties in a proceeding unrelated to this instant investigation.  TRLED includes the following incomprehensible rendition of what Plaintiffs presume TRLED believes to be a discussion of substantial evidence:

> Happy Home claimed that it produced plywood from individual veneers.[129] However, other evidence on the record indicates that it also produced plywood from [      ] imported from [ ] as well.[130]  Additionally, contracts translated from [      ] indicate that Happy Home purchased "[      ]" from a [ ] supplier named [      ].[131] Though the contract indicates "[          ]," several other documents associated with these raw material purchases, such as the [ ] indicate that Happy Home imported "[      ]" into Cambodia from [      ].[132] Furthermore, apart from the translation of the contract's [          ], there is no indication that the "[  ]" was [    ]. If the [        ] are

> taken at face value, Happy Home imported completed [ ] plywood that it could comingle *[sic]* with any Cambodian-origin plywood.

TRLED Determination, **Appx01048**.  From the public version of its determination made available to them, Plaintiffs have no idea what TRLED is referring to.  TRLED references the Secret Memoranda in note 130.  In notes 131 and 132, TRLED cites to Happy Home's Exhibit 11, including specific pages in Exhibit 11.  These pages include documentation on raw material purchases and transportation, which Happy Home also listed on its summary spreadsheet in Exhibit 11.  The cited pages do not provide information that fits into the above paragraph.  Such an incomprehensible mélange of evidence and argument cannot constitute "substantial" evidence.

Only now can Plaintiffs' counsel view the confidential information and respond to TRLED's allegations, but the opportunity for Plaintiffs and Plaintiff-Intervenors to rebut TRLED's findings and conclusions during the agency's EAPA 7321 has lapsed.  Plaintiffs request that the Court disregard all "evidence" upon which TRLED heretofore failed to disclose to Plaintiffs or legal counsel.

## C. ORR Improperly Applied the Substantial Evidence Standard in its De Novo Review and Final Determination.

On August 10, 2020, Plaintiffs and Plaintiff-Intervenors timely requested an administrative review of TRLED's final determination as authorized by 19 U.S.C. §1517(f).  In its administrative review decision, ORR acknowledged receipt of the review requests and supporting briefs filed by Plaintiff-Intervenors but elected to disregard their briefs because they were not parties to the EAPA investigation as defined by 19 CFR §§165.1 & 165.41(a). **Appx01053**.

### 1. Plaintiff-Intervenors' Right to Comment on TRLED's Determination Before ORR

The EAPA statute authorizes only U.S. importers and the alleger to request an administrative review.  19 U.S.C. §1517(f)(1).  It neither provides details regarding the form or requirements for administrative review requests nor limits supporting briefs to only U.S. importers and the alleger.  While CBP's interpretive rules masquerading as "regulations" arbitrarily claim the right to obtain information from parties other than the U.S. importers and allegers, they simultaneously deny such parties any right to participate in the proceed because they are not "parties to the investigation" (a term unilaterally created and

117

defined by CBP in §165.1).  *See* CBP Intro to EAPA Regs, 81 Fed. Reg. 56,477, 56,479; *see also* 19 CFR §165.23(a)(3).

The Plaintiff-Intervenors' role in EAPA 7321 far exceeds that of mere witnesses.  Nothing in this record suggest Plaintiffs purposefully participated in any evasion scheme.  Indeed, ORR clarifies in its decision that "the statutory definition of 'evasion' does not require an intentional or purposeful attempt to avoid duties, nor does the statute provide for reasonable care as a defense to evasion."  ORR Decision, **Appx01064**.  Only now do Plaintiffs have the opportunity to comment on whether TRLED should have found guilty them guilty of evasion notwithstanding their due diligence in visiting Plaintiff-Intervenors' manufacturing facilities and confirming that Plaintiff-Intervenors had the production capacity, manpower, and technical capabilities to manufacture plywood in Cambodia of the quality and in the quantity Plaintiffs required.  *See* APPI Qre Rsp. at 3-4 & Ex. 2-5, **Appx07399-07400, Appx07427-07449**; IGF Qre Rsp at 3-4 & Ex. 2, **Appx09001-09025, Appx09001-09025**, and USG Qre Rsp. at 3 & Ex. 2, **Appx.20352, Appx18210-18211.**

CBP placed culpability squarely at the feet of Plaintiff-

Intervenors, claiming that these companies had motive and opportunity

to transship Chinese plywood through Cambodia to the U.S.  ORR

Decision, **Appx01065-01066 & Appx01066-01067**.  Further, CBP

claimed the Plaintiff-Intervenors could not prove through their books

and records that they did not transship Chinese plywood or, at the very

least, commingle Chinese plywood with Cambodian plywood.  CBP

therefore maintains that it established that Plaintiff-Intervenors were

guilty of evasion, yet Plaintiffs, through no fault of their own, are to

bear the consequences of Plaintiff-Intervenors' allegedly fraudulent

activities.  *Id.*, **Appx01072-01073**.

Plaintiffs maintain that Plaintiff-Intervenors have the right under

U.S. due process law to defend the integrity of their business

operations, books and records, and their business relations with

Plaintiffs.  As the immediate holders of the evidence required to rebut

the evasion allegation, Plaintiff-Intervenors are uniquely positioned to

provide CBP with relevant information.  The restrictions on Plaintiff-

Intervenors' participation in EAPA resulted in the exclusion of relevant

information which exacerbated the likelihood that CBP would draw

erroneous inferences and reach erroneous decisions in this case EAPA 7321.

For instance, as provided in 19 CFR §165.41, a request for an administrative review is a 30-page brief that sets forth the procedural history, facts, and argument of the party.  Thus, the brief that LB provided to ORR to support Plaintiffs' request for administrative review (inaccurately designated as LB's own request for review) contained crucial arguments rebutting TRLED findings regarding LB's raw material purchases, production, inventory, payroll, and financial statements.  LB also rebutted TRLED's conclusions based on the visit described in the Secret Memoranda, a visit to which only LB was privy.

Because this court owes no deference to CBP's interpretive regulations and the silence of the EAPA statute on the extent of the foreign producers' and exporters' role in EAPA investigations, Plaintiffs ask the Court to find that ORR's disregard of Plaintiff-Intervenors' brief was arbitrary and unacceptable.

## 2.  Plaintiffs' Requests for Administrative Review

Plaintiffs have shown that TRLED's reliance on the Secret

Memoranda was procedurally and factually flawed and that TRLED's

findings and conclusions from the visit were not based on substantial

evidence.  APPI/IGF Rev. Req., **Appx44481-44487**; USG/HH Rev. Req.,

**Appx44443-44447, Appx44458-44459**.  Plaintiffs rebutted TRLED's

analysis of alleged discrepancies in sales records and production

records, including the sample entries which TRLED selected for in-

depth discussion.  APPI/IGF Rev. Req., **Appx44487-44495**; USG/HH

Rev. Req., **Appx44447-44456**.  Finally, Plaintiffs demonstrated that the

trade data upon which TRLED relied were unofficial statistics based

upon stale information. APPI/IGF Rev. Req., **Appx44495-44497**;

USG/HH Rev. Req., **Appx44456-44458**.

### 3.  ORR's Handling of Plaintiffs' Record Evidence

ORR concluded that, after a de novo review of the administrative

record, substantial evidence supported TRLED's findings of Plaintiffs'

evasion of the Orders in accordance with 19 U.S.C. §1517(f)(2).

Although ORR's decision quoted the factual and legal arguments that

Plaintiffs made in their briefs requesting review (ORR Decision,

**Appx01058-01063**) its threadbare "Administrative Review Analysis" did

not substantively address or weigh the merits of Plaintiffs factual and

PUBLIC VERSION

legal arguments.  *Id.*, **Appx01064-01072**.  Eschewing substantive analysis, ORR summarily dismissed Plaintiffs' lengthy arguments and detailed evidence and repeatedly derided them as mere "claims." **Appx01065**.  ORR ignored its obligation to examine the documents which inexorably proved the truth of the factual assertions by Plaintiffs and Plaintiff-Intervenors.  *See e.g.*, ORR Decision, **Appx01067**, referring dismissively to Plaintiffs' "claims" of their visits to LB, with no reference to the photographs that Plaintiffs APPI and IGF took to document their visits.  *See* APPI Qre Rsp. at Exhibits 4 and 5, **Appx07441-07449**; IGF Qre Rsp. at Exhibit 2, **Appx09001-09025**. Neither did ORR mention that the photographs that LB submitted in its questionnaire response documenting the company's production equipment and production capacity supported APPI's and IGF's "claims" of their visit.  *See* LBW Qre Rsp. at Ex. 14, **Appx27757-27773**; HH Qre Rsp. at Ex. 13, **Appx22977-22995**, attached hereto as **Attachments 2 & 3**.

Without explanation, ORR asserted that LB's ownership structure and supply chain for raw materials rendered Plaintiff-Intervenors'

"assertions" unreliable, ignoring LB's documentation of production in Cambodia.  ORR Decision, **Appx01065-01066**.

Most notably, ORR did not evaluate and weigh Plaintiffs' rebuttal of alleged discrepancies in ten specific entries that TRLED selected for detailed analysis.  Neither did ORR acknowledge, let alone evaluate, Plaintiffs' record evidence supporting their arguments.  ORR's summary of TRLED's allegations of "discrepancies" patently ignored Plaintiffs' rebuttal.  ORR clearly conducted no *de novo* review of the record as mandated by 19 U.S.C. §1517(f)(1).  *See* ORR Decision, **Appx01070-01072**.

ORR was compelled by the substantial evidence standard to support its conclusions and findings after consideration of the whole record.  ORR utterly failed to do so.  Instead, ORR based its findings and conclusions on isolated tidbits of information as opposed to the clear weight of the evidence.  *USX Corp. v. United States*, 655 F. Supp. 487, 489 (Ct. Int'l Trade 1987).

### 4. ORR's Continued Reliance on CBP's Site Visit

ORR places inordinate weight on the brief email exchange

regarding CBP's June 6, 2018 visits to Plaintiff-Intervenors' facilities and the photographs the Agent took at that time. *Compare* **Attachment 1** with **Attachments 2 and 3**. ORR's main argument for finding evasion is: "{t}he results of the CBP visit and the actions taken by CBP after said June 6, 2018 visit to both Happy Home and LB provide evidence substantiating the finding of evasion. Basically, CBP was able to observe that the processing in Cambodia was not sufficient to manufacture the goods observed on-site . . . ." ORR Decision, **Appx01067**. ORR claims further that "the best evidence of what was actually occurring at Happy Home's manufacturing facilities are the observations of CBP during the June 6, 2018 site visit, as buttressed by the trade data, . . .." **Appx01069**. For the reasons detailed above in Section B of this brief, the Agents' observations alone cannot stand as sufficient evidence to support a finding of evasion without further documentary evidence that supports the Agent's conclusions. The record of EAPA 7321 contains no such supporting evidence.

### 5. ORR's New Allegations Against Happy Home

Unable to fault Plaintiffs' rebuttal of TRLED's claims of record discrepancies, ORR contrived new allegations purporting to support a

chimerical finding of evasion.  ORR's new claims were revealed to legal

counsel only through the confidential version of the record that CBP

filed in this litigation.  These allegations are: (1) Happy Home had [

], (**Appx01071, Appx01072**); and (2) Home Home's closure of

its Cambodian operations in 2020 prevented TRLED's verification visit

to the company. **Appx01069, Appx01072**.

Regarding Happy Home's purchases of [                    ], these were

made for the company's production of multilayered wood flooring, as

ORR itself acknowledged in its expansive characterization of the site

visit on June 6, 2018. **Appx01068**.  ORR's conclusion that Happy Home's

sales to the U.S. were imported as wood flooring and covered under

AD/CVD orders on multilayered flooring from China directly contradicts

ORR's conclusion that the same sales were entered as plywood subject

to the Orders on hardwood plywood from China.  Those conclusions are

mutually exclusive.  The Orders expressly exclude "multilayered wood

flooring." 83 Fed. Reg. 504, 512-513, Appendix, exclusion (3).  If CBP

reasonably found specific entries of multilayered flooring which

incorporated Happy Home's [                              ] in its

flooring, CBP cannot now claim that Happy Home used the same [     ] purchases of raw materials to incorporate into specific entries of plywood.  ORR's claim must be rejected as to any specific entry of plywood that Plaintiff USG purchased from Happy Home.

Second, ORR claims that TRLED's verification of Happy Home was stymied because Happy Home was no longer able to carry on its manufacturing operations after notice of CBP's EAPA Inv. 7321. **Appx01069, Appx01072**.  The fact that Happy Home had to close its Cambodian manufacturing operations is entirely unsurprising given the understandable reluctance of U.S. importers to purchase from the company after CBP accused Happy Home of evading the Orders on the basis of the flimsiest conjecture (*i.e.*, flawed partial trade data supplied by petitioner in the Plywood cases).  On January 31, 2020 counsel for Happy Home informed TRLED that Cambodia had imposed a 14-day quarantine on all travelers to Cambodia due to the COVID outbreak. *See* TRLED, Memorandum re: Adding Information to the Administrative Record of EAPA Cons. Case 7321 -Emails from Legal Counsel (Feb. 10, 2020), **Appx44379-44382**.

Obviously, these travel restrictions applied to TRLED's team as well as to legal counsel.  For that reason, counsel suggested that TRLED postpone its on-site verifications.  Counsel also informed TRLED that Happy Home had to close its operations, but that all records and documents were being held ready for verification.  The ultimate decision to postpone or cancel verification of Plaintiff-Intervenors rested with TRLED.  ORR cannot now pretend that Happy Home was not fully prepared to present all of its books and records for TRLED to verify.  ORR nevertheless claimed that it could not verify "what was going on at Happy Home" and, therefore, had to rely on the Agent's visit.  **Appx01069**.

ORR's statement implicitly admits that ORR did not consider the evidence Plaintiffs and Plaintiff-Intervenors submitted for the record of EAPA 7321.  For instance, ORR correctly notes that Plaintiffs IGF and APPI visited LB during the same timeframe as CBP visited the Cambodian manufacturing facilities.  **Appx01067**.  APPI and IGF made extensive photographic documents of the facilities' production equipment and processing, whereas CBP's agent concentrated her observations only on the companies' [                    ] and quality

of the finished plywood.  *Compare* **Attachment 1** with **Attachments 2 &
3**.

CBP did not explain why the Agent limited her observations to a
single operation.  Moreover, the agent admitted that she [

].  **Appx07021-
07022.**  Plaintiff-Intervenors' managers, on the other hand, had daily
experience with their production processes and must necessarily know
the production capacity of their machines and workforce in order to plan
their production runs to fulfill Plaintiffs' purchase orders.  Plaintiff-
Intervenors' production machinery is clearly depicted in the
photographic evidence on the record.  *See* APPI Qre Rsp. at Ex. 2, 4 & 5,
**Appx07427-07432; Appx07441-07449**; IGF Qre Rsp. at Ex. 2,
**Appx09001-09020**; LB Wood Qre Rsp. at Ex. 14, **Appx27757-27773**; HH
Qre Rsp. at Ex. 13, **Appx22977-22995.**  Plaintiffs' and Plaintiff-
Intervenors' photographic evidence clearly limits the utility of CBP's
photographic evidence.  Yet, during the investigation, neither the
companies nor legal counsel had access to CBP's photos or the
opportunity to comment on the stark difference between CBP's photos
and their own photos.  TRLED alone had full access to all photographic

128

evidence.  It was incumbent upon TRLED to clarify the discrepancy between CBP's limited observations and Plaintiffs' and Plaintiff-Intervenors' more complete and detailed submissions.  ORR's blunt dismissal of this and other documentary evidence that Plaintiffs and Plaintiff-Intervenors produced for the record as "{o}ther than the claims made by the Importers" (**Appx01065**) and its conclusory finding that "insufficient evidence in the form of production records to indicate that the manufacturers had the capacity to produce the plywood in the quantities and quality that was exported to the United States" cannot stand as a determination based on substantial evidence; rather it suggests ignorance employed to justify a preordained result. **Appx01065, Appx01068.**

The Agent expressly admitted that there were very few employees onsite at the time of her brief visit to LB.  **Appx07031.**  She could not have personally observed any defects in the quality of the product that LB's Cambodian employees could produce while working with Chinese veneers under the supervision of Chinese managers for consumption by U.S. customers who would reject any plywood that was not "Chinese quality."

129

PUBLIC VERSION

Blinding itself to all contradictory evidence, ORR failed to consider the whole record.  Therefore, its review decision is arbitrary and capricious. It appears that before any allegation against Plaintiffs was made, and one year before TRLED initiated EAPA Inv. 7321, CBP formed its own foregone conclusion that Plaintiff-Intervenors were transshipping plywood from China to Cambodia for export to the U.S., and no evidence to the contrary could change CBP's mind.

## VII.  CONCLUSION AND PRAYER FOR RELIEF

EAPA Inv. 7321 is a case that is marred by procedural deficiencies.  Further, no reasonable connection exists between the record facts and the conclusions that TRLED and ORR reached.

The Court should find that the procedural infirmities infecting in CBP's EAPA interpretive rules require CBP's corrective action to establish investigation procedures that do not violate the parties' rights to notice and opportunity to be heard.  For EAPA Inv. 7321, however, CBP has no means to correct those defects.  Given that CBP conducted EAPA Inv. 7321 based on defective procedures, the Court should order

PUBLIC VERSION

CBP to withdraw its determinations in this case and lift its enforcement measures against Plaintiffs.

Should the Court be unable to detect any due process violations or deficiencies in CBP's EAPA regulations, Plaintiffs request that the Court find that CBP's determinations were arbitrary and capricious. Because CBP did not consider the whole record, the determinations could not be based on substantial evidence.

Respectfully submitted,

/s/ Gregory S. Menegaz

Gregory S. Menegaz
J. Kevin Horgan
Alexandra H. Salzman*
DEKIEFFER & HORGAN, PLLC
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiff and Consolidated Plaintiffs*

Date: August 5, 2021

*Admitted to California Bar; practice supervised by attorneys of the firm who are active D.C. Bar members pursuant to D.C. Bar Rule 49(c)(8).

131

Attachment 1



1300 Pennsylvania Avenue NW
Washington, DC 20229

**U.S. Customs and
Border Protection**

**Public Version**

### Memo to the File

**EAPA Cases:** 7321, 7323, 7327

**Date:** September 12, 2019

**Re:** Adding Certain Documents to the Administrative Record

---

We are uploading the attached documents to the administrative records of EAPA cases 7321, 7323, and 7327. These documents concern the June 6, 2018, site visits that CBP personnel conducted at LB Wood Cambodia Co., Ltd.'s (LB Wood) and Cambodia Happy Home Wood Products Co. Ltd.'s (Happy Home) facilities in Cambodia.

<u>**Appx07018**</u>

| From: | [          ] |
| To: | [          ] |
| Cc: | [     ] [     ] |
| Subject: | RE: Happy Home photos |
| Date: | Friday, July 26, 2019 11:09:13 AM |

No, poplar and birch are not harvested in Cambodia.  But "Made in Cambodia" is a different issue.  "Made in Cambodia", based on 19 CFR 134 (19 USC 1304), is where manufacturing results in a substantial transformation of products.  So, a log may be harvested in China (4403, origin China), but sliced into veneers in Cambodia (4408, origin Cambodia).  A log and veneers are significantly different products, and, so, when the logs are changed into veneers, a substantial transformation takes place.  If the veneers were exported to the US, the c/o would be Cambodia.  If the veneers (4408, origin Cambodia) were shipped to Vietnam and made into plywood or flooring (4412, origin Vietnam), then the country of origin would be Vietnam.  Veneers are significantly different products from plywood, so, when made into plywood, a substantial transformation takes place, and where the plywood is made is the c/o.  The problem comes when you have Chinese plywood (4412) that goes to Cambodia and is clear-coated (4412), there is no substantial transformation, therefore, the C/O is still China.  If it's flooring and the plywood base goes from China to Cambodia, where they put a face ply on it, there is no substantial transformation and the C/O would remain China.  The Court of Appeals in Kahrs v. US determined that plywood (i.e., building material) and plywood flooring are not different products.  They both meet the definition of plywood in the ENs.  So, adding a face is not a substantial transformation, and no country change takes place.

So, you could make birch/poplar plywood in Cambodia, but the factories just aren't sophisticated enough to produce large quantities of "perfect" birch/poplar plywood.  Plus, those are temperate woods that wouldn't do well in tropical climates.  The only likely possibility is that the plywood was made in China.

[          ]

[          ]

[          ]

Customs and Border Protection

[          ]

[          ]

[          ]

[          ]

**From:** [          ]
**Sent:** Friday, July 26, 2019 9:51 AM
**To:** [          ]

**Cc:** [          ]
**Subject:** RE: Happy Home photos

[     ]

<u>Appx07019</u>

Thanks again for sending these photos. I recall you mentioned that Birch, White Birch, and Poplar plywood are typical Chinese products. Is it possible for those species to originate in Cambodia or do those species not grow there and thus, the "Made in Cambodia" labels on those products are definitely not accurate?

Thanks,
[        ]

**From:** [                              ]
**Sent:** Thursday, July 18, 2019 5:20 PM
**To:** [

_____          _____

_____

                    ]

**Subject:** Happy Home photos

This first email is photos from Happy Home. We did not see markings specifically for
[                    ]. We did, however, see pallets of [                              ] (typical
Chinese product, Chinese [                                        ].

Kh2 – pallet label
Kh3 – packed pallet with [          ] marking
Kh4 – another pallet label
Kh5 – only pallet with a name or product description, [                    ]
Kh6 – another packed pallet. I believe this one was just about to be loaded.
Kh7 – plywood stack. Looks too precise to be Cambodian. Very few voids or veneer overlaps. That requires sophisticated manufacturing which Happy Home didn't really have.
Kh8 – another stack. Same characteristics.
Kh9 – Employee and warehouse of plywood flooring blanks behind him. They appeared to be mostly engaged in making flooring. Oddly, they did have a
[                                                                        ]

HHUV1 and 2 - Happy Home did have a functioning [                    ]. I don't know how much they
were      actually      manufacturing      with      it.       In      the      photos,
[                                                              ].

[                    ]
[                              ]
Customs and Border Protection
[                        ]
[                          ]
[                    ]

**Appx07020**

PR 000718

PR 000719

**Page Redacted**

**Page Redacted**

**Page Redacted**

**Page Redacted**

**Page Redacted**

**Page Redacted**

**Page Redacted**

**Page Redacted**

**Page Redacted**

From:                    [          ]
To:                      [                                          ]
Subject:                 LB Wood photos
Date:                    Thursday, July 18, 2019 5:33:08 PM
Attachments:             [

                         ]

Kh10 – LB Wood had a [                    ] when we visited that was small, broken up into multiple
pieces, and was covered in a thick layer of dust.  Any [        ] plywood leaving that factory prior to
June 2018 was not [    ] there.
Kh11 – [          ]
Kh12 – [          ]
Kh13 – [          ] and, off to the right, strapped stacks of packed plywood for [          ]
Kh15 – stacked veneers
Kh17 – [          ] packaging on plywood pallets.  The label says "[          ]", meaning
[                ].
Kh18 – [              ] packaging that says "[                    ]", meaning [                    ].
Note, that, again, the plywood is clear of laps and voids.  This is a sophisticated product coming from
a factory that barely had any employees or much manufacturing.

[                    ]
[                              ]
Customs and Border Protection
[                              ]

[              ]
[              ]
[              ]
[              ]

PR 000720

Case 1:20-cv-03914-MMB · Document 30-6 · Filed 02/26/21 · Page 74 of 975

PR 000721

PR 000722

**Page Redacted**

**Page Redacted**

**Page Redacted**

**Page Redacted**

**Page Redacted**

Attachment 2

Exhibit 14

Production Flowchart and Photographs

PR 001495

EXHIBIT NOT SUSCEPTIBLE TO

PUBLIC SUMMARY

PR 001496

**Page Redacted**

**Page Redacted**

**Page Redacted**

**Page Redacted**

**Page Redacted**

**Page Redacted**

**Page Redacted**

**Page Redacted**

**Page Redacted**

**Page Redacted**

**Page Redacted**

**Page Redacted**

**Page Redacted**

**Page Redacted**

**Page Redacted**

Attachment 3

Exhibit 13

Production Flowchart and Photographs

PR 001393

PUBLIC VERSION

EXHIBIT NOT SUSCEPTIBLE TO

PUBLIC SUMMARY

PR 001394

**Page Redacted**

**Page Redacted**

**Page Redacted**

**Page Redacted**

**Page Redacted**

**Page Redacted**

**Page Redacted**

**Page Redacted**

**Page Redacted**

**Page Redacted**

**Page Redacted**

**Page Redacted**

**Page Redacted**

**Page Redacted**

**Page Redacted**

**Page Redacted**

**Page Redacted**

**Page Redacted**

Attachment 4

# Exhibit 12.1

# Imported Raw Material Purchases

PR 001457

**Exhibit 12.1 Imported Raw Material Purchases**
**LB Wood**

| Import Purchase Line Item | Material Type | Supplier | Material | Invoice No. | Date of Invoice | Quantity (M3) | Value | Currency |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

**Appx29807**

PR 001458

PUBLIC VERSION

THE FOLLOWING PAGES CONTAINED IN
THE CONFIDENTIAL VERSION OF THIS
EXHIBIT ARE PROPERLY SUMMARIZED
BY THE FOREGOING PAGES

PR 001459

**Page Redacted**

**Page Redacted**

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2007 using a proportionally spaced typeface (14 point Century font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth.  Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **23,992** words.  In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**DEKIEFFER & HORGAN, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiff and Consolidated Plaintiffs*