# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE M. MILLER BAKER

| | |
|---|---|
| AMERICAN PACIFIC PLYWOOD, INC., U.S. GLOBAL FOREST, INC. and INTERGLOBAL FOREST, LLC, <br>         Plaintiff and Consolidate Plaintiffs, <br><br> and <br><br> LB WOOD CAMBODIA CO., LTD. and CAMBODIAN HAPPY HOME WOOD PRODUCTS CO., LTD., <br>         Plaintiff-Intervenors, <br><br> v. <br><br> UNITED STATES, <br>         Defendant, <br><br> and <br><br> COALITION FOR FAIR TRADE IN HARDWOOD PLYWOOD, <br>         Defendant-Intervenor. | **PUBLIC VERSION** <br><br> Consol. Court 20-03914 |

## PLAINTIFF AMERICAN PACIFIC PLYWOOD, INC. AND CONSOLIDATED PLAINTIFF U.S. GLOBAL FOREST, INC., <u>REPLY BRIEF</u>

Gregory S. Menegaz
J. Kevin Horgan
Alexandra H. Salzman
Vivien Junghui Wang
**deKieffer & Horgan, PLLC**
Suite 410
1090 Vermont Ave, N.W.
Washington, D.C. 20005
*Counsel to Plaintiffs American Pacific Plywood, Inc, and U.S. Global Forest*

Dated: January 24, 2022

# TABLE OF CONTENTS

I.   INTRODUCTION...........................................................................1

II.   ARGUMENT .................................................................................4

    A.   Standard of Review and Deference to the Agency's
        Decision ...............................................................................4

        1. CBP's EAPA Regulations are Interpretive Rules
           Only to Which the Court Owes No Deference.................4

        2. The EAPA Statute's Silence on Procedural
           Safeguards Does Not Prevent Judicial Review of
           CBP's Violations of Due Process. ....................................6

        3. Plaintiffs' Due Process Rights Were Not
           Committed to Agency Discretion by Law (5 U.S.C.
           § 701(a)(2)). .....................................................................13

    B.   CBP's Due Process Deficiencies Were Not
        Reasonable ........................................................................15

        1. Plaintiffs' Protected Interests .......................................17

           a. Plaintiffs' Private Interest ....................................18

           b. Irreparable Harm ..................................................23

           c. Interim Measures as Temporary Measures;
              Judicial Review......................................................29

           d. The Government's Interest ....................................35

        2. The EAPA Statute and CBP's Regulations Do Not
           Limit Plaintiffs' Interests in Due Process.....................42

    C.   CBP's Evasion Determinations were Not Supported
        by Substantial Evidence. ...................................................44

1. Inadequacy of Public Summaries on the Agency Record to Establish Substantial Evidence ..................... 44

2. CBP Cancelled Verification of LB Wood and Happy Home Because of COVID-Related Travel Restrictions; Not Because Verification Was Not Possible or Fruitful. ....................................................... 48

3. Plaintiffs Supposed Selective Discussion of Record Evidence ......................................................... 55

III.   CONCLUSION .............................................................. 60

# TABLE OF AUTHORITIES

## CASES

*Advanced Sys. Tech., Inc. v. United States*, 69 Fed. Cl. 474, 484 (2006) ................................................................................... 22

*Algoma Steel Corp. v. United States*, 865 F.2d 240 (Fed. Cir. 1989) ........................................................................................ 34

*Am. Frozen Food Inst. v. United States*, 855 F. Supp. 388 (Ct. Int'l Trade 1994) ................................................................. 20

*Bauer v. DeVos*, 325 F. Supp. 3d 74 (D.D.C. 2018) ................................ 14

*Block v. Community Nutrition Institute*, 467 U.S. 340 (1984) ........ 22, 33

*Bluescope Steel v. United States*, No. 19-00057, 2021 Ct. Intl. Trade LEXIS 168 (Ct. Int'l Trade Nov. 30, 2021) ............................................. 57

*Bowe-Passat v. United States*, 17 Ct. Int'l Trade 335 (U.S. 1993) ... 57-58

*Calgon Carbon Corp. v. United States*, 145 F. Supp. 3d 1312 (Ct. Int'l Trade 2016) .................................................................................... 5

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ......................................................................................... 14

*CPC Int'l v. United States*, 896 F. Supp. 1240 (Ct. Int'l Trade 1995) ......................................................................................... 20

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020) ........................................................................... 14, 15

*Diamond Tools Tech LLC v. United States*, 2021 Ct. Intl. Trade LEXIS 155 ................................................. 29-32, 33, 45, 58-60

*Essar Steel Ltd. v. United States*, 678 F.3d 1268 (Fed. Cir. 2012) ......................................................................................... 9

*Vietnam Firewood Company Limited v. United States*, 466 F.Supp 3d 1273, 1284 (2020) ..................................................... 31

*FPC v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326 (1976) .............. 9

*Greene v. McElroy*, 360 U.S. 474 (1959) ................................................. 11

*Heckler v. Chaney*, 470 U.S. 821 (1985) ................................................ 14

*Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123 (1951) ....................................................................................................... 19

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019). .................................................. 43

*Kwo Lee, Inc. v. United States*, 24 F. Supp. 3d 1322 (Ct. Int'l Trade Oct. 16, 2014) ........................................................................ 20, 23

*Lincoln v. Vigil*, 508 U.S. 182 (1993) ...................................................... 14

*Londoner v. City and County of Denver,* 210 U.S. 373 (1908) ......... 19, 22

*Lone Star Steel Co. v. NLRB*, 766 F.2d 1459 (10th Cir. 1985).......... 51-52

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ....................... 17-18, 23-24, 30

*Micron Tech., Inc. v. United States*, 117 F.3d 1386 (Fed. Cir. 1997) .................................................................................................. 10, 11

*Mid Continent Nail Corp. v. United States*, 949 F. Supp. 2d 1247 (Ct. Int'l Trade 2013) ................................................................ 10

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) .......................................................................... 54

*New Am. Keg v. United States*, No. 20 - 00008, 2021 Ct. Intl. Trade LEXIS 34 (Ct. Int'l Trade Mar. 23, 2021) ................................... 28

*Pension Benefit Guar. Corp. v. The LTV Corp., Inc.*, 496 U.S. 633, 655, (1990) ....................................................................... 22

*Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015) ............................... 43

*PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 761 (Fed. Cir. 2012)...............................................................9

*Qingdao Taifa Grp. Co. v. United States*, 581 F.3d 1375 (Fed. Cir. 2009) .................................................................51

*Richardson v. Perales*, 402 U.S. 389 (1971)..................................2

*Royal Brush Mfg. v. United States*, 2021 Ct. Intl Trade LEXIS 153 ...............................................................................32, 33

*Sackett v. EPA,* 566 U.S. 120 (2012).................................32-33

*Shenzhen Xinboda Indus. Co. v. United States*, 456 F. Supp. 3d 1272 (Ct. Int'l Trade 2020) .......................................34

*SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312 (Fed. Cir. 2006) ....................................................................4

*Sumecht NA, Inc. v. United States*, 399 F. Supp. 3d 1370 (Ct. Int'l Trade 2019)...........................................................20-21

*United States v. Great Am. Ins. Co.*, 738 F.3d 1320 (Fed. Cir. 2013) ................................................................................4

*United States v. Morgan*, 313 U.S. 409 (1941) .....................54

*Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519 (1978) ...............................................42-43

*Zen Magnets, LLC v. Consumer Prod. Safety Comm'n*, 968 F.3d 1156 (10th Cir. 2020).......................................................53-54

## STATUTES

5 U.S.C. § 553(a)...............................................................42-43

5 U.S.C. § 553(b)...............................................................42-43

5 U.S.C. § 553(c) .................................................................. 42-43

5 U.S.C. § 555 ....................................................................... 21-22

5 U.S.C. § 701(a)(2) ............................................................. 13-15

5 U.S.C. § 704 ........................................................................ 30, 35

19 U.S.C. § 1504(c) ...................................................................6-7

19 U.S.C. § 1509 ..................................................................... 16

19 U.S.C. § 1517(a)(5) ........................................................... 58

19 U.S.C. § 1517(e) ................................................................ 36

19 U.S.C. § 1517(g) ........................................................... 31, 32

19 U.S.C. § 1677m(d) ............................................................ 57

19 U.S.C. § 1592 ................................................................58-59

19 U.S.C. § 1592a .................................................................. 59

19 U.S.C. § 2461 *et seq.*..................................................... 12

## REGULATIONS

19 CFR § 10.171 ..................................................................... 12

19 CFR § 163.11 ..................................................................... 29

## OTHER AUTHORITIES

Statement of Administrative Action (To accompany H.R. 826(I),
H.R. REP. 103-316, H.R. Rep. No. 316, 103rd Cong., 2nd Sess. 1994,
1994 WL 16137731, 1994 U.S.C.C.A.N. 4040 (Leg. Hist.) P.L. 103-
465, The Uruguay Round Agreements Act House Report No. 103-

316 (December 8, 1994) .................................................. 17, 38

Trade Facilitation and Trade Enforcement Act of 2015, Title IV,
"Prevention of Evasion of Antidumping and Countervailing Duty
Orders" ("TFTEA"), Sec. 411 ............................................. 38-39

# GLOSSARY OF TERMS

| | |
|---|---|
| APA | Administrative Procedures Act |
| APO | Administrative Protective Order |
| CBP | U.S. Customs and Border Protection |
| EAPA | Enforce and Protect Act |
| GSP | Generalized System of Preferences |
| ORR | Office of Trade, Regulations & Rulings |
| RFI | Request for Information |
| SAA | Statement of Administrative Action |
| TFTEA | Trade Facilitation and Trade Enforcement Act of 2015 |
| TRLED | Trade Remedy Law Enforcement Directorate |

## I.    INTRODUCTION

Consolidated Plaintiffs American Pacific Plywood, Inc. ("APPI")
and U.S. Global Forest, Inc. ("USG") (together, "Plaintiffs") hereby reply
to the response briefs of Defendant United States ("Defendant" or
"United States") and Defendant-Intervenor, the Coalition for Fair Trade
in Hardwood Plywood ("Defendant-Intervenor" or the "Coalition"). *See*
Defendant's Response in Opposition to Plaintiffs' and Plaintiff-
Intervenors' Motions for Judgment on the Agency Record (December 10,
2021) ("U.S. Rsp. Br."), ECF Doc. No. 55, and Coalition for Fair Trade in
Hardwood Plywood's Response Brief (December 30, 2021) ("Coalition
U.S. Customs and Border Protection. Br."), ECF Doc. No. 57.

In their moving brief, Plaintiffs argued that U.S. Customs and
Border Protection's ("CBP") regulations for investigating evasion under
the Enforce and Protect Act of 2015 ("EAPA") do not provide a legal
basis for CBP's enforcement actions because CBP issued its EAPA
regulations as interpretive rules that lack the force and effect of law.
5 U.S.C. §555, on the other hand, provides minimum due process
protections such as the right to legal counsel, timely notification of
impending enforcement actions, and the right to bring argument and

objections before an agency takes enforcement actions. Plaintiffs suffered injury to their businesses, losses for breach of contracts with their U.S. customers, and injury to their reputations and relations with U.S. customers that could have been avoided if CBP had timely notified Plaintiffs of the pending EAPA investigation. Plaintiff likewise had no opportunity to rebut and defend against the allegations of evasion so as to avoid enforcement measures altogether.

Further, the record evidence that CBP's Trade Remedy Law Enforcement Division ("TRLED") cited as establishing a reasonable suspicion of evasion is not specific to Plaintiffs and does not document any instance of Plaintiffs' evasion of the Orders. TRLED also failed to disclose other record evidence that the agency claims to have relied upon. Even after the interim measures were in place, Plaintiffs had no opportunity to rebut and defend against the purported record evidence to which Plaintiffs lacked access. *Richardson v. Perales*, 402 U.S. 389 (1971) (at minimum, any process affecting a cognizable interest should include a meaningful opportunity to confront the evidence or testimony to be used against that party). No rational basis exists for not disclosing a party's own confidential information to that party and for

not providing legal counsel access to confidential information under an administrative protective order ("APO") or similar protocol to adequately safeguard Plaintiffs' rights to be confronted with the evidence that was used to support the affirmative evasion decision.

TRLED's determination and the determination of CBP's Office of Regulations & Rulings ("ORR") finding evasion were arbitrary and capricious because they continued to rely on discredited and unreliable trade data as substantial information that was not in any respect specific to Plaintiffs or their Cambodian suppliers. CBP's decision to rely on undisclosed documents to find evasion was not in accordance with law and prevented Plaintiffs from developing a record of substantial evidence on critical issues for CBP to consider in its determinations *during CBP's investigation from its outset through to its completion* when such defense would have been appropriate, required by fundamental fairness, and most effective to stem undue harm to Plaintiffs. CBPs refusal to permit the targeted respondents' access to translators or counsel, or to allow disclosure of confidential information under an administrative protective order was an abuse of discretion.

## II.  ARGUMENT

### A.  Standard of Review and Deference to the Agency's Decision

#### 1.  CBP's EAPA Regulations are Interpretive Rules Only to Which the Court Owes No Deference.

In their response briefs, neither the Defendant United States nor Defendant-Intervenor, the Coalition, challenge Plaintiffs' argument that CBP's EAPA regulations are interpretive rules only to which the Court owes no deference.  Plaintiffs therefore ask the Court to consider any challenge to Plaintiffs' arguments on the nature and legal authority of CBP's EAPA regulations as waived.  "It is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived."  *United States v. Great Am. Ins. Co.*, 738 F.3d 1320, 1328 (Fed. Cir. 2013) (*citing SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) (collecting cases)).  This Court's Rules require that moving briefs, whether contesting or supporting the agency's determination, must include a statement of the issues presented, the authorities relied upon, and the conclusions of law warranted by the authorities.  USCIT Rule 56.2(c)(1)–(2).  In this case, the extent of the legal authority of CBP's EAPA regulations is not a

minor issue that Defendant may have overlooked or unintentionally waived. In such a case, where the Defendant and Defendant-Intervenors choose not to address the merits of the plaintiffs' arguments, the court has found that it is not proper to allow these parties the opportunity to defend their position. In *Calgon Carbon Corp.*, for instance, the Court stated: "{t}he government and petitioners had ample opportunity to address the arguments CAC made in its opening brief, but they made a decision not to do so. It would not be proper to allow these parties, after full briefing and oral argument, the belated opportunity to defend their position or address CAC's arguments on the merits." *Calgon Carbon Corp. v. United States*, 145 F. Supp. 3d 1312, 1321 (Ct. Int'l Trade 2016). Further, CBP cannot remedy its decisions and enforcement actions taken on the basis of interpretive rules that have no force of law by a simple remand requiring further explanation of the agency's actions. Instead, the Court must find that the United States has conceded that its enforcement actions taken without notice and opportunity for the Plaintiffs to defend themselves against the allegation of evasion were without a legal basis and therefore null and void.

The Court also owes no deference to any CBP action or decision based on its regulations. Defendant tacitly concedes that CBP's EAPA regulations cannot function as legal authority supporting the Court's deference to the agency's decisions. Rather, Defendant argues that CBP acted lawfully pursuant to its statutory authority because the EAPA statute is silent on when CBP must provide interested parties such as Plaintiffs notice of interim measures. U.S. Rsp. Br. at 26. Defendant's position is untenable. It cannot be law in the United States that a vague statute implies that there are no guardrails on Governmental conduct when investigating foreign and U.S. citizens for the purposes of assessing taxes on them. Rather, the Administrative Procedure Act ("APA") places fundamental guardrails on Government investigators that were completely ignored, with impunity, by the Government investigators in this case, as discussed further in the section below.

2. **The EAPA Statute's Silence on Procedural Safeguards Does Not Prevent Judicial Review of CBP's Violations of Due Process.**

In their response briefs, the United States and the Coalition argue that the EAPA statute itself, along with 19 U.S.C. § 1504(c), provide the basis for CBP's authority to decide the methods it uses to perform its

statutory obligations.  U.S. Rsp. Br. at 14–15, 29–30; Coalition Rsp. Br. at 14.

The United States and the Coalition reason that because Congress delegated the authority to carry out the dictates of the EAPA statute to CBP, the Court owes deference to CBP's methodological choices.  Such methodological choices include whether to allow Plaintiffs' legal counsel access to confidential information under an APO and when to provide notice to Plaintiffs of the initiation of the investigation and imposition of interim measures.  U.S. Rsp. Br. at 14–15, 29–30; Coalition Rsp. Br. at 14.  The U.S. and the Coalition are silent on the impropriety of CBP's surprise visits to Plaintiff-Intervenors with no opportunity for the producers' management to have their own translators or legal counsel bear witness to the Government's undisclosed investigative methods and conclusory findings.

Notably, the case authority upon which Defendant relies concerns investigative methodologies that the U.S. Department of Commerce ("Commerce") employs in their antidumping duty ("AD") and countervailing duty ("CVD") proceedings.  As Plaintiffs pointed out in their moving brief, Commerce conducts its AD/CVD proceedings under

strict procedural safeguards, including access of legal counsel to confidential information and ample notice of pending AD/CVD proceedings before Commerce can impose enforcement measures, including temporary or "preliminary" measures. *See, e.g.,* Plaintiff and Consolidated Plaintiffs American Pacific Plywood, Inc., U.S. Global Forest, Inc., and InterGlobal Forest, LLC Rule 56.2 Memorandum in Support of Motion for Judgment Upon the Agency Record (Aug. 5, 2021) at 34, 38–40, 54–58 ("Pl. R.56.2 Br"), ECF Doc. No. 48.

Plaintiffs note further that Commerce coordinates with counsel for the exporter to arrange on-site foreign visits and provides a detailed agenda of its investigative purpose seven days in advance of its visit in all cases. The Government investigators are represented by reputable translators (a short list of pre-approved locals) and the exporter is almost always represented by its own local and foreign counsel. Misinterpretation of the exporter's responses are commonplace; and it is also commonplace for that which is lost in translation to be clarified through amicable communications between exporter's counsels, the Government investigators, and the Government translators. No such "guardrails" were in place in this investigation.

With the exception of the Supreme Court's decision in *FPC v. Transcon Gas Pipe Line*, the cases upon which Defendant relies concern Commerce's discretion to employ specific methodologies to decide whether dumping or subsidies exist. *PSC VSMPO-Avisma* concerned the respondent's untimely submission of factual information regarding its accounting methodology and cost allocation. *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 761, 763 (Fed. Cir. 2012). *Essar Steel* likewise concerned the respondents' untimely submissions of factual information. *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1278 (Fed. Cir. 2012). In *FPC v. Transcon Gas Pipe Line,* the Supreme Court recognized that the court reviewing the decisions of the Federal Power Commission is vested with equity powers and "may authorize the Commission in proper cases to take new evidence," which will ordinarily require a remand to the agency to exercise its administrative discretion in deciding how to proceed in developing such evidence. *FPC v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976).

In doing so, however, the Court of Appeals' ability to fully and effectively review the administrative process regarding the implementation of curtailment plans and their underlying factual premises need not be relinquished. *Id.* at 334. *MidContinent Nail Corp.* concerned Commerce's selection of mandatory respondents as well as Commerce's treatment of entries of merchandise initially attributed to the wrong company. *Mid Continent Nail Corp. v. United States*, 949 F. Supp. 2d 1247, 1252 (Ct. Int'l Trade 2013). *Micron Tech* concerned Commerce's authority to decide its verification techniques where neither the AD/CVD statute nor Commerce's regulations provided details on procedures for Commerce to meet its verification requirements. *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1394–95 (Fed. Cir. 1997). Of course, the protections enumerated above were provided to respondents—advance notice of inspection, agenda for inspection, availability of counsel and translators for the exporter in that case and every one of tens, if not hundreds of thousands, Commerce on-site verifications these last 30 years.

In each of the above cases, the Court had to decide the extent of

the agency's discretion on highly fact-based issues, the particulars of which can vary from case to case. Nevertheless, Commerce's methodologies at issue in the above cited cases must be seen within the context of the procedural safeguards that the AD/CVD statute provides. Pl. R.56.2 Br. at 34, 38–40, 54–58. The procedural safeguards at issue in EAPA Inv. 7321 address the very framework under which CBP can, and should, conduct its factual investigation. Given the EAPA statute's silence on the issues of legal counsel's access to confidential information under an APO and timely notification to targeted parties of evasion allegations and CBP's initiation of an EAPA investigation, CBP was not prohibited by law in providing these safeguards in its regulations and in its practice. CBP's decision in EAPA Inv. 7321 not to provide these safeguards was not reasonable, but rather arbitrary and capricious, devoid of long-established basic minimums of due process of law.

At a minimum, the Court must consider whether the agency's decision, on the particular facts of the case, was reasonable. *See, e.g., Micron Tech*, 117 F.3d at 1396 ("We find that our role, instead, is to evaluate for reasonableness the way in which Commerce chose to interpret the verification requirement in conducting its investigation of

HEI and LGS.") *See also* Pl. R.56.2 Br. at 30, (*citing Greene v. McElroy*, 360 U.S. 474, 496 (1959)) ("Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue.").

The evidence gathering in this case was highly irregular from the outset. CBP visited the exporters without notice and for an entirely different purpose: to evaluate whether value added in Cambodia met requirements for wood flooring (a related but different product) under the U.S. Generalized System of Preferences ("GSP").[1] *See* ORR, Ltr. re: EAPA Case Number 7321: Administrative Review Decision (Nov. 5, 2020) at 8, 10 ("ORR Decision"), Appx01059, Appx01061. CBP paid no

---

[1] *See* 19 U.S.C. § 2461-2467 and 19 CFR § 10.171, which authorize the President to establish a Generalized System of Preferences (GSP) to provide duty-free treatment for eligible articles imported directly from designated beneficiary developing countries. As the U.S. Trade Representative explains: "GSP promotes economic growth and development in the developing world. . . . GSP supports U.S. jobs and helps keep American companies competitive. . . . GSP promotes American values. https://ustr.gov/issue-areas/trade-development/preference-programs/generalized-system-preference-gsp (last accessed January 23, 2022).

heed to even the basic tenets of its audit regulations, which require advance notice and a written agenda that mirror Commerce practice. *See* Pl. R.56.2 Br. at 69–73, 85–98; TRLED, Memo to File re: June 6, 2018 Site Visit (Sept. 12, 2019), ("June 2018 Site Visits Memo"), Appx07018–07038; TRLED, Memo to File re: [

] (Sept. 13, 2019) ("TRLED Sept. 13 Memo"), Appx07040–07131; and TRLED, Memo to File re: [

] (Sept. 16, 2019) ("TRLED Sept. 16 Memo"), Appx07133–07176.

### 3. Plaintiffs' Due Process Rights Were Not Committed to Agency Discretion by Law (5 U.S.C. § 701(a)(2)).

Neither Defendant nor Defendant-Intervenor suggest that the Court should deny judicial review of Plaintiffs' due process claims because the EAPA statutes' silence on these questions indicates that the "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Namely, courts have found that if a statute fails to set a "meaningful standard," then "there is no basis for a court to conclude that the challenged agency action was unlawful or an abuse of

discretion." *Bauer v. DeVos*, 325 F. Supp. 3d 74, 101–02 (D.D.C. 2018), *citing Heckler v. Chaney*, 470 U.S. 821, 830 (1985)) (*citing Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 410 (1971)). Defendant and Defendant-Intervenors have waived any argument that relies on 5 U.S.C. § 701(a)(2).

All the same, with very few exceptions, Courts have interpreted 5 U.S.C. § 701(a)(2) narrowly and found courts must apply a presumption in favor of judicial review. *Bauer v. DeVos* at 101–102. Such rare instances in which courts have applied 5 U.S.C. § 701(a)(2) include agency decisions to not institute enforcement proceedings, allocation of lump sum appropriations, an agency's refusal to reconsider an action because of material error, and the CIA's decision to terminate an employee in the interests of national security. *See, e.g., Lincoln v. Vigil*, 508 U.S. 182, 191–192 (1993). *See also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905–07 (2020) ("Because the DACA program is more than a non-enforcement policy, its rescission is subject to review under the APA.").

CBP's decisions to not disclose evidence used against Plaintiffs

throughout the investigation and to impose interim measures without notice to Plaintiffs are enforcement policies, which Defendant states are designed to protect the Government's revenue rather than non-enforcement policies. *See* U.S. Br. at 15, 18 & 23. This Court must therefore consider the reasonableness of CBP's policies restricting Plaintiffs' ability to defend themselves in EAPA Inv. 7321. As the Court stated in *Regents of the Univ. of Cal.*: "{w}e do not decide whether DACA or its rescission are sound policies. . . .. We address only whether the agency complied with the procedural requirement that it provide a reasoned explanation for its action." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1916 (2020).

## B. CBP's Due Process Deficiencies Were Not Reasonable

Defendant argues that (1) Plaintiffs failed to identify any protected interest of which they were deprived (U.S. Rsp. Br. at 16–17, 19–21); and (2) Plaintiffs are entitled to only what the statute or regulation prescribes (U.S. Rsp. Br. at 18, 22–24). Yet, CBP's conclusions that the United States defends are not reasonable. Plaintiffs have shown that CBP had no reasonable explanation for denying them due process or access to confidential documents under an

APO before imposing interim measures.  Pl. R.56.2 Br. at 48–58.

No evidence on the administrative record supports a theory that the government would be disadvantaged by ensuring the standards of fairness that Plaintiffs request.  The case does not concern a threat to safety, health, or welfare.  *Id.* at 48–51.  Further, CBP's investigation for determining liability for fees, taxes, duties, fines, or penalties are governed by 19 U.S.C. §1509 and CBP's regulations, 19 CFR §163.11, which compel CBP to give reasonable notice before it examines books and records or questions witnesses or undertakes any enforcement actions.  *Id.* at 54.

It is also not reasonable for CBP to ignore the procedural protections built into the U.S. trade laws.  *Id.* at 54–58.  Fair procedures are established in U.S. AD/CVD laws because the United States expects reciprocity from its trading parties.  In passing the current version of Commerce's AD statute, Congress stated: "the Agreement" {Uruguay Round Agreement on Implementation of Article VI (Antidumping Agreement)} adopts U.S. standards of transparency and procedural fairness, thereby ensuring that U.S. exporters will have the opportunity

to defend their interests in foreign antidumping proceedings. In these and many other respects, the more detailed rules of the Agreement reflect existing U.S. law and practice." Statement of Administrative Action (To accompany H.R. 826(I), H.R. REP. 103–316, H.R. Rep. No. 316, 103rd Cong., 2nd Sess. 1994, 1994 WL 16137731, 1994 U.S.C.C.A.N. 4040 (Leg. Hist.) P.L. 103–465, The Uruguay Round Agreements Act House Report No. 103–316 (December 8, 1994) at 4151 ("SAA"). CBP provided no reason for departing from these principles embedded in U.S. trade law.

### 1. Plaintiffs' Protected Interests

Although neither Defendant nor Defendant-Intervenor discuss the validity of Plaintiffs' due process claims with express reference to the three factors identified in *Mathews v. Eldridge*, the United States disputes Plaintiffs' protected interests and harm (U.S. Rsp. Br. at 16–17, 19–21) and propels the Government's interest in protecting its revenue (U.S. Br. at 15, 18, 23).

In *Mathews v. Eldridge*, the Supreme Court considered "the specific dictates of due process," which include three distinct factors.

> {O}ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. 319, 334–35 (1976).

### a. Plaintiffs' Private Interest

Defendant erroneously categorizes Plaintiffs' protected interests as either a right to engage in international trade or solely a financial loss. U.S. Rsp. Br. at 16–17 & 19–21. The United States mischaracterized Plaintiffs' stated interests in a fair procedure during CBP's preliminary EAPA investigation, a procedure that would enable Plaintiffs to defend against the allegation of evasion in a timely manner and to have a chance to avoid the imposition of interim measures altogether. At a minimum, timely notice and disclosure of the evasion allegations and CBP's initiation of its EAPA investigation and the allegations would have allowed Plaintiffs to mitigate financial and contractual losses, before CBP's imposition of interim measures.

Defendant does not dispute either Plaintiffs' interest in defending

against the Coalition's allegations of evasion before the imposition of interim measures or the supporting case law. *See, e.g.*, Pl. R.56.2 Br. at 33: ("{W}hen a person has an opportunity to speak up in his own defense, and when the State must listen to what he has to say, substantively unfair and simply mistaken deprivations of property interests can be prevented. . . . No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it."); *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 170–172 (1951). *See also Londoner v. City and County of Denver,* 210 U.S. 373 (1908) (holding that prior to the imposition of an individual sanction by the government, basic fairness demands notice and an opportunity to be heard).

Defendant also does not dispute the facts that show Plaintiffs were unable to mitigate their losses before CBP's imposition of interim measures.

> Plaintiffs were unable to plan for TRLED's demand for cash deposits amounting to almost 200% of the value of the merchandise. Plaintiffs were unable to consult their banks or liquidate assets in time to meet CBP's demand for cash

deposits. CBP's demand imposed overnight without notice, left Plaintiffs unable to negotiate with its surety the terms and conditions for single entry bonds, resulting in loss of bond coverage for their imports. Plaintiffs had no opportunity to renegotiate contracts with their customers to cover the cost of importing the goods. They were forced to breach their contracts with both suppliers and U.S. customers by sending back ordered merchandise that was already shipped. TRLED's interim measures therefore rendered Plaintiffs liable for breach of contract damages vis-à-vis their trading partners and U.S. customers.

Pl. R.56.2 Br. at 44–45.

Defendant also does not contest the case law that Plaintiffs cite in support of their protected interests. Pl. 56.2 Br. at 45–46. *See, e.g.*, *CPC Int'l, Inc. v. United States*, 896 F. Supp. 1240, 1243–45 (Ct. Int'l Trade 1995) (interest in not incurring costs, expenditures, business disruption or other financial losses that cannot be recovered by a court's legal redress); *Am. Frozen Food Inst. v. United States*, 855 F. Supp. 388, 393–94 (Ct. Int'l Trade 1994) (loss from destroying stockpiled nonconforming labels, cost to redesign labels, costs to re-engineer inventory management); *Kwo Lee, Inc. v. United States*, 24 F.Supp. 3d 1322, 1327 (Ct. Int'l Trade 2014) (price erosion, loss of good will, damage to reputation, loss of business opportunities, bankruptcy); *Sumecht NA, Inc. v. United States*, 399 F. Supp. 3d 1370, 1379 (Ct. Int'l

Trade 2019) (establishing Plaintiff's ability to make appropriate business decisions and take actions with the benefit of information required by statutorily mandated notice as a protected interest).

Defendant's conclusory statements that Plaintiffs have identified no protected interest of which they were deprived cannot stand. *See* U.S. Rsp. Br. at 17, 20, 21, 25. In particular, Defendant's conclusion that "{t}hus, the statutorily authorized interim measures imposed by CBP do not give rise to a protected interest beyond what the statute contemplates" does not include any analysis of what Plaintiffs' protected interests might be or an explanation as to why "the statute" does or does not cover all of Plaintiffs' protected interests. U.S. Rsp. Br. at 20. Defendant does not even explain what it means by "the statute."

In any event, Defendant's statutory reference does not address the issues of notice and opportunity to defend against an allegation of evasion before the imposition of interim measures, including the exporter's and importer's right to bear witness to CBP's site visit methodologies and findings with its own counsel and translators. A discussion of an individual's rights under the Administrative

Procedures Act ("APA") in 5 U.S.C. § 555 is nowhere to be found in Defendant's and Defendant-Intervenor's briefs. Defendant has thus waived any argument against Plaintiffs' protected interests that are based on 5 U.S.C. § 555. *See* Pl. R.56.2 Br. at 10, 12, 15, 41–44, 58. *See Pension Benefit Guar. Corp. v. The LTV Corp., Inc.*, 496 U.S. 633, 655, (1990) ("{a}s a matter of administrative law, the protections afforded by Section 555 of the APA correspond to procedural due process."). In *Advanced Sys. Tech.*, the court stated:

> {S}ection 555(b) is "universally understood to establish the right of an interested person to participate in an on-going agency proceeding." *Block v. SEC*, 311 U.S. App. D.C. 126, 50 F.3d 1078, 1085 (D.C. Cir. 1995); see also *Amer. Commc'ns Ass'n v. United States*, 298 F.2d 648, 650 (2d Cir. 1962) (stating that an agency's discretionary power over intervention is limited by Section 555(b) which gives any interested person the right to intervene in a proceeding 'so far as the orderly conduct of public business permits').

*Advanced Sys. Tech., Inc. v. United States*, 69 Fed. Cl. 474, 484 (2006).

Defendant and Defendant-Intervenor simply ignore Plaintiffs' rights to procedural due process afforded by the APA. *See also Londoner v. City and County of Denver,* 210 U.S. 373 (1908) (prior to the imposition of an individual sanction, basic fairness demands notice and an opportunity to be heard).

### b. Irreparable Harm

The Supreme Court in *Mathews v. Eldridge* described the second factor to be weighed in assessing what process is due as follows: "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." *Mathews v. Eldridge*, 424 U.S. at 335.

In many of the above-cited cases, the court found irreparable harm from the agency's proposed actions. In *Kwo Lee*, for instance, the Court considered whether the plaintiff showed a viable and immediate threat of irreparable harm to warrant a preliminary injunction that prevented CBP from imposing a single transaction bond on plaintiff's entries of merchandise. *Kwo Lee*, 24 F.Supp. 3d at 1326–1327. The Court defined "irreparable harm" as a harm that "no damages payment, however great" can address. *Id.* at 1326. The Court found that the potential harm to the importer – price erosion, loss of goodwill, damage to reputation, loss of business opportunities, and bankruptcy – were irreparable and could not be compensated by a favorable court decision, refund of deposited duties, or a claim for damages. *Id.* at 1327–1328.

*Mathews v. Eldridge*, however, requires more. Plaintiffs must

show that the claimed procedural safeguards would have mitigated the risk of an erroneous deprivation of their interests. In *Mathews v. Eldridge*, the Court described in detail the procedural safeguards built into the Social Security's disability insurance program. 424 U.S. at 337–340, 343–347. The Supreme Court stated expressly that "{a}n additional factor to be considered here is the fairness and reliability of the existing pretermination procedures, and the probable value, if any, of additional procedural safeguards." *Id.* at 343.

> A further safeguard against mistake is the policy of allowing the disability recipient's representative full access to all information relied upon by the state agency. In addition, prior to the cutoff of benefits the agency informs the recipient of its tentative assessment, the reasons therefor, and provides a summary of the evidence that it considers most relevant. Opportunity is then afforded the recipient to submit additional evidence or arguments, enabling him to challenge directly the accuracy of information in his file as well as the correctness of the agency's tentative conclusions.

*Id.* at 347.

CBP provided *none* of these procedural safeguards in EAPA Inv. 7321.

For Plaintiffs, timely notice of the Coalition's allegation of evasion and CBP's initiation of EAPA Inv. 7321 would have allowed them time

to mitigate their losses by cancelling orders for the covered merchandise and reaching agreement with their contracting partners – suppliers and customers – on compensation. Plaintiffs would have adjusted their business model to compensate for lost business in importing covered merchandise. Plaintiffs could have ensured that they imported no covered merchandise by the time interim measures took effect.

Plaintiffs would have also immediately contacted their legal counsel for advice on how to best defend against the evasion allegation. With advance notice of the site visits and full disclosure under an APO and access to the complete confidential version of the allegation and CBP's initiation of EAPA Inv. 7321, legal counsel could have assisted Plaintiffs in responding to the allegation and in assessing the substantiality of the Coalition's and CBP's evidence. In particular, legal counsel would have been in a position to immediately and thoroughly vet CBP's memoranda filed on September 12, 13, and 16, 2019 to evaluate the accuracy of CBP's interpretations and conclusions concerning Plaintiff-Intervenors' manufacturing facilities and processes. *See* Pl. R.56.2 Br. at 69–73, 85–98; June 2018 Site Visits Memo, Appx07018–07038; TRLED Sept. 13 Memo, Appx07040–07131; and

TRLED Sept. 16 Memo, Appx07133–07176.  Instead, the investigated producers were left in the dark entirely, both as to the purpose and findings of CBP's on-site inspectors, who never even established their credentials to draw the secret conclusions they did not share.

Much harm resulted from CBP's failure to disclose the details of its Agent's site visit to LB Wood and Happy Home on June 6, 2018.  As Plaintiffs stated in their moving brief "TRLED had it completely in its own power to compare the observations and photographs it received from the Agent about the June 6, 2018 visits to Plaintiff-Intervenors and compare them with the photographs and data that Plaintiff-Intervenors provided to TRLED.  Plaintiffs and Plaintiff-Intervenors never saw the Agent's photographs, lacked access to the Secret Memoranda, and had no opportunity to rebut or explain what the Agent was looking at, the purpose of her visit, or the {in}accuracy of her conclusions."  Pl. R.56.2 Br. at 92.

Plaintiffs pointed out in their moving brief that Plaintiffs and Plaintiff-Intervenors provided photographs of LB Wood's and Happy Home's production facilities demonstrating the production process and

capacity for each machine.  Pl. R.56.2 Br. at 90; LB Wood, RFI Questionnaire Response (Nov. 8, 2019) at Ex. 14, ("LBW Qre Rsp."), Appx27757-27773; Happy Home, RFI Questionnaire Response (Nov. 9, 2019) at Ex. 13 ("HH Qre Rsp."), Appx22977-22995, also attached as Attachments 2 & 3 to Plaintiffs' moving brief.  Taking LB Wood's photograph of its machinery for core gluing as an example (photo no. 2 of LB Wood's Exhibit 14), CBP's agent did not mention or photograph this machinery or comment on the machine's production capacity.  LB Wood, for its part, explained: [



].  Appx27760.  LB Wood used the same format for showing the production steps and calculating the capacity of each machine for core cold pressing, core repairing, core hot pressing, puttying, sanding, face veneer gluing, plywood cold pressing, plywood repairing, sawing, plywood hot pressing, and UV coating. Appx27760-27772.  Happy Home likewise explained in detail each production step and its production capacity.  HH Qre Rsp. at Ex. 13, Appx22977-22995.

CBP did not use its agent's asserted expertise to explain, production step by production step, and machine by machine, why LB Wood's and Happy Home's production facilities could not produce their calculated quantity of covered merchandise. Instead, CBP cavalierly ignored Plaintiff-Intervenors' own documentation, production records, and production capacity calculation for each production step that disproved CBP's conclusions from the Secret Memoranda because the companies allegedly had a "significant incentive for bias." Pl. R.56.2 Br. at 92; TRLED Determination, Appx01040, Appx01045; ORR Decision, Appx01065-01068. Although CBP held all the cards in EAPA Inv. 7321, at no point did CBP indicate that Plaintiffs could rely on a fair and impartial agency investigation with CBP's heightened obligation to protect Plaintiffs' interests. It is not enough for CBP "simply to 'determine,' as it did here, that the record does not support a particular conclusion without addressing the evidence both in support of and in derogation of that conclusion . . .." *New Am. Keg v. United States*, No. 20 - 00008, 2021 Ct. Intl. Trade LEXIS 34, at *48 (Ct. Int'l Trade Mar. 23, 2021).

In sum, Plaintiffs suffered irreparable harm from CBP's failure to

provide notice of its initiation of EAPA Inv. 7321 before CBP imposed interim measures and from CBP's failure to provide an APO for legal counsel's access to confidential information in order to adequately defend against the allegation of evasion. Similarly, Plaintiffs and Plaintiff-Intervenors were deprived of their rights of fair notice, preparation, and representation at the site visits, as are enshrined in CBP's audit regulations and in the Commerce Department's verification practice. *See* 19 CFR §163.11.

The risk of an erroneous deprivation of Plaintiffs' interest through the procedures used was great because no procedural safeguards at all were in place during CBP's preliminary phase of EAPA Inv. 7321 and prior to CBP's imposition of interim measures. The value of providing procedural protections is undeniably clear, and CBP's failure to provide basic procedural safeguards thus harmed Plaintiffs irreparably and violated their due process rights.

### c. Interim Measures as Temporary Measures; Judicial Review

Defendant alleges that Plaintiffs suffered no harm because CBP's interim measures are temporary. U.S. Rsp. Br. at 20–21, *citing to Diamond Tools Tech LLC v. United States*, 2021 Ct. Intl. Trade LEXIS

155 at 36. First, neither the *Diamond Tools* court nor Defendant cite to any other legal authority for the general proposition that a party cannot be harmed by *temporary* measures. Plaintiffs were specifically harmed by the lack of procedural safeguards before CBP's enforcement actions, temporary or not. As the Supreme Court stated in *Mathews v. Eldridge*, decisive is that the existing pre-enforcement procedures be fair and reliable. 424 U.S. at 343.

Defendant-Intervenor also argued that Plaintiffs' procedural and substantive claims against CBP's interim measures fail due to the temporary nature of the measures. Coalition Rsp. Br. at 18–19, 22. Further, the Coalition argues that Congress did not provide for judicial review of CBP's decision to impose interim measures. *Id.* at 19. The Coalition fails to consider, however, that the APA specifically provides that a "preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action." 5 U.S.C. §704.

The Coalition also argues that the *Diamond Tools* Court found as "purposeful" the lack of any reference to the review of interim measures

in the judicial review provision of the EAPA statute, 19 U.S.C. §
1517(g)(1)–(2).  The Coalition has misread the *Diamond Tools* Court's
discussion of judicial review concerning interim measures.  First and
foremost, under its introductory "Standard of Review" section, the Court
cites to *Vietnam Finewood* stating "The court's review of Customs'
determination as to evasion may encompass interim decisions
subsumed into the final determination." *Diamond Tools* at 11-12 *citing
Vietnam Firewood Company Limited v. United States*, 466 F.Supp 3d
1273, 1284 (2020).

The Coalition's reference to the Diamond Tools decision,
conversely, concerns the Court's discussion of whether the EAPA
statute's deadlines for the imposition of interim measures is mandatory.
In that context, the Court found that "DTT USA does not cite to any
case in which this Court has read expansively the standard of review in
Section (g)(2)(A) to apply to the procedural requirements in subsection
(e) or any language in the legislative history that would point to such
intent. . . .  To the contrary, the plain language of the statute — in
particular, the explicit mention of subsections (c) and (f) — indicates
that Congress' intent was to exclude other subsections." *Diamond Tools*

at 21.

Of course, prior CIT decisions interpreting the extent of judicial review in accordance with 19 U.S.C. § 1517(g) would have been hard to find at the time briefing took place in *Diamond Tools*. Counsel is not aware of any CIT final decisions in EAPA cases before October 29, 2021 when *Royal Brush* was decided. *Royal Brush Mfg. v. United States*, 2021 Ct. Intl Trade LEXIS 153. Also on October 29, 2021, on different grounds, the *Diamond Tools* Court remanded its EAPA case to CBP for reconsideration. 2021 Ct. Intl. Trade LEXIS 155 at 74-75. In addition, it appears that the *Diamond Tools* court failed to consider that the APA creates a presumption of judicial review of agency action, with the burden on the party challenging judicial review to rebut the presumption.

*Sackett v. EPA* is a case where the Supreme Court considered whether the Clean Water Act excluded judicial review of compliance orders. 566 U.S. 120 (2012). The Court stated that "in 'determining {w}hether and to what extent a particular statute precludes judicial review,' we do not look 'only [to] its express language.' *Sackett v. EPA* at

128 (*citing Block v. Comty Nutrition Inst.*, 467 U.S. 340, 345 (1984)). The Supreme Court reiterated that the APA creates a presumption of judicial review of agency action, but this presumption may be overcome by inferences of intent drawn from the statutory scheme as a whole. *Id.* at 128. In this instant case concerning EAPA Inv. 7321, the Coalition has provided no evidence of intent by Congress to preclude the Court's review of CBP's interim measures; as such, the presumption of review must prevail in this case.

Second, both the United States and the Coalition rely extensively on the two recent CIT decisions, *Diamond Tools and Royal Brush,* which included decisions and analysis on procedural deficiencies in EAPA investigations. U.S. Br. at 17, 20–25; Coalition Rsp. Br. at 12–19, 22, 30, 40. Regarding the temporary nature of interim measures, and Plaintiffs' due process claims generally, the United States notes that "{i}n fact, the Court has recently dismissed these very arguments." U.S. Rsp. Br. at 16–17, *citing to Diamond Tools* and *Royal Brush.* The Coalition advises the Court that "{t}here is no reason for this Court to depart from these precedents here." Coalition Rsp. Br. at 13.

Plaintiffs have full confidence that this Court, presiding over this litigation concerning CBP's conduct of EAPA Inv. 7321, will make its own decision based on the specific facts of this case. Indeed, decisions of other CIT judges are not precedents for this Court, contrary to the Coalition's characterization; the Court is not bound by the decisions of other CIT judges. As the CAFC directly stated:

> {A}mong trial courts it is unusual for one judge to be bound by the decisions of another and, if it is to occur, such a rule should be stated somewhere. That is not done here; with all the criticism directed by appellants towards Judge Restani for not following Judge Newman, nowhere is anything pointed out saying she must. She, herself, accepts an analysis of Judge Newman's decisions as precedents which we deem in part mistaken, but she is right in making her own decision nevertheless.

*Algoma Steel Corp. v. United States*, 865 F.2d 240, 243 (Fed. Cir. 1989).

*See also Shenzhen Xinboda Indus. Co. v. United States*, 456 F. Supp. 3d 1272, 1285 n.22 (Ct. Int'l Trade 2020) (stating: "each administrative review is a separate segment of an antidumping proceeding and each with its own, unique administrative record. . . . one judge of the United States Court of International Trade [("CIT")] is not bound by the decision of another judge of the [CIT].").

Different facts and legal arguments are presented in each unique

case to the Court of International Trade. There are ample facts and arguments of record in the instant appeal to support the application of the APA to the preliminary and other procedural measures CBP undertook in implementing its statutory mandate. Defendant and Defendant-Intervenor have not met their burden to rebut the presumption that APA protections should have been afforded to Plaintiffs and Plaintiff-Intervenors

In sum, the temporary nature of CBP's interim measures in this case is not determinative as to whether Plaintiffs' suffered harm to their legitimate interests that are to be protected in accordance with the APA. Further, the EAPA statute does not preclude judicial review of CBP's interim measures in accordance with 5 U.S.C. §704.

### d. The Government's Interest

The United States claims that the Government's interest in denying procedural safeguards in EAPA Inv. 7321 is to protect the United States Government's revenue. U.S. Rsp. Br. at 15, 17–18, 23. Defendant articulates no other Governmental interest. Defendant does not claim that CBP's EAPA investigation involves any reason to keep its investigation secret in order to protect national security or public

safety.  *See* Pl. R.56.2 Br. at 29.  Rather:

> {T}he EAPA statute authorizes CBP, as a law enforcement
> agency, to take aggressive and early action by imposing
> interim measures based upon a reasonable suspicion of
> evasion. 19 U.S.C. § 1517(e). CBP's responsibility is to protect
> the revenue so that, as the administrative processes continue,
> the Government is not left with uncollectable bills.

U.S. Rsp. Br. at 23.

In reality, upon notice of initiation of an antidumping, countervailing duty, or EAPA investigation, importers normally curtail their business arrangements with suppliers of the subject merchandise from the subject country and cease importing the subject merchandise. In proceedings before the agency—Commerce—with primary jurisdiction to determine the scope of its orders, there has been a balance between aggressive enforcement and reasonable notice to importers.  CBP's regulations are unreasonable in part because they make no attempt to strike such balance.

Regardless of the fairness of an importers' pricing or legitimacy of their suppliers' operations, AD/CVD and EAPA proceedings are lengthy and the outcomes uncertain.  Approximately three years pass before Commerce determines the final AD and CVD duty rates of entries

imported during the initial period of investigation. Most importers are not able to risk having cash deposits of 200% tied up before Commerce's final determination of the actual duty rate, liquidation of the entries, and eventual reimbursement of AD and CVD duties. Thus, in reality, the "preliminary" measures are final in the sense that they are trade blocking until and unless the case is resolved with a negative finding of evasion.

The Coalition explains this phenomenon in their evasion allegations. *See, e.g.*, the Coalition's allegation against APPI, Ltr. from Wiley Rein LLP on behalf of the Coalition re: Request for an Investigation under the Enforce and Protect Act (May 1, 2019) at 6–7 (explaining that after imposition of the Orders and Commerce's imposition of a final cash deposit rate of 171.55% on all respondents, Chinese exports to the United States decreased), Appx01606–01607; *see also* CBP Memorandum re: Initiation of Investigation for EAPA Case Number 7323 – American Pacific Plywood, Inc. (June 26, 2019) at 2 (reiterating the Coalitions' assertion that "Chinese exports of hardwood plywood to the United States decreased from 1,153,065 cubic meters in 2017 to 181,288 cubic meters in 2018, the year that CBP implemented

the AD/CVD orders."), Appx01002.

Once an importer ceases its imports of subject merchandise, the importer owes no AD/CVD duties on its entries. The importers' adjustment to its trade activity is not illegal, does not deprive the United States Government of duly-owed revenue, nor does it contravene the purposes of the AD/CVD laws. The purpose of the U.S. AD/CVD law is to preserve "the ability of U.S. industries to obtain meaningful relief from dumped imports into the U.S. market and ensures U.S. exporters fair treatment in foreign antidumping investigations." SAA at 4151. Certainly, the importer's immediate cessation of importing subject merchandise that the petitioner or alleger claims to be unfairly priced or subsidized achieves the purpose of the U.S. AD/CVD law to ensure a fair playing field for U.S. industries.

The purpose of the EAPA law is not to maximize the Government's revenue, but rather *prevent* the evasion of AD and CVD Orders. *See* Trade Facilitation and Trade Enforcement Act of 2015, Title IV, "Prevention of Evasion of Antidumping and Countervailing Duty Orders" ("TFTEA"). Sec. 411 of the TFTEA establishes CBP's

"Trade Remedy Law Enforcement Division," which shall be dedicated –

(A) to the development and administration of policies to prevent and counter evasion . . .." TFTEA Sec. 411 (3)(A). Surely, the best way to prevent evasion is providing immediate notification to the targeted importer that it is under investigation for EAPA violations. Whether or not the allegation ultimately proves to be true, the U.S. importer cannot afford to continue importing the covered merchandise, and the U.S. industry likely receives immediate relief from the perceived threat of the foreign imports. Defendant gives no indication whatsoever as to how "notice may have very well thwarted the investigation," U.S. Rsp. Br. at 24, nor do Defendants proffer any scenario where this concern would arise. Defendant seems to concede that CBP's purpose and modus operandi is to operate in the shadows and shun inconveniences like the APA and due process of law.

Thus, Plaintiffs' interest in immediate notification of the allegation of evasion against it and the Government's interest in protecting the Coalition's interest in immediate relief from the alleged offending imports are one and the same. The Government's interest in initiating EAPA Inv. 7321 was to protect the U.S. industry from

evasion, not to maximize revenue. When importers cease their imports of covered merchandise, no AD/CVD duties are duly owed, and the Government is not entitled to collect AD/CVD duties on non-imported merchandise. CBP may believe that this outcome "deprives" the U.S. Government of revenue that it could have otherwise collected during its 95-day secret investigation, but, as discussed above, maximizing Government revenue is not the purpose of the AD/CVD laws nor the EAPA law.

Similarly, allowing disclosure of confidential information under an APO in EAPA Inv. 7321 would have in no way impeded the Government from pursuing its legitimate purpose of protecting the U.S. industry from dumped or subsidized imports of covered merchandise, regardless of whether the merchandise was shipped directly from China or transshipped from China through Cambodia. Full disclosure of all record documents supports CBP in the pursuit of its goals by ensuring that all interested parties, including the Coalition, are able to vet the data and documents and aid CBP in its understanding of the record information. Counsel for the Coalition has taken this very position in comments on CBP's proposed EAPA regulations. *See* Pl. R.56.2 Br at

39, *citing to* Wiley Rein LLP, Ltr to CBP re: Docket No. USCBP-2016-0053: Comments on Interim Final Regulations Regarding Investigation of Claims of Evasion of Antidumping and Countervailing Duties (Dec. 20, 2016) at 7–8. Counsel for the Coalition states: "{i}n the absence of access to information filed by other parties, each interested party's ability to represent its interests will be compromised." Further: "where parties are not able to access the full information that CBP has used to make a decision, it is difficult to see how any 'opportunity to be heard' is meaningful and thus lawful." Counsel made these comments on the relatively neutral ground of rulemaking and represent Counsel's honest assessment of the legal and practical basis for allowing parties to an EAPA investigation access to confidential information through an APO. The Coalition's arguments against full disclosure in EAPA Inv. 7321 are not credible.

Thus, Plaintiffs' request here for basic due process safeguards is not a ploy for Plaintiffs to gain an unwarranted advantage in EAPA proceedings. On the contrary, the Coalition, and allegers of evasion generally, have as much to gain as the targeted importers and foreign producers and exporters in ensuring fair and transparent EAPA

proceedings. Providing a minimum amount of procedural protection therefore furthers CBP's interest in protecting the U.S. industry against unfair traded imports or imports that enter the United States through evasion as much as it protects Plaintiffs' interests. No legitimate conflicting United States Government interest exists here.

Accordingly, CBP's refusal to ensure due process safeguards that Plaintiffs request in EAPA Inv. 7321 was unreasonable.

### 2. The EAPA Statute and CBP's Regulations Do Not Limit Plaintiffs' Interests in Due Process.

Defendant cites *Vermont Yankee* for its proposition that "plaintiffs are entitled {to} only what the statute or regulation prescribes," U.S. Rsp. Br. at 18 (*citing Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978)). In context, however, *Vermont Yankee* refers to the rule-making process by which the agency promulgates its regulations.

> Section 4 of the Act, 5 U. S. C. § 553 (1976 ed.), dealing with rulemaking, requires in subsection (b) that "notice of proposed rule making shall be published in the Federal Register . . . ," describes the contents of that notice, and goes on to require in subsection (c) that after the notice the agency "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments

> with or without opportunity for oral presentation. After
> consideration of the relevant matter presented, the agency shall
> incorporate in the rules adopted a concise general statement of
> their basis and purpose."

*Vermont Yankee Nuclear Power Corp.*, 435 U.S. at 523–24 (1978).

As discussed in Plaintiffs' moving brief, CBP did not follow the APA's requirements for informal rule-making under 19 U.S.C. §§ 553(a)–(c) to promulgate its regulations. Pl. R.56.2 Br. at 35–40. Unlike *Vermont Yankee*, CBP has failed to comply with the APA's procedural minimum, and it has deprived Plaintiffs of due process.

Conversely, Defendant does not question the applicability of *Kisor v. Wilkie* or *Perez v. Mortg. Bankers* to the facts of this case. As in these cases, CBP did not follow the rule-making procedures of 19 U.S.C. §§ 553(a)–(c) and the court owes no deference to CBP's interpretations of the EAPA statute found in CBP's regulations. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2420 (2019) (to be valid, enforcement actions must rely on a legislative rule that has gone through notice and comment); and *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96–97 (2015) ("Interpretive rules do not have the force and effect of law and are not accorded that weight in the adjudicatory process.") *See* Pl. R.56.2 Br. at 37–38,

including further citations to case law.

In the conduct of its EAPA investigation, however, CBP could not rely on the silence of the EAPA statute to decide when to notify Plaintiffs that they were targeted parties in an EAPA investigation and whether to allow legal counsel to prepare and attend site visits as well as gaining access to confidential information under an APO. As discussed above, CBP's decisions on these issues were unreasonable. The Court should find that CBP's determinations of evasion are arbitrary and capricious, and that they are fatally flawed by CBP's due process violations.

### C. CBP's Evasion Determinations were Not Supported by Substantial Evidence.

#### 1. Inadequacy of Public Summaries on the Agency Record to Establish Substantial Evidence

In their moving brief, Plaintiffs showed that CBP's public summaries of confidential information were inadequate to establish substantial evidence upon which CBP could find that Plaintiffs evaded the Orders on hardwood plywood. Pl. R.56.2 Br. at 42–44, 59–64, 69–73, 80–87, 115–116. CBP's public summaries were also inadequate to permit full and robust rebuttal, correction, and clarification.

Defendant and Defendant-Intervenor disregard Plaintiffs'
concerns. They argue that Plaintiffs had the opportunity to be heard
throughout the pendency of the EAPA investigation, after CBP imposed
interim measures and prior to a final determination. U.S. Rsp. Br. at
28–29; Coalition Rsp. Br. at 18. Defendant-Intervenor, in particular,
claims that Plaintiffs have not persuasively explained why the public
data were insufficient to rebut CBP's final determination. Coalition
Rsp. Br. at 16–18.

As an example, the Coalition notes that CBP's Interim Measures
Notice publicly described both the notice of action that was issued with
respect to Happy Home and an affidavit that Happy Home provided
regarding that notice. *Id.* at 17, referring to Interim Measures Notice
(PUBLIC VERSION) at 8–9, Appx01027–01028. The Coalition claims
that Plaintiffs have not shown how access to the proprietary
information would have aided Plaintiffs in the administrative
proceeding. Coalition Rsp. Br. at 17, *citing to Diamond Tools*, slip op.
21–151 at 36 (2021 Ct. Intl. Trade LEXIS 155 at 41).

Yet, Plaintiffs have demonstrated the insufficiency of CBP's public

summaries in their moving brief. *See, e.g.*, Pl. R.56.2 Br at 69–73, 79, 85–87; TRLED Sept. 16 Memo, Appx07133–07176. For instance, in the "Document Description" table on the first page of TRLED's Sept. 16, 2019 Memo, pdf pages 29–30 refer to a document entitled "Response to CF-29." *Id.*, Appx07133. This document is found in the Joint Appendix at Appx07161–07162. The confidential version of this document reveals that it [                    ]. Rather, [

                                                                    ], which CBP never mentioned in drawing its conclusions from CBP's site visit.

Since CBP used its September 12, 13, and 16 memoranda as substantial evidence for its findings of evasion, CBP's disclosure of this contemporaneous statement at the outset of EAPA Inv. 7321 would have provided strong evidence that CBP's rendition and conclusions of

its June 6, 2018 site visit were not accurate. In particular, the

statement mentions contemporaneous [

], which are missing from both the TRLED Site

Visit Memo and the TRLED Sept. 16 Memo.

In their moving brief, Plaintiff-Intervenors point out the same

problem with the "Affidavit" included in CBP's Sept. 16 Memo. *See*

Plaintiff-Intervenors LB Wood Cambodia Co., Ltd. and Cambodian

Happy Home Wood Products Co., Ltd. Rule 56.2 Memorandum In

Support Of Motion For Judgment Upon The Agency Record (Aug. 25.

2021) at 13–16, ECF Doc. No. 51. In reference to this Affidavit,

Plaintiff-Intervenors show that CBP selectively quoted half of one

sentence, out of context, which neither Plaintiffs nor Happy Home had

an opportunity to rebut because CBP did not disclose the full document.

*Id.*

In conclusion, the Court should disregard in their entirety the

documents included in CBP's secret memoranda dated September 12,

13, and 16, 2019. CBP never made the full content of these memoranda

available to legal counsel for review and rebuttal. The documents do

not pertain to Plaintiffs nor to the merchandise covered in EAPA Inv. 7321 but, rather, were created in the context of a GSP review to confirm the domestic content under a different statute of wood flooring entries that were produced and shipped to the U.S. in [                    ]. *See* Plaintiffs discussion in their moving brief, Pl. R.56.2 Br. at 71–73, 79, 85–88.

### 2. CBP Cancelled Verification of LB Wood and Happy Home Because of COVID-Related Travel Restrictions; Not Because Verification Was Not Possible or Fruitful.

In their moving brief, Plaintiffs state that they and Plaintiff-Intervenors prepared their responses and documentation in anticipation of CBP's visit to Plaintiff-Intervenors' facilities in Cambodia to verify the accuracy and completeness of their responses to CBP's requests for information. Pl. R.56.2 Br at 75, 95. CBP was forced to cancel its verifications initially scheduled for February 17–22, 2020, however, due to COVID-associated travel restrictions. *Id.* at 75, 126–127. Defendant-Intervenor, however, would have the Court believe that CBP cancelled verification due to Happy Home's [                    ]. In so doing, the Coalition reiterates CBP's position articulated in ORR's administrative review decision, but knows better. *See* Coalition Rsp. Br. at 30, 40, 42;

*and* ORR Decision at 18 & 21, Appx01069, Appx01072; *see also* TRLED,

Notice of Determination as to Evasion (June 29, 2020) at 4 ("TRLED

Determination"), Appx01037.

In TRLED's final determination of evasion, CBP reported that it

postponed verification of LB Wood and Happy Home on February 11,

2020 and cancelled verification with a notification to all parties on May

8, 2020. TRLED Determination at 4, Appx01037; *see also* Email from

CBP, "RE: EAPA 7321 - Extension of the Written Arguments Deadline,"

dated May 8, 2020" ("May 8, 2020 Email") Appx45139–45141. In its

review determination, ORR then claimed that CBP cancelled its

verification of Happy Home because [

]. ORR Decision at 18 & 21; Appx01069, Appx01072. In its

response brief, Defendant-Intervenor continues to misrepresent CBP's

reason for cancelling its on-site verifications. Coalition Rsp. Br. at 30,

40, 42.

First, CBP *also* cancelled verification of LB Wood, who was still in

full production operations. Second, the administrative record of this

case proves that the *only* reason for CBP's cancellation of verification

was the COVID-related restrictions on travel to Cambodia. No other reason exists. During January and February, CBP officials, company personnel, and legal counsel were not allowed to travel in and out of Cambodia to conduct verification of LB Wood and Happy Home without quarantining for 14 days. *See* CBP Memorandum, Adding Information to the Administrative Record of EAPA Cons. Case 7321 (Feb. 10, 2020), which include legal counsel's emails to CBP dated January 31, 2020 and February 3, 2020, Appx44379–44382.

On May 8, 2020, CBP notified all parties that it must cancel on-site verification of LB Wood and Happy Home in Cambodia, which is referenced in TRLED's Determination at FN 29, Appx01037; May 8, 2020 Email, Appx45139–45141. In its May 8, 2020 email to all parties, CBP states: "We note that since verification was initially postponed in February 2020, the difficulties pertaining to travel and the accompanying health risk have not diminished. Therefore, CBP will not proceed with a verification in this investigation."

CBP's email exchange with the parties from January through May 2020 confirm that CBP always intended to verify both LB Wood and

Happy Home in Cambodia.  Happy Home's [



] would not have prevented verification

of the company's books and records.  Indeed, Counsel for Happy Home

stated in its January 31, 2020 email:  [



] Appx44380.

Namely, at the time of the scheduled verification, and even now,

Happy Home continues to have a persistent and concrete interest in

participation and cooperation with CBP in EAPA Inv. 7321 and in the

outcome of this litigation.  Happy Home's interest is to contest the harm

arising from CBP's unlawful imposition of duties on Plaintiffs.  The fact

that Happy Home [                                  ] awaiting the results of EAPA

Inv. 7321 does not matter.  What matters is that a favorable outcome

can redress the unlawful harm to Plaintiffs.  *See Qingdao Taifa Grp. Co.*

*v. United States*, 581 F.3d 1375, 1380–81 (Fed. Cir. 2009) (recognizing

foreign manufacturer may suffer harm even though deposits were

actually made by domestic importers); and *Lone Star Steel Co. v.*

*NLRB*, 766 F.2d 1459, 1462 (10th Cir. 1985) (review of enforcement action was not moot even where union no longer represented employees of company and company no longer operated mines at which union was collective bargaining representative).

In all of the correspondence with CBP concerning its planned verification, the agency confirmed that it intended to verify LB Wood and Happy Home – until the deadlines for rendering a decision in EAPA Inv. 7321 and ongoing travel restrictions forced the cancellation. For instance, on February 11, after Counsel informed CBP that Happy Home had to [                                    ], CBP wrote to all parties: "Because a verification report that would follow rescheduled on-site verifications would be provided after the current written arguments deadline, CBP is extending the deadline for written arguments to May 11, 2020. This extended deadline would allow interested parties the opportunity to respond to CBP's site verification report, which will be placed on this case's administrative record in a timely manner following on-site verifications." Email from EAPA Allegations to Interested Parties (Feb. 11, 2020), Appx45140–45141.

In conclusion, Plaintiffs consider CBP's and the Coalition's misrepresentations regarding CBP's scheduled verifications and subsequent cancellations to be egregious because Plaintiffs and Plaintiff-Intervenors provided their statements and comprehensive documentation of raw material purchases, production, production capacity, and sales in full anticipation that CBP would verify the information. Plaintiffs and Plaintiff-Intervenors cooperated with CBP conscientiously and completely throughout EAPA Inv. 7321. The administrative record of this case does not support any suggestion whatsoever that Plaintiffs or Plaintiff-Intervenors impeded the investigation or were less than absolutely honest in their narrative and documentary responses to CBP's requests for information. Plaintiffs ask only that Defendant and Defendant-Intervenors exhibit the same scrupulousness and fairness. *See e.g., Zen Magnets*:

> Though agencies may undertake overlapping rulemakings and adjudications, commissioners may still be disqualified for bias if they have "prejudged the case or . . . given a reasonable appearance of having prejudged it." *Kennecott Copper Corp. v. FTC*, 467 F.2d 67, 80 (10th Cir. 1972). But challengers must overcome a presumption that adjudicators are neutral, for we assume that adjudicators are people "of conscience and intellectual discipline, capable of judging a

particular controversy fairly on the basis of its own circumstances."

*Zen Magnets, LLC v. Consumer Prod. Safety Comm'n*, 968 F.3d 1156, 1168 (10th Cir. 2020), *citing United States v. Morgan*, 313 U.S. 409, 421, 61 S. Ct. 999, 85 L. Ed. 1429 (1941).

The administrative record establishes beyond refute that (1) CBP did not cancel verification because Happy Home [        ]; and (2) Happy Home was prepared to present managers and books and records at such verification.  CBP's excuse that verification was cancelled due to Happy Home's [        ] is both unsupported by substantial evidence and arbitrary and capricious.  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency rule is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.").

In this instant case the agency failed to consider the *actual* reason for CBP cancelling verification – namely, the effects of the ongoing

COVID pandemic and the travel restrictions imposed on CBP and the parties – which is clearly presented on the record of this case.

### 3. Plaintiffs Supposed Selective Discussion of Record Evidence

Defendant and Defendant-Intervenor claim that Plaintiffs have "selectively" discussed "a few pieces of evidence in an attempt to establish that CBP's determination is unsupported by substantial evidence." U.S. Rsp. Br. at 39; Coalition Rsp. Br. at 31. In fact, in their submissions before the agency and this Court, Plaintiffs have successfully rebutted each and every documentary detail that CBP claims is indicative of evasion. *See* Respondents' Written Argument (May 14, 2020), Appx44384–44421; USG and Happy Home Request for Administrative Review (August 10, 2020), Appx44423–44459; IGF and APPI Request for Administrative Review (August 10, 2020), Appx44461–44497; LB Wood Request for Administrative Review (August 10, 2020), Appx44499–44539, and Plaintiffs' and Plaintiff-Intervenors' moving briefs before this Court.

CBP's claim that Plaintiffs' arguments in their moving brief were "selective" is unwarranted. Plaintiffs responded fully to, and rebutted,

each of CBP's allegations – many of which were themselves isolated tidbits that CBP presented only in TRLED's final determination and ORR's administrative review decision *after* CBP concluded its fact-finding phase of the investigation. *See* TRLED Determination at 7–10 and 13–15, alleging for the first time inconsistencies in LB Wood's and Happy Home's statements and documentation, Appx01040–01043 & Appx01046–01048; and ORR Decision at 19–21, Appx01070-01072.

Most notably, during the course of EAPA Inv. 7321, five months elapsed between Plaintiffs' last questionnaire response on December 12, 2019 and Plaintiffs' submission of written argument to CBP. During this time, CBP asked Plaintiffs no further questions nor indicated in any way that CBP found discrepancies in Plaintiffs' and Plaintiff-Intervenors' questionnaire responses, despite TRLED's evident need to prepare for on-site verifications in Cambodia. As it became increasingly clear during the months of January through May 2020 that verification would necessarily be cancelled due to the COVID-related travel restrictions, CBP had the option to issue further detailed questionnaires in lieu of verification, as has become Commerce's practice during the COVID pandemic. In any event, Plaintiffs' and Plaintiff-Intervenors'

carefully and truthfully responded to CBP's questionnaires in full knowledge that TRLED intended to verify their responses through an on-site verification in Cambodia.

Moreover, CBP should have notified Plaintiffs and Plaintiff-Intervenors of all perceived deficiencies during the fact-finding phase of its EAPA investigation. The antidumping statute requires Commerce and the U.S. International Trade Commission to notify parties submitting deficient information of the deficiency and to give the submitter an opportunity to remedy or explain the deficiency. 19 U.S.C. § 1677m(d). Regarding the antidumping statute specifically, the Court recently found:

> The Department "satisfies its obligation under § 1677m(d) to place the respondent on notice of the nature of a deficiency in its initial questionnaire response where a supplemental questionnaire 'specifically point[s] out and request[s] clarification of [the] deficient responses,' and identifies the information needed to make the required showing." *Hyundai Steel*, 45 CIT at    , 518 F. Supp. 3d at 1322-23 (alterations in original) (emphasis added) (quoting *NSK Ltd. v. United States*, 481 F.3d 1355, 1360 n.1 (Fed. Cir. 2007)).

*Bluescope Steel v. United States*, No. 19-00057, 2021 Ct. Intl. Trade LEXIS 168, at *25 (Ct. Int'l Trade Nov. 30, 2021). The Court has articulated this same principle as a general prohibition on the agency

playing a game of "gotcha."

> In the case at bar, the ITA would have this Court endorse an
> investigation where the ITA sent out a general questionnaire
> and a brief deficiency letter, then effectively retreated into
> its bureaucratic shell, poised to penalize Bowe for
> deficiencies not specified in the letter that the ITA would
> only disclose after it was too late, i.e., after the preliminary
> determination. This predatory "gotcha" policy does not
> promote cooperation or accuracy or reasonable disclosure by
> cooperating parties intended to result in realistic dumping
> determinations.

*Bowe-Passat v. United States*, 17 Ct. Int'l Trade 335, 343 (U.S. 1993).

Ultimately, CBP was not able to point to any specific entry of covered merchandise that Plaintiffs made with a material false statement or material omission. 19 U.S.C. § 1517(a)(5)(A). Rather, Defendant must rely on CBP's amorphous theory of "commingling" to *speculate* that Plaintiffs may have entered covered merchandise in some unspecified entry using some unidentified false statement or document or some unspecified omission. U.S. Rsp. Br. at 30, 37, 38.

Insofar as this Court looks to *Diamond Tools* for guidance, it should not overlook the latter part of the *Diamond Tools* decision. There, the court noted the potential consequences of an evasion finding that extend far beyond the application of AD and CVD duties, including

proceedings under 19 U.S.C. § 1592 (penalties for fraud, gross negligence, and negligence) and under 19 U.S.C. § 1592a (aiding unlawful importation). *Diamond Tools*, 2021 Ct. Intl. Trade LEXIS 155 at 72. The court stated: "{t}he fact that there may be additional consequences to an importer from a finding of evasion punctuates the need for Customs to provide a well-buttressed and well-reasoned explanation of its conclusion." *Id.*

Further, CBP has never claimed that Plaintiffs were negligent or guilty of fraud or gross negligence in importing plywood from Cambodia or in preparing their entry documentation for their imports of covered merchandise. No record evidence points to any culpability on Plaintiffs' part. CBP has stated, and Defendant-Intervenor has echoed, that "the EAPA does not require any specific showing of intent to evade duties on plaintiffs' part." Coalition Rsp. Br. at 24, 27, citing to ORR Decision at 13, Appx01064. Yet, the *Diamond Tools* court questioned CBP's interpretation of the EAPA statute on the issue of culpability.

> Customs in the Final Administrative Determination found that "a finding of evasion does not require an intentional or purposeful attempt by an importer to avoid duties."
> Customs' statements are insufficient as a matter of law in at

> least three respects. First, Customs' comment that it "does not need to determine any level of culpability only that evasion occurred with entry" is unclear at best and potentially tautological. Second, even if Customs' statement were readily comprehensible, neither the text of the EAPA statute nor 19 C.F.R. 165.1 supports Customs' statement that it does not need to establish "any level of culpability."

*Diamond Tools*, 2021 Ct. Intl. Trade LEXIS 155 at 72. In other words, the EAPA statute is silent on the issue of whether CBP must show some level of Plaintiffs' culpability in evading the Orders on hardwood plywood from China. The *Diamond Tools* court found CBP's interpretation of the statute unreasonable because CBP allowed a finding of evasion even when the importer did not know, and could not have known, of the material false statement or document or omission. *See id* at 70. In the instant case, CBP made no finding of Plaintiffs' negligence or fraud in entering the covered merchandise into the United States. For this separate reason, the Court must overturn CBP's evasion determination.

## III. CONCLUSION

In light of the foregoing and the legal arguments and positions set forth in the briefs of Consolidated Plaintiff InterGlobal Forest, LLC and Plaintiff-Intervenors in this action, APPI and USG respectfully request

the Court to find that CBP's process for promulgating its interpretive rules was procedurally deficient and failed to ensure the parties' rights to notice and opportunity to be heard. CBP conducted EAPA Inv. 7321 based on defective procedures, and APPI and USG ask the Court to order CBP to withdraw its determinations in this case and lift its enforcement measures against Plaintiffs.

Should the Court be unable to detect any due process violations or deficiencies in CBP's EAPA regulations, Plaintiffs request that the Court find that CBP's determinations were arbitrary and capricious. EAPA Inv. 7321 is a case that is marred by procedural deficiencies. No reasonable connection exists between the record facts and CBP's conclusions. CBP did not disclose its full concerns to the targets and permit them meaningful opportunities to confront their accusers and facts alleged in support of the allegations.

Finally, because CBP did not consider the whole record, the determinations are not based on substantial evidence and are, by any measure, far below the most basic standards of fairness our legal system commands. Other countries may be content with summary

action unsupported by a credible record, and other countries may find acceptable actions taken without any modicum of fairness, but such actions are not acceptable, appropriate, or suitable to those who act on behalf of this country.  Under the guise of "enforcement", CBP evades the deepest notions of law and justice embedded in American (and before that English) legal traditions.

Respectfully submitted,

/s/ Gregory S. Menegaz

Gregory S. Menegaz
J. Kevin Horgan
Alexandra H. Salzman*
Vivien Junghui Wang**
DEKIEFFER & HORGAN, PLLC
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiffs American Pacific
Plywood, Inc. and U.S. Global Forest, Inc.*

Date: January 24, 2022

*Admitted to California Bar; practice supervised by attorneys of the firm who are active D.C. Bar members pursuant to D.C. Bar Rule 49(c)(8).

**Admitted to New Mexico Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).

# Word Count Certificate of Compliance

This brief has been prepared utilizing Microsoft Word 2007 using a proportionally spaced typeface (14 point Century font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth.  Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **11,914** words.  In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**DEKIEFFER & HORGAN, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiffs American Pacific Plywood, Inc, and U.S. Global Forest*