**PUBLIC VERSION**

**SECOND REMAND REDETERMINATION**
*American Pacific Plywood, Inc., et al. v. United States*
Consol. Court No. 20-03914 (Ct. Int'l Trade)
EAPA Cons. Case No. 7321
Remand No. 8296

I.    **SUMMARY**

U.S. Customs and Border Protection (CBP) has prepared this second remand

redetermination pursuant to the order, dated February 27, 2026, issued by the U.S. Court of

International Trade (CIT) in *American Pacific Plywood, Inc., et al. v. United States*, Consolidated

Court No. 20-03914.[1] This remand concerns CBP's affirmative determination as to evasion of

the antidumping and countervailing duty orders (AD/CVD Orders)[2] on certain hardwood

plywood products from the People's Republic of China (China) against importers American

Pacific Plywood, Inc. (American Pacific); U.S. Global Forest, Inc.; and InterGlobal Forest, LLC

(InterGlobal) (collectively, the Importers), under Title IV, Section 421 of the Trade Facilitation

and Trade Enforcement Act of 2015, commonly referred to as "the Enforce and Protect Act" or

"EAPA," 19 U.S.C. § 1517, as well as CBP's affirmative administrative review decision.[3] Given

the long history of this matter, familiarity with the facts and procedure of this case is presumed.

---

[1] *See* Remand Order, Am. Pacific Plywood, Inc. v. United States, Consol. Court No. 20-3914 (Ct. Int'l Trade Feb. 27, 2026), ECF No. 158 (Remand Order or Order).
[2] *Certain Hardwood Plywood Products from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 83 Fed. Reg. 504, 504–13 (Dep't of Commerce Jan. 4, 2018) (AD Order); *Certain Hardwood Plywood Products from the People's Republic of China: Countervailing Duty Order*, 83 Fed. Reg. 513, 513–16 (Dep't of Commerce Jan. 4, 2018) (CVD Order).
[3] *See* Notice of Determination as to Evasion in EAPA Investigation Number (No.) 7321 (June 29, 2020) (Confidential Record (C.R.) No. 204 (Determination)); *see also* Administrative Review Determination (Nov. 5, 2020) (C.R. No. 206) (Admin. Review).

On July 9, 2025, the Court sustained CBP's May 28, 2024 determination on remand finding that InterGlobal evaded the AD/CVD Orders by entering Chinese-origin hardwood plywood into the United States and falsely declaring it as Cambodian in origin.[4] InterGlobal filed a motion for reconsideration, arguing that CBP failed to place on the administrative record and consider certain documents related to the government's 2018 site visit to the purported Cambodian manufacturer LB Wood Cambodia LLC's (LB Wood) facility, which were produced by CBP in discovery in *Richmond Int'l Forest Prods. LLC v. United States*, Case No. 21-178 (Ct. Int'l Trade). On February 27, 2026, the Court vacated the judgment in *American Pacific Plywood II* as it relates to InterGlobal and remanded the matter to CBP to place six additional documents on the record and reconsider the finding of evasion in light of those additional documents.[5] The Court ordered CBP to place the following documents on the administrative record:

- LB Wood Photos (GOV0002579–GOV0002760);[6]

- August 14, 2018, Report of Investigation: Factory Site/Inspection on June 6 & 7, 2018 (GOV0010083–GOV0010087);

- 4/12/2019 Email from [        names        ] Re LB Wood (GOV0010006–GOV0010007);

- 4/12/2019 Email from [        names        ] Re LB Wood (GOV0010008–GOV0010011);

- 5/21/2019 Email from [        names        ] Re LB Wood Followup (GOV0010012–GOV0010015); and

---

[4] *American Pacific Plywood Inc. et al. v. United States*, 791 F. Supp.3d 1348 (Ct. Int'l Trade 2025) (*American Pacific Plywood II*).

[5] Remand Order. The Remand Order did not disturb judgments as to American Pacific Plywood, Inc. (American Pacific) (Case No. 20-03914) and U.S. Global Forest, Inc. (Case No. 20-03915).

[6] The bates numbers refer to the documents produced in discovery in the separate litigation, *Richmond International Forest Products v. United States*, Court No. 21-00318 (Ct. Int'l Trade).

- LB Wood Video (GOV0010209).

During this remand proceeding, after considering submissions by InterGlobal, CBP also placed the following additional documents on the administrative record:

- LB Wood Photos (GOV0010032-GOV0010033, GOV0002751, GOV0002753).

As described in detail below, after consideration of the additional documents that have been added to the administrative record, as well as the outcome of the *Richmond* litigation, CBP continues to find that InterGlobal entered covered merchandise into the United States by means of evasion, when it falsely declared Chinese-origin hardwood plywood as Cambodian in origin.

## II. PROCEDURAL BACKGROUND

In its February 27, 2026 Order, the Court granted InterGlobal's motion for reconsideration and ordered CBP to place the documents described above on the administrative record, and to reconsider its determination of evasion in light of those materials and the agency's concessions in the *Richmond* litigation concerning LB Wood.[7] The Court found that although the issues in the *Richmond* litigation and this matter are not literally identical, CBP's concessions made in the *Richmond* litigation substantially overlap in material aspects with matters at issue in this EAPA case, including "whether LB Wood had the capability—during the same relevant time frame—to manufacture its plywood exports to this country."[8] The Court concluded that the inconsistency between the positions CBP took in the *Richmond* litigation and this matter warranted a return of this matter to the agency and ordered CBP to "provide a reasoned explanation of why it found in this proceeding that LB Wood could not produce its plywood exports when it conceded precisely the opposite in the *Richmond* actions."[9]

---

[7] Remand Order.
[8] *Id.* at 16.
[9] *Id.* at 18.

On March 6, 2026, CBP commenced this remand proceeding by placing an administrative protective order (APO) on the administrative record and providing access to the administrative record of this remand to the parties to the investigation via CBP's Case Management System (CMS).[10] On the same day, as required by the Court, CBP placed the documents identified in the Remand Order on the administrative record, and instructed the parties to submit any rebuttal factual information by March 20, 2026.[11] On March 18, 2026, InterGlobal submitted a letter to CBP requesting that CBP place additional documents on the administrative record.[12] Specifically, InterGlobal listed "at minimum" 35 categories of documents from discovery requests in the *Richmond* litigation, that, in InterGlobal's view, CBP should have placed on the administrative record of this remand proceeding.[13] The categories of documents included additional photos and emails that were produced in discovery in the *Richmond* litigation by the government, identified by bates numbers, as well as broad categories of documents that would require the agency to conduct an e-discovery search of its systems, locate transcripts of depositions of specific employees, and add in again, multiple items already on the administrative record in the EAPA 7321 proceeding.[14] Moreover, InterGlobal requested

---

[10] Trade Remedy Law Enforcement Directorate (TRLED), Revised APO List, *Filed in (8296)*, March 30, 2026; TRLED, Response to Letters, *Filed in (8296)*, March 31, 2026, at Attachment, pages 1, 3 for pertinent emails dated March 6, 2026.

[11] TRLED, Response to Letters, *Filed in (8296)*, March 31, 2026, at Attachment, pages 1, 3 for pertinent emails dated March 6, 2026.

[12] Letter from InterGlobal, Re: EAPA Remand (7321) Filed in 8296 — Failure to Provide Business Confidential Information in Compliance with Order to Remand from the U.S. Court of International Trade to Customs and Border Protection in American Pacific Plywood, Inc., et al. v. United States, Consolidated Court No. 1:20-cv-03914, dated February 27, 2026, March 18, 2026 (InterGlobal's March 18 Letter).

[13] *Id.* at 5.

[14] *Id.* at 5-9. For example, InterGlobal identified "7/18/2019 Email from [        names        ] et al. Re LB Wood," GOV0002749-GOV0002750, GOV0002752, GOV0002754, GOV0002756-GOV0002758, GOV0009988, and GOV0009989-GOV0009995 as items CBP had not added to the record; however, CBP placed those documents on the EAPA 7321 administrative record on September 12, 2019.

4

that CBP add confidential documents from *Richmond* discovery to the administrative record.[15]

Finally, InterGlobal requested a 30-day extension to submit rebuttal factual information.[16]

On March 19 and March 20, 2026, InterGlobal filed lengthy submissions purported to be rebuttal factual information. InterGlobal's submissions consisted of the entire public and confidential portions of the administrative record of this investigation and the first remand proceeding, public and confidential filings from the docket of this matter, Consol. Court No. 20-03914, and public and confidential filings from the docket of the *Richmond* litigation. In addition to these documents, InterGlobal submitted two additional declarations, photos, and a video of LB Wood's facility.

On March 24, 2026, CBP responded to InterGlobal's March 18 Letter, stating that CBP had reviewed InterGlobal's March 18 Letter and identified two additional photos from the 2018 site visit to LB Wood that it would place on the administrative record of this remand.[17] These photos were added because CBP determined that these two photos would have been responsive to the CBP EAPA team's requests for information regarding the site visit of CBP's Center of Excellence and Expertise for Industrial and Manufacturing Materials (CEE), as described in the declaration filed with this Court on February 18, 2026.[18] On the same day, CBP informed InterGlobal that CBP was rejecting InterGlobal's March 19 and March 20, 2026 filings because many items in the submissions were already on the administrative record (either from the investigation or prior remand) and did not purport to rebut the factual information CBP placed on

---

[15] *Id.* at 9.
[16] *Id.* at 11.
[17] TRLED, Email to Parties to the Investigation, RE: American Pacific Plywood Inc. v. United States, 20-3914 (Remand EAPA 7321) *Filed in (8296)*, March 24, 2026, 1:53PM.
[18] Declaration by the lead analyst, *American Pacific Plywood Inc. v. United States*, Court No. 20-3914, ECF 156-2 (Ct. Int'l Trade, February 18, 2026) (Lead Analyst's Declaration).

the administrative record of this remand on March 6, 2026.[19] CBP provided an opportunity to

InterGlobal to submit a corrected filing by 5:00PM EST on March 26, 2026, stating that the

corrected submission must be in rebuttal to the documents placed on the administrative record by

CBP on March 6, 2026, and that the documents already on the administrative record, because

they were added during the investigation or the first remand, do not need to be resubmitted.[20]

On March 24, 2026, InterGlobal responded to CBP by objecting to the rejection of

InterGlobal's March 19th and 20th submissions and accusing CBP of improperly deleting records

from CMS.[21] InterGlobal included CBP counsel as well as a U.S. Department of Justice trial

attorney on this communication. As is CBP's practice, rejected documents are deleted from CMS

to avoid confusion as to what documents are on the administrative record. On March 26, 2026,

InterGlobal timely submitted rebuttal documents. This submission consisted of largely the same

documents as InterGlobal's March 19th and 20th submissions, except that InterGlobal did not

include the administrative record of this investigation and the first remand. While this

submission included documents available on the CIT docket for this matter, which generally

should not be placed on the administrative record, CBP did not reject the submission.[22]

Subsequently, on March 27, 2026, InterGlobal filed another letter on CMS reiterating its

request from its March 18 letter, that CBP place 35 document categories from discovery in the

*Richmond* litigation on the administrative record of this remand proceeding.[23] On March 30,

---

[19] TRLED, Email to Willian Carlsen, Dan Fuller, Hanh Nguyen, and Richard Reincke, Re: Documents Filed March 19, 2026, and March 20, 2026, March 24, 2026, 2:12PM.
[20] *Id.*
[21] InterGlobal, Email to TRLED and DOJ, Re: Documents Filed March 19, 2026 and March 20, 2026, March 24, 2026, 3:21PM.
[22] CBP also notes, that while part of InterGlobal's March 19th and 20th submission was received after the 5PM deadline, CBP exercised its discretion and did not reject the late submission.
[23] InterGlobal, Letter to CBP re Request for Access to the Whole Administrative Record, March 27, 2026.

**PUBLIC VERSION**

2026, after reviewing InterGlobal's letter, CBP added four additional photos from the 2018 site visit to LB Wood's facilities, to the administrative record.

On March 31, 2026, CBP issued a letter in response to InterGlobal's March 18 and March 28 letters.[24] In this letter, CBP explained that in the remand, per CBP's letter reopening the administrative record on March 6, 2026, parties are only allowed to submit factual information to rebut the documents placed on the administrative record by CBP.[25] CBP stated that while parties to the investigation may place information on the administrative record, neither the EAPA statute, nor EAPA regulations allow parties to submit requests for production of documents to CBP.[26] CBP provided the following explanation to InterGlobal, explaining CBP's decision not to add additional documents to the administrative record:

> Outside of the photos that CBP is placing on the administrative record, as described below, remaining items are either internal emails that do not include the EAPA investigative team, documents that were generated after the investigation, documents that only relate to *Richmond International Forest Product LLC*, pleadings filed with the Court of International Trade, or items that have been on the EAPA 7321 case record since September 2019.

> For example, most of the items {InterGlobal} listed in item five of its March 18 letter were already on the case record. {InterGlobal} listed GOV0002749-GOV0002750, GOV0002752, GOV0002754, GOV0002756-GOV0002758, and GOV0009989-GOV0009995 in item five; each of those photographs has been on the EAPA 7321 case record since September 12, 2019. GOV0009988 is an unbracketed version of an email already on the record as of September 12, 2019. GOV00010034- GOV00010035 are the same site visit photographs CBP added to the record on March 24, 2026 as "LB Wood Photos (GOV0002751) – (Remand 7321)- BC" and "LB Wood Photos (GOV0002753) – (Remand 7321)- BC."

---

[24] TRLED, Memorandum to the Parties to the Investigation, Response to IGF's March 18, 2026, and March 27, 2026, Letters, March 31, 2026 (CBP's March 31 Letter).

[25] *Id.* at 1.

[26] *Id.*

PUBLIC VERSION

In item six, {InterGlobal} identified GOV0002759 and GOV0002760 as items CBP had not placed the record; however, CBP placed those items on the CIT Remand 2 record two days before its March 18, 2026 letter, on March 16, 2026, as "LB Wood Photos (GOV0002759) - (Remand 7321) – BC" and "LB Wood Photos (GOV0002760) - (Remand 7321) – BC{.}"

In item seven, {InterGlobal} listed a "7/18/2019 Email from [ names ] et al. Re LB Wood." {InterGlobal} also listed this email in item five as "GOV0009988." CBP placed this email on the EAPA 7321 record on September 12, 2019.

Many of the 35 items identified emails (and email attachments) to/from [ names of individuals ] (such as items 8-16). These emails were not provided to the EAPA 7321 investigatory team during the investigation and do not include the EAPA investigative team. As such, they played no role in CBP's EAPA 7321 determination notice.

In item 18, {InterGlobal} listed "August 14, 2018 Report of Investigation: Factory Site/Inspection on June 6 & 7, 2018 (GOV0010083–GOV0010087)." However, CBP had already uploaded that file to CMS two days before the March 18, 2026 letter, on March 16, 2026, as "08-14-2018 - Report of Investigation - Factory Site Inspection on June 6 and June 7 2018 (GOV0010083 - GOV0010087) - (Remand 7321) - BC.pdf{.}"

In items 19, 21-25, {InterGlobal} indicated that CBP should have added various HQ ruling and NY rulings to the record. CBP did not consider them during its EAPA 7321 investigation.

In item 26, {InterGlobal} claimed CBP should have placed {the} "Public and Private Administrative Record from EAPA Investigation No. 7321, including all documents entered in the first remand and second remand, and all supplemental documents entered into the Administrative Record at any time." CBP notes that {InterGlobal} and the Alleger already have access to these documents as they were filed on {the} CIT's CM-ECF. Furthermore, some of these documents are duplicated in the first remand's CMS location at 7970 in CMS. {InterGlobal}'s paralegal, Richard Reincke, has had continuous access to that in CMS in addition to his access to the additional remand 2 documents in 8296. CBP notes that {the} 8296 CMS location contains only documents that are relevant for this second remand for easy identification and access. As noted, the complete record is available to parties via the court document system.

8

> In item 27, {InterGlobal} listed "All reports from third-party inspectors regarding LB Wood's production facilities and operations, including but not limited to reports from [ company name ] provided to CBP during its investigation of LB Wood's production facilities from {InterGlobal}, American Pacific Plywood, Inc., Richmond, Cosco Star, or any other importer or agent." However, in its initial {Request for Information} RFI response {InterGlobal} stated that "{InterGlobal} utilizes [ description of the company ] to inspect the integrity of its importation of hardwood plywood from various sources, including LB Wood." As such, {InterGlobal} and possibly LB Wood possessed these kinds of documents. Corroborating that, {InterGlobal} did provide a [ company ] "third party summary" in its supplemental RFI response. Thus, {InterGlobal} had at least one of these documents in its possession. If {InterGlobal} had additional documents of this sort, it and LB Wood had the opportunity to submit any additional records of this sort in their possession to the EAPA 7321 case record pursuant to 19 C.F.R. § 165.23(b), as well as in response to CBP's March 6th request to submit rebuttal information in this remand.[27]

Because CBP already addressed the document categories InterGlobal outlined in detail, CBP also rejected InterGlobal's request for a telephonic conference, finding it unnecessary.[28] CBP set the deadline for written arguments as April 10, 2026, instructing the parties to the investigation that no additional submissions other than the written arguments would be accepted onto the administrative record.[29]

On April 9, 2026, InterGlobal submitted another letter to CBP, referring to the CIT's March 31, 2025[30] order denying InterGlobal's motion for clarification, and again challenging the

---

[27] *Id.* at 2-3.
[28] *Id.* at 3.
[29] Email from CBP to the Parties to the Investigation, NT07-29 American Pacific Plywood Inc. v. United States, 20-3914 (Remand EAPA 7321) Filed in (8296) March 31, 2026, 11:28 AM; Email from CBP to the Parties to the Investigation, NT07-29 American Pacific Plywood Inc. v. United States, 20-3914 (Remand EAPA 7321) Filed in (8296) March 31, 2026, 1:52PM.
[30] On March 30, 2026, while the remand proceedings were ongoing, InterGlobal filed a motion for clarification with the Court arguing that the Court should clarify its Remand Order and order CBP to supplement the administrative record with additional documents from the *Richmond* litigation. Mot. For Clarification, *American Pacific Plywood Inc. v. United States*, Court No. 20-03914, ECF 160 (Ct. Int'l Trade, March 30, 2026). On March 31, 2026, the Court

completeness of the administrative record.[31] In it, InterGlobal challenged CBP's March 24, 2026

rejection of InterGlobal's rebuttal information from the administrative record and demanded that

CBP answer the list of questions InterGlobal had included in the letter regarding documents on

the administrative record, produce a complete log of deleted documents from the record, and

grant InterGlobal a telephonic conference.[32] InterGlobal also sought an extension of the

deadlines to submit rebuttal information and written arguments.[33] "In the absence of

compliance," InterGlobal stated that it had no option but to seek relief from the Court.[34] On April

10, 2026, CBP rejected InterGlobal's April 9 letter as untimely, pointing to CBP's March 31

communication, which stated that other than written arguments, no further submissions would be

accepted onto the administrative record.[35] Further, CBP denied InterGlobal's request for an

extension of time for written arguments and rebuttal factual information.[36] CBP stated that the

request for an extension of time to submit written arguments was untimely, as CBP regulations

require such extensions of time to be submitted three business days before the deadline.[37] As for

the request for an extension of time to submit rebuttal factual information, CBP stated that the

deadline for rebuttal factual information was March 26, 2026, such that the request was untimely

and noted that InterGlobal had already submitted more than two dozen documents by that

deadline.[38]

---

denied InterGlobal's motion for failure to meet and confer with the government prior to filing the motion. Order, *American Pacific Plywood Inc. v. United States*, Court No. 20-03914, ECF 161 (Ct. Int'l Trade, March 31, 2026).

[31] InterGlobal, Letter to CBP Re: IGF's Renewed Request to Meet and Confer Regarding Customs' Requirement to Complete the Administrative Record, and IGF's Motion for Clarification and for an Order to Complete the Record, April 9, 2026 (InterGlobal's April 9 Letter).

[32] *Id.* at 13.

[33] *Id.*

[34] *Id.*

[35] Memorandum from CBP to File, EAPA Remand 7321 – Response to InterGlobal Forest, LLC's April 9, 2026, Submission" April 10, 2026.

[36] *Id.*

[37] *Id.*

[38] *Id.*

**PUBLIC VERSION**

On April 10, 2026, InterGlobal timely submitted written arguments. The Alleger, Coalition for Fair Trade in Hardwood Plywood, did not submit written arguments.

On June 1, 2026, CBP issued the draft remand redetermination and sought comments from parties to the investigation. On June 10, 2026, InterGlobal and the Alleger submitted comments.

### III. ANALYSIS

As an initial matter, CBP incorporates by reference the June 29, 2020 determination of evasion where the facts supporting the finding of evasion are discussed in depth and further incorporates by reference the *de novo* administrative review decision issued November 5, 2020, which similarly discusses the information upon which CBP relied to affirm the determination of evasion.[39] Further, CBP incorporates by reference its May 28, 2024 remand redetermination that continued to find evasion after parties to the investigation were permitted to view business confidential information (BCI) on the record under an administrative protective order and submit rebuttal information in response to the BCI as well as written arguments.[40] As discussed below, CBP continues to find that InterGlobal engaged in evasion by entering Chinese-origin plywood covered by the AD/CVD Orders into the United States while declaring it as Cambodian in origin.

### A. Completeness of the Administrative Record

Consistent with EAPA regulations, the administrative record in this matter contains all evidence that CBP obtained and considered in reaching a determination of evasion in this investigation. Under 19 C.F.R. § 165.21, CBP maintains an administrative record of an EAPA investigation that contains:

---

[39] *See* Determination; *see also* Admin. Review.
[40] Confidential Remand Results filed by U.S. Customs and Border Protection, *American Pacific Plywood Inc. v. United States*, Court No. 20-03914, ECF 97 (Ct. Int'l Trade, May 28, 2024) (Remand Redetermination).

(1) Materials obtained and considered by CBP during the course of an investigation under this part;
(2) Factual information submitted pursuant to § 165.23;
(3) Information obtained during and the results of any verification conducted pursuant to § 165.25;
(4) Materials from other agencies provided to CBP pursuant to the investigation;
(5) Written arguments submitted pursuant to § 165.26 and subpart D of this part; and
(6) Summaries of oral discussions with interested parties relevant to the investigation pursuant to § 165.23.[41]

Regulations also provide that CBP will only place information that is properly filed on the administrative record pursuant to 19 C.F.R. § 165.4 and § 165.5.[42] In this matter, all information that was considered by CBP was placed on the administrative record. As explained in the declaration filed with the Court on February 18, 2026, to the extent that certain information pertaining to the 2018 site visit to LB Wood's facility was not included in the administrative record of the investigation, it is because such information was not provided to the analyst in charge of this investigation in response to their requests for information about the site visit.[43] As such, the additional information from the LB Wood site visit that was produced in the *Richmond* litigation, and ordered by the Court to be placed on the administrative record, was not considered by CBP during the investigation. CBP has now added such documents to the administrative record during this remand proceeding pursuant to the Court's Order, and as discussed herein, has considered such information in rendering its decision.

Moreover, as noted above, in the spirit of completeness, CBP has reviewed requests by InterGlobal and placed additional photos from the 2018 LB Wood site visit onto the administrative record because CBP found that such photos would have been responsive to the

---

[41] 19 C.F.R. § 165.21(a).
[42] *Id.* § 165.21(b).
[43] Lead Analyst's Declaration.

12

lead analyst's requests to the CEE for information regarding the site visit. As explained in CBP's March 31 letter to InterGlobal, the additional information from the *Richmond* litigation identified by InterGlobal in its March 18 and March 27 letters is not part of the administrative record, because such information was not considered by CBP in reaching the determination of evasion (nor is there a need for such information to be considered). Moreover, CBP regulations do not allow parties to the investigation to make requests for document production to CBP.[44] Instead, parties to the investigation are allowed to make voluntary submissions of factual information or respond to requests for information from CBP.[45] None of InterGlobal's submissions included the categories of documents identified in its March 18 and March 27 letters. As such, CBP is not placing such documents on the administrative record.

Moreover, given the limited time within which CBP must complete an EAPA investigation and the size of CBP, CBP does not, and cannot, conduct an e-discovery search of agency records to identify all emails and communications that have remote relevance to the EAPA investigation. Once it receives an EAPA allegation, CBP takes reasonable steps to identify other pending enforcement actions involving the parties to the investigation, and employs all other means authorized by law to "obtain information from its own files, from other agencies of the United States Government, through questionnaires and correspondence, and through field work by its officials."[46] Neither the statute nor the regulations, require CBP to place on the administrative record any and all internal emails and communications, and any and all documents, that are remotely associated with the investigation. Rather, what is required is that CBP include in the record the information that was considered by the agency in rendering its

---

[44] 19 C.F.R. § 165.5(a); 19 C.F.R. § 165.23(a)-(b).
[45] 19 C.F.R. § 165.23(a)-(b).
[46] *Id.* § 165.5(a).

13

decision;[47] CBP has done so here. Nor do the statute and regulations require CBP to depose or obtain sworn statements from its employees.

### B. Impact of the *Richmond* Litigation

CBP has considered the government's position in the *Richmond* litigation and continues to conclude that InterGlobal entered covered merchandise into the United States through evasion. The *Richmond* litigation involves two actions brought by Richmond International Forest Products LLC (Richmond) challenging CBP's denial of protests contesting CBP's determination that plywood imported by Richmond was of Chinese origin, and thus subject to the AD/CVD Orders, and claiming instead that Richmond's product was produced in Cambodia at LB Wood's facility.[48] Richmond's entries were made during the period of investigation (POI) in this matter.[49] Both *Richmond* cases were filed at the CIT after EAPA Investigation No. 7321 had been completed, and this matter was already pending before the Court. In *Richmond I*, the government moved for a confessed judgment, agreeing that the plywood was produced in Cambodia, and the case was closed in July 2022.[50] In *Richmond II*, the parties entered into a stipulated judgment in January 2025, where the government agreed that Richmond's entries contained merchandise produced in Cambodia.[51] These settlement documents from both *Richmond* matters have been placed on the administrative record on remand by InterGlobal.[52] Notably, in its July 9, 2025 order, this Court denied InterGlobal's motion seeking that the Court take judicial notice that Richmond and InterGlobal bought the same type of plywood from LB Wood.[53]

---

[47] 19 C.F.R. § 165.21.
[48] *See Richmond Int'l Forest Prods. LLC v. United States*, Court No. 21-00178, ECF 5, ¶¶ 9–17 (*Richmond I*); *Richmond Int'l Forest Prods. LLC v. United States*, Consol. Court No. 21-00318, ECF 13, ¶¶ 9–17 (*Richmond II*).
[49] The period of investigation in this matter was June 5, 2018, to June 29, 2020.
[50] *Richmond II* at ECF 22.
[51] *Id.* at ECF 64.
[52] InterGlobal Rebuttal Information, March 26, 2026.
[53] *American Pacific Plywood II.*

Even though the *Richmond* litigation and this matter both involve plywood produced at LB Wood's facility during the POI, CBP finds that, while the government agreed with Richmond that Richmond's merchandise was produced by LB Wood, CBP does not have sufficient evidence in this matter to conclude that all of InterGlobal's merchandise imported during the POI was produced by LB Wood.

First, the government's stipulations in the *Richmond* litigation were preceded by extensive discovery. Discovery is a normal part of the litigation process in protest litigation; EAPA proceedings, on the other hand, were designed by Congress to be speedy and based on an administrative record. Specifically, as evidenced by InterGlobal's requests to place information from discovery in the other cases onto the record of this remand, in the *Richmond* litigation, the government responded to interrogatory requests and requests for production.[54] Richmond also submitted extensive documentation that demonstrated that specific merchandise subject to the protests was produced in LB Wood's facility.[55] In addition, as evidenced by the LB Wood Video (GOV0010209), Richmond obtained services of a market research firm to travel to LB Wood's facility and observe the production.[56] The collection and review of this evidence happened years after the 300-day EAPA investigation had concluded. In the EAPA investigation, the importers, including InterGlobal, had multiple opportunities to submit information and evidence that their merchandise was produced at LB Wood's facility. Nevertheless, they failed to do so. Specifically, CBP concluded the following:

> LB Wood could not provide documentation to substantiate what products it had actually produced in Cambodia, 2) LB Wood's [                          description of paperwork                    ], 3) LB Wood admitted that [
> description of the product                          ], 4) CBP's site visit revealed that [

---

[54] *Richmond International II* at ECF 36-1, 36-2.
[55] *Id.* at ECF 13, ¶¶ 35-39.
[56] *Id.* at Complaint, ECF 13, ¶¶ 10-11; LB Wood Video (GOV0010209).

15

description of product process                                ], and 5) LB Wood acknowledged that it is [ description of the company's logistics ]. These facts, coupled with others contained in the record, support a conclusion that LB Wood supplied Chinese-origin plywood to InterGlobal and APPI {American Pacific}, which was falsely designated as made in Cambodia when imported into the United States.[57]

Moreover, InterGlobal had additional opportunities to submit evidence during the first remand in this matter to attempt to show that its merchandise was made in Cambodia. Even then, InterGlobal failed to do so, and CBP concluded that InterGlobal had submitted largely duplicative information that was already on the administrative record, as well as two declarations.[58] CBP concluded that "the additional information submitted on remand, if anything, supports the conclusions previously reached by the agency."[59] The Court sustained CBP's first remand redetermination, finding that "no part of its redetermination is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[60] InterGlobal is trying to benefit from another importer's commitment to provide comprehensive evidence of the origin of that importer's merchandise, while itself only submitting self-serving declarations to the administrative record.

Second, the *Richmond* litigation was limited to review of 59 entries by one importer. The discovery, while extensive, focused on those specific entries. This investigation was broader and involved merchandise imported by three importers that was purportedly manufactured by two different suppliers. The fact that Richmond was able to show that its merchandise was produced in Cambodia, and that LB Wood had the capacity to produce merchandise that it exported to Richmond, does not mean that LB Wood also had the capacity to manufacture merchandise

---

[57] Admin. Review at 21.
[58] Remand Redetermination at 13-14.
[59] *Id.* at 14.
[60] *American Pacific Plywood II* at 28.

exported to two other importers subject to this EAPA investigation. CBP has consistently

acknowledged that LB Wood had some capacity to manufacture some plywood, but that the

capacity appeared limited and lower than what was claimed. In its final determination, CBP

pointed out numerous facts that cast doubt on LB Wood's total production capacity, which

InterGlobal has failed to rebut. Specifically, CBP made the following findings regarding LB

Wood's exports to InterGlobal:

- While LB Wood appears to possess machinery capable of producing some amount of plywood in Cambodia, the record evidence, including LB Wood's lack of a functioning [   product   ] and the inconsistencies of its production records, shows that its machinery likely could not produce the entire quantity of plywood that it claimed.[61]

- {R}eview of LB Wood's documentation indicates that [   description of an event   ]. The [ description of an event    ] occurred from [  date  ], to [  date  ], and totaled [  amount  ]. Additionally, [   description of an event   ]. CBP observed an email pertaining to a payment from InterGlobal and addressed to "[   name and email address   ]" with "[ email address    ]" cc'ed. The email was dated [   date   ]; pertained to LB Wood plywood that InterGlobal purchased, "[   description of a document   ];" and yet it did not contain any LB Wood email addresses. CBP observed similar emails pertaining to the sale of LB Wood's plywood to American Pacific. This contradictory documentation calls into question the accuracy of LB Wood's claims concerning [  company  ]'s lack of involvement in the sale and production of LB Wood's plywood.[62]

- LB Wood provided payroll sheets and financial reports, in which CBP observed certain inconsistencies. Specifically, CBP noted a difference of $[  amount  ] between the payroll sheets and the salary payable on the balance sheet from [ date range    ]. LB Wood had an average of [  number  ] employees during this period; therefore, this difference is the equivalent of about [  number  ] employees.[63]

- In its RFI responses, LB Wood provided warehouse-in tickets and warehouse-out tickets. Among these tickets, there was a [  number  ] percent difference between the total veneer sheets going into the warehouse and the total number going out.[64]

---

[61] Determination at 7.
[62] *Id.* at 7-8.
[63] *Id.* at 8.
[64] *Id.*

- LB Wood provided various other documents pertaining to its production, sale, and exportation of plywood to InterGlobal. Using these documents, CBP reviewed several transactions, from initial purchase of raw materials to customer payments for finished merchandise. These reviews pertained to invoice [    number    ]/entry [    number    ]6164, invoice [    number    ]/entry [    number    ]7576, invoice [    number    ]/entry [    number    ]8194, and invoice [    number    ]/entry [    number    ]8376. After examining these documents, CBP noticed certain factual discrepancies. In each of the four reviews, the manufacturing dates on the California Air Resources Board (CARB) certificates did not match the manufacturing dates in the production records. For invoice [    number    ]/entry [    number    ]7576, the amount packaged and shipped was [    number    ] pieces greater than what was produced. For invoice [    number    ]/entry [    number    ]8376, CBP noticed that the date on the bill of lading that InterGlobal provided did not match the date on the bill of lading that LB Wood provided. Moreover, in each of the four reviews, CBP was unable to tie LB Wood's production records to its raw material purchase records.[65]

- The fact that the number of veneer sheets that LB Wood claimed it purchased did not match or correlate to the number of sheets that they claimed to have used in the production of completed plywood renders these figures unusable for our purposes. Because CBP cannot tie these figures, LB Wood's production claims remain unsubstantiated. Additionally, because CBP cannot be certain of LB Wood's production capabilities, CBP cannot be certain that LB Wood had the capability to produce all of the plywood they claimed was Cambodian origin. Consequently, the origin of the merchandise that InterGlobal and American Pacific imported from LB Wood cannot be reliably assumed to be Cambodian-origin.[66]

- Because the subject merchandise was com{m}ingled and no reliable evidence exists on the record to differentiate between the Cambodian-origin and Chinese-origin plywood, all subject merchandise that InterGlobal and American Pacific entered from LB Wood during the period of investigation is subject to the AD/CVD rates from plywood from China.[67]

Given CBP's findings that the merchandise at LB Wood was commingled and there was no reliable evidence to distinguish between Cambodian- and Chinese-origin merchandise, and given that the *Richmond* stipulation was based on the evidence that was specific to entries that were imported by Richmond, an importer not investigated by the EAPA team in this case, CBP

---

[65] *Id.* at 9.
[66] *Id.* at 10.
[67] *Id.*

18

concludes that the stipulation in the *Richmond* litigation does not change the analysis in this matter. If anything, it buttresses CBP's original conclusion – the fact that Richmond was able to adequately trace the origin of its entries to LB Wood's production, to the satisfaction of CBP, indicates that doing so is feasible; that InterGlobal has failed to do the same thus supports CBP's conclusion that the facts do not match InterGlobal's claims.

### C. Additional Administrative Record Documents

As discussed in the final determination and summarized above, CBP found that InterGlobal was evading the AD/CVD Orders based on several key pieces of evidence: "the manufacturers' extensive connections to China, CBP personnel's observations during the 2018 site visits to LB Wood's and Happy Home's Cambodian manufacturing facilities, and a multitude of discrepancies and inconsistencies in the documentation that the Importers and manufacturers provided to CBP throughout the investigation."[68]

The record was replete with LB Wood's connections to plywood manufacturing in China. During the original EAPA investigation, it was determined that LB Wood sourced "most of its raw materials, [      number      ] percent by value, from [                names of companies and their locations      ]"[69] LB Wood sourced raw material from [ name of company      ], a [      description of company and the location ].[70] LB Wood was registered as a business in Cambodia by [      company      ] only [ amount      ] after the preliminary AD determination covering plywood from China.[71]

However, LB Wood was not forthcoming about its connections to plywood manufacturing in China. Its suppliers, [          names of companies      ], issued

---

[68] *Id.* at 9-10, 16-17.
[69] *Id.* at 6.
[70] *Id.* at 5-6.
[71] *Id.* at 5.

sales contracts and invoices that had the same formats and listed the same telephone and fax numbers, [                    phone and fax numbers                    ].[72] Both companies' company stamps on these documents are almost identical as well.[73] Moreover, the previously-mentioned [                    name of individual and company names along with telephone and fax numbers                    ].[74] [          name of individual          ], and is the same [               description of individual and company               ].[75] These common sales contracts, invoices, telephone number, fax number, and company stamps indicate [

description of several companies                              ].

Notably, CBP asked LB Wood to identify its affiliates; however, LB Wood identified [

name of company          ] as an affiliate but did not list [          names of companies

] as affiliates.[76] Thus, LB Wood omitted and concealed material evidence from CBP concerning its affiliation with [               names of companies               ]. LB Wood concealed this affiliation from CBP to give the appearance it was sourcing from unaffiliated companies other than its [               description of company               ]. Because

[      company name      ] is LB Wood's parent company and [

description of company                    ], LB Wood is also affiliated with [               names of companies               ]. This is corroborated in that LB Wood also issued invoices with the same format as [          names of companies          ].[77] This common format

---

[72] *Id.* at Exhibit 12.1. The same telephone and fax numbers are also listed on Thai import declarations and bills of lading.

[73] *Id.*

[74] *See* Letter from InterGlobal, "EAPA Con. Case No. 7321 InterGlobal Forest Questionnaire Response," dated October 28, 2019 (InterGlobal RFI) at Exhibit 2, pages 22-24.

[75] *See id.*; *see also* Letter from InterGlobal, "EAPA Con. Case No. 7321 InterGlobal Forest Questionnaire Response," (InterGlobal Supplemental RFI) at SQ1-5, page 1. [                    description of individual and company                    ].

[76] *See* Letter from LB Wood, "EAPA Con. Case No. 7321 LB Wood Questionnaire Response, dated November 8, 2019 (LB Wood RFI) at 4-8 and Exhibit 2.

[77] *Id.* at Exhibit 1, pages 319, 333, 344, 356, 370, *etc.*

20

indicates that all three invoices were issued from a common source. The common invoice format, combined with LB Wood not being forthcoming about its connections to Chinese plywood manufacturers and their affiliation, could suggest that LB Wood/[   name of company   ] created the invoices in [              company names              ]'s names and submitted them to CBP.

LB Wood/[   name of company   ] may have also created [ company names                                ]'s invoices to hide the original invoices and create new documents indicating LB Wood imported only veneers from its suppliers. If so, LB Wood omitted and concealed the original invoices from CBP and thus omitted and concealed material evidence. Further, LB Wood's concealment of material evidence is consistent with the evidence that it transshipped Chinese-origin merchandise through its facility.

Because [                                          description of the company and the location                                ] City, that would have made it easy for [ company name                ] to supply them with the materials they exported to LB Wood. Corroborating that this was the case, LB Wood provided its list of imported raw materials.[78] The list indicated that LB Wood sourced all of its imported [         product         ] from [ names of companies                        ].[79] LB Wood's accounts payable also listed another company named [                         description of companies ].[80] The references to [            company name            ] are limited; therefore, it is uncertain whether the company is also affiliated with [       company name        ]. However, [            company name            ] is located near [    location of company     ]

---

[78] *See* LB Wood RFI at Exhibits 12.1 and 12.2.
[79] *Id.* at Exhibit 12.1. LB Wood also imported a few shipments of [       product       ] from other companies.
[80] *See* Letter from LB Wood, "EAPA Con. Case No. 7321 - LB Wood Supplemental Questionnaire Response," dated December 16, 2019 (LB Wood Supplemental RFI) at Exhibit SQ1-4.

21

City and so it would have been convenient for [          description of company          ]

to export its merchandise to LB Wood as well.

LB Wood provided a list of imported raw material purchases that purported to list all of

its raw material imports from [     date     ], 2018, to [     month     ] 2019.[81] However, the

list omitted all the raw material purchases LB Wood made from [          names of companies

] that were denoted in LB Wood's 2018 accounts payable list.[82] LB Wood's 2018 accounts

payable listed [          names of companies          ] as the suppliers of dozens of raw

material purchases in 2018, many of which were dated after [     date     ], 2018.[83] These

listings contained descriptions like "[          description of a

transaction          ]{.}"[84] Thus, [          names of companies

] probably exported [     company name     ]'s merchandise.

Additionally, many of the listings denoted as "[

description of an event          ]" were dated "[     date     ]" or later.[85]

As such, the listings after [     date     ] are within the date range of LB Wood's raw

material import list.[86] However, that list does not contain a shipment with the [     date

] date nor does it contain any shipments from [     names of companies     ].[87] LB

Wood's initial RFI response included invoices, sales contracts, and bills of lading for the

purchases denoted in the raw materials import list from [

names of companies          ].[88] Because LB Wood purchased from [

---

[81] *See* LB Wood RFI at Exhibit 12.1.
[82] *See id.*; *see also* LB Wood Supplemental RFI at Exhibit SQ1-4. Although row one indicates [
several dates          ].
[83] *See* LB Wood Supplemental RFI at Exhibit SQ1-4, page 10.
[84] *Id.* at Exhibit SQ1-4.
[85] *Id.*
[86] *See* LB Wood RFI at Exhibit 12.1.
[87] *Id.*
[88] *Id.*

company names                    ] during the list's date range, it would be expected that LB Wood would have provided documents from them. However, LB Wood's RFI responses did not include invoices, sales contracts, bills of lading, or any other documents concerning its import purchases from [          company names          ]. As such, these documents were omitted from LB Wood's RFI responses.

Also, those [                              description of an even and timeframe ] were denoted as "[          product          ]"; however, LB Wood's raw material import list does not contain any imports of [          product          ]{.}"[89] The fact that LB Wood's raw material import list does not contain any references to shipments dated to [ date ], 2018, or to [          product          ]" also indicates that LB Wood omitted those items from the list it submitted to CBP.[90]

The omission of these shipments from LB Wood's import shipment list may indicate that LB Wood also omitted certain warehouse-in tickets.[91] This omission may be reflected in the fact that LB Wood provided [ number ] percent fewer warehouse-in tickets (by veneer sheet quantity) than warehouse-out tickets.[92] This discrepancy would be expected if LB Wood did not submit the warehouse-in tickets to CBP that pertained to its incoming Chinese-origin plywood from [          company names          ].[93] This misrepresentation and omission of references to import shipments of [          product          ]" from [          company names          ] and warehouse-in tickets indicates that LB Wood's raw material documents are not reliable.

---

[89] *Id.*

[90] *Id.*

[91] *See* Determination at 8; *see also* LB Wood Supplemental RFI at Exhibits SQ1-1 and SQ1-2.

[92] *Id.*

[93] *Id.*

Corroborating the unreliability of LB Wood's documents, the payroll amount in its payroll sheets was very different from the salary payable on the balance sheets.[94] Furthermore, more than two dozen of these payroll sheets listed "[          company name          ]" as the company they pertained to and several others indicated "[          company name          ]."[95] The payroll sheets' references to other companies, coupled with the payroll amount not matching the balance sheet, likely indicates that LB Wood obtained paper copies of these payroll sheets from other companies and imposed its company name on them. The purpose would be to create the appearance that LB Wood had more employees than it actually had and substantiate that it had enough employees to produce the quantities it exported. The fact that LB Wood did not have enough employees was reflected in the [     name     ] statement that "This is a sophisticated product coming from a factory that barely had any employees or much manufacturing."[96]

Regarding other deceptive tactics, LB Wood made a false statement to CBP during the EAPA 7321 proceeding concerning LB Wood's owner [     company     ]. For context, LB Wood stated that it was registered in [     date     ], "imported and installed production equipment in [     date range     ]," and purportedly began producing in "[     date     ]."[97] Regarding [     company     ]'s role in its inception, LB Wood stated that LB Wood's owners [

description of an event

].[98] Notably, [

---

[94] *See* LB Wood RFI at Exhibit 10; *see also* LB Wood Supplemental RFI at Exhibits SQ1-6 through SQ1-8; *see also* Determination at 8.
[95] *See* LB Wood RFI at Exhibit 10, pages 4-7, 9, 11, 15, 17, 21-22, 24, 26, 29, 33-34, 38, 41, 45, 47, 49, 53, 57, 60, 64, 66, 68, 71-72, which denote "[          company name          ]" and pages 112, 114, and 117, which denote "[          company name          ]."
[96] *See* CBP Memorandum, "Adding Certain Documents to the Administrative Record," dated September 12, 2019 (Sept. 12, 2019 Memorandum) at 14.
[97] *See* LB Wood Supplemental RFI at 3.
[98] *See* LB Wood RFI at 5-6.

description of an event                                                                                   ]."[99] For

the period after LB Wood's establishment, LB Wood claimed that [

description of a transaction                                            ]."[100] LB Wood made two

additional statements implying the same thing: "[

description of the an event with the company                          ]" and "[

description of an event with the company                      ]."[101] Because LB Wood

imported several shipments from [        company        ] well after LB Wood's establishment,

such as those dated "[        date        ]," LB Wood made a false statement to CBP when

it claimed that [                description of an event with the company                ]."[102]

This false statement corroborates that the documents originating from LB Wood are not reliable.

　　　　Although LB Wood claimed [        company        ] was [

description of an event                                ], record evidence shows that in addition to

supplying LB Wood, [        company        ] sold the plywood for LB Wood.[103] CBP

observed multiple [        date        ] emails from InterGlobal pertaining to a payment

for LB Wood plywood; these emails were addressed to [        email address        ]

and cc'd "[        email address        ] and did not contain any LB Wood email

addresses.[104] Likewise, CBP observed nine payment-related emails pertaining to the sale of LB

Wood's plywood to American Pacific, which were addressed to "[        individual and

company        ]" or "[        company        ]" rather than LB Wood.[105] As

---

[99] *Id.*
[100] *Id.* at Exhibit 2.
[101] *Id.* at 7 and 12.
[102] *Id.* at Exhibit 2.
[103] *Id.* at 7.
[104] *See* InterGlobal RFI at Exhibit 16, page 2198; *see also* Determination at 7.
[105] *See* Letter from American Pacific, "EAPA Con. Case No. 7321 – American Pacific Plywood Questionnaire Response," dated October 28, 2019 (American Pacific RFI) at Exhibit 17, pages 10, 20, 35, 44, 54, 65, 97, 117, and 128; *see also* Determination at 7.

25

explained above, [                                                              description of individual

and the company                        ]."[106] This contradicts LB Wood's claim that [

description of an event              ] and is additional evidence that documents originating from

LB Wood are not reliable.

LB Wood was unable to demonstrate that it had adequate production capacity to supply

InterGlobal with sufficient quantities of Cambodian-origin plywood to match the volume

InterGlobal imported to the United States during the whole POI. On June 6, 2018, [   name of

individual        ], CBP's [        title          ] for wood products, conducted an [

description          ] site visit to LB Wood's facility in Cambodia as part of a [

description of an event                  ].[107] During this visit the [      name      ] noted the

presence of [      product       ] plywood at LB Wood and articulated that Cambodia's tropical

climate is not suitable to grow [        product         ], which is a temperate wood.[108] Because

the [    name     ] observed plywood made from temperate wood at LB Wood, and it noticeably

lacked veneer overlaps, gaps, and voids that would be characteristic of plywood produced in

Cambodia from less sophisticated production techniques, the [   name    ] believed the products

were made in China.[109] Other observations by the [      name      ] at the site visit included "few

employees" and "not much manufacturing."[110] And despite photographs from the 2018 site visit

depicting multiple pallets of [     product     ] plywood, the [   name   ] reported that LB

Wood's [              product              ] "was small, broken into multiple pieces, and covered

in a thick layer of dust," which indicated any [        product        ] plywood leaving LB

---

[106] *See* InterGlobal RFI at Exhibit 2, pages 22-24; *see also* InterGlobal Supplemental RFI at Exhibit SQ1-5, page 1.
[107] *See* Determination at 6; *see also* Admin. Review at 16; *see also* Sept. 12 Memorandum at 14; *see also* CBP Memorandum, "Adding Certain Documents to the Administrative Record," dated September 13, 2019 (Sept. 13, 2019 Memorandum) at 83, 91.
[108] *See* Determination at 6; *see also* Sept. 12, 2019 Memorandum at 2, 14, 20-21.
[109] *See* Determination at 6; *see also* Sept. 12, 2019 Memorandum at 2, 14.
[110] *Id.*

Wood's factory before the site visit was not [    product    ] there.[111] CBP determined during its investigation that LB Wood did have "machinery capable of producing some amount of plywood in Cambodia," but LB Wood failed to substantiate the production capacity of its machinery for the entire POI.[112]

As explained above, for the entries CBP reviewed, CBP was "unable to tie LB Wood's production records to its raw material purchase records."[113] As articulated in the Final Determination:

> Overall, CBP finds that record evidence—including the magnitude of the AD/CVD duties placed on merchandise from [    company description    ]; the timeline of its establishment; CBP officials' observations of a lack of employees, minimal production, and [    product    ] plywood at LB Wood's factory without a functional [    product    ] machine to [    product    ]; the various discrepancies in record evidence; and the unsubstantiated production quantities—indicates that LB Wood could not have produced all the plywood it claimed to have produced in Cambodia. Consequently, record evidence shows that Cambodian-origin plywood was com{m}ingled with Chinese-origin plywood, which was then exported to InterGlobal and American Pacific and entered as [    description    ] entries that evaded the payment of AD/CVD duties on plywood from China.[114]

This decision was affirmed by CBP's Regulations and Rulings Directorate (R&R) on November 5, 2020, when R&R issued a *de novo* administrative review decision determining "the import data, coupled with the evaluation of the production capabilities at the factories, discrepancies in the record evidence and unsubstantiated production quantities" support a conclusion that LB Wood supplied Chinese-origin plywood to InterGlobal, "which was falsely designated as made in Cambodia when imported into the United States."[115] And the final determination was again sustained in CBP's May 28, 2024 remand redetermination, which found

---

[111] Determination at 7; Sept. 12, 2019 Memorandum at 14-18.
[112] Determination at 7.
[113] *Id.* at 9.
[114] *Id.* at 10.
[115] Admin. Review at 21.

that rebuttal information added to the record by InterGlobal (the only party to add information to the record on remand), was either duplicative of what was already presented on the record or supports the determination of evasion.[116]

Even during the initial remand when InterGlobal was afforded another opportunity to submit documentation establishing sufficient production capability, it fell flat. The sole rebuttal information included a declaration from InterGlobal's Chief Operating Officer, Kurt Winn, which included photographic exhibits, and a declaration by Mr. Fu Wenjie, General Manager of LB Wood.[117] The declaration of Mr. Winn explains the relationship between LB Wood and InterGlobal as well as his visits to LB Wood during 2018 and inspections of LB Wood by [ company name        ] and independent, local inspectors.[118] But the pre-remand record already includes a report from [            company name            ] as well as photographs purporting to show the production equipment and personnel of LB Wood that Mr. Winn took during his trips to LB Wood.[119]

As further explained in the initial remand redetermination, if anything, Mr. Winn's declaration supports the finding of evasion.[120] For example, Mr. Winn's declaration corroborates LB Wood's close relationship to [ company name ], and despite claiming there were independent, local inspectors hired to monitor the production of merchandise destined for import by InterGlobal, Mr. Winn does not identify them or evidence of their work.[121] If such purported smoking gun evidence truly existed, it is baffling why neither InterGlobal nor LB Wood produced reports or testimony from these third-party inspectors. The only paragraphs of the

---

[116] Remand Redetermination at 13.
[117] *Id.* at 13-14; Declaration of Kurt Winn (Apr. 30, 2024), filed Apr. 30, 2024 (Winn Declaration); Declaration of Fu Wenjie (April 11, 2024), filed April 12, 2024 (Wenjie Declaration).
[118] Remand Redetermination at 14; Winn Declaration.
[119] Remand Redetermination at 14.
[120] *Id.* at 14-17.
[121] *Id.* at 16.

declaration that do not directly cite to evidence previously on the record speak to the declarant's ability to serve as an affiant, relate to the business confidentiality of certain information, and provide Mr. Wenjie's "opinion about the June 6, 2018 CBP site visit that CBP believes is outweighed by CBP's own employee's factual observations, or references purported visits by Mr. Winn and two other individuals to LB Wood with observations on production capacity."[122] These statements are years after any such visits occurred, and it remains perplexing that any such testimony was not produced in the initial investigation, which renders it suspect. Similarly, as explained in the prior remand redetermination, the declaration by Mr. Wenjie, inadvertently accepted onto the record despite being late, "adds no substantive value in that it merely restates information already placed on the pre-remand administrative record."[123]

In light of the Court's February 27, 2026 Remand Order, CBP has added or accepted onto the record materials that would have been responsive to the lead analyst's request for information related to the June 2018 site visit.[124] As addressed above, CBP added only these records because they are what the lead analyst "*wanted* to consider" but was unable to because of their omission from the [   name   ] response when the analyst asked for "any reports that were generated following" the site visit as well as "photos or reports obtained during or generated after the site visit."[125] Other related records produced in the *Richmond* discovery are therefore outside of the scope of this remand because they were not considered by the EAPA investigative team in this investigation nor sought by the team during that investigation. CBP addresses each such material below.

---

[122] *Id.* at 17-18.
[123] *Id.* at 17 (further explaining what information was on the record and what was subjective opinion entitled to no weight).
[124] Opinion, *Am. Pacific Plywood, Inc. v. United States*, Consol. Court No. 20-3914 (Ct. Int'l Trade Feb. 27, 2026), ECF No. 157 (Remand Opinion) at 22-23.
[125] *Id.* at FN 14, 22; Lead Analyst's Declaration at 9-10.

### 1. LB Wood Photograph (GOV0002751)

This photograph (GOV0002751) shows what appears to be [          products          ].[126]
The [   name   ] provided another similar photograph of [          products          ] to the EAPA
investigative team during the EAPA investigation, which was previously placed on the record in
2019.[127] The photograph is therefore duplicative of evidence already present on the record. The [
products          ] do not negate the fact that the [     name     ] observed an unused [
products          ] machine and packaging indicating LB Wood's plywood was [
products ], and that the facility machinery had inadequate production capacity, as discussed
above.

### 2. LB Wood Photographs (GOV0002753, GOV0010033)

The photographs at GOV0002753 and GOV0010033 both depict [          products          
].[128] Several of the photographs that the [     name     ] sent via email to the EAPA 7321 analysts
during the investigation also contained [          products          ].[129] Therefore, these photographs
are duplicative and add no further evidence to the record. Mere presence of [
products          ] at the LB Wood facility does not affect the prior EAPA 7321 remand
redetermination because the [   name   ] stated that the "[   product   ] the [   name   ] observed
at the facility during the site visit was "small, broken up into multiple pieces, and covered in a
thick layer of dust".[130] As previously explained, the [     name     ] therefore concluded any [
description of product          ] plywood leaving that factory prior to June 2018 was not [
description of product          ] there.[131] Thus, the [     description of product          ] were not being

---

[126] *See* LB Wood Photos (GOV0002751) - (Remand 7321) – BC.
[127] *See* Sept. 12, 2019 Memorandum at 14, 19.
[128] LB Wood Photos (GOV0002753) - (Remand 7321) – BC; LB Wood Photos (GOV0010033) - (Remand 7321) –
BC.
[129] *See* Sept. 12, 2019 Memorandum at 15-18.
[130] *See* Sept. 12, 2019 Memorandum at 14-15.
[131] Admin. Review at 16; Determination at 6.

used to produce the merchandise imported by InterGlobal during the full POI, which ran from

June 5, 2018, through the pendency of the investigation, because the [ product ] machine was

not operational.[132]

### 3. LB Wood Photos (GOV0010032)

GOV0010032 is a poor quality, pixelated and darkened photograph that is hard to

interpret but appears to depict a [ product ].[133] The presence of a [ product ] at LB

Wood's facility does not affect production capacity, and so it does not affect CBP's decision

concerning LB Wood's facilitation of transshipment.

### 4. LB Wood Photos (GOV0002759, GOV0002760)

GOV0002759 and GOV0002760 show LB Wood's storage of plywood on [ product

].[134] Some of these [ description of the product ] on the side.[135]

The [ name ] provided a photograph during the investigation that likewise showed [

description of product ] merchandise at LB Wood's facility with [ company name ] on the

side.[136] The [ name ] further explained based on observations during the site visit that

InterGlobal's packaging indicated it was [ product ] but, as previously noted, LB Wood's [

description of product ] machinery was not working when [ name ] visited.[137] Thus,

InterGlobal's plywood was [ product ] elsewhere, namely at its [ description of company ]

parent company's facility or one of its Chinese affiliates.

These photos also show larger portions of the LB Wood facility, the majority of which

appears to be dedicated to [ description of an area at the company

---

[132] *See* Determination at 3; *see also* 19 U.S.C. § 1517(b)(5); *see also* 19 C.F.R. § 165.13; *see also* 19 C.F.R. § 165.2.
[133] LB Wood Photos (GOV0010032) - (Remand 7321) – BC.
[134] LB Wood Photos (GOV0002759) - (Remand 7321) – BC; LB Wood Photos (GOV0002760) - (Remand 7321) – BC.
[135] LB Wood Photos (GOV0002760) - (Remand 7321) – BC.
[136] *See* Sept. 12, 2019 Memorandum at 15-18, 20-21.
[137] *Id.* at 14, 20.

**PUBLIC VERSION**

].[138] As such, these photographs corroborate the [    name    ] following statement about LB Wood: "Note, that, again, the plywood is clear of laps and voids. This is a sophisticated product coming from a factory that barely had any employees or much manufacturing."[139]

> 5. *August 14, 2018 Report of Investigation: Factory Site/Inspection on June 6 & 7, 2018 (GOV0010083–GOV0010087).*

During the June 6, 2018 site visit to LB Wood, [

description of an event                                                       ].[140] [

name                  ] created a site visit report, in which it noted it was focused on

investigating [

description of an event that occurred

][141] While the report describes [

description of an event

], the report makes clear that it relates to [

description of an event

][142] Notably, this report does not address the actions of any [

description of an event                              ]. This report also does not specify

beyond [                  description of information                  ]."[143] The report later states

that on the site visit, [

description of an event and personnel                  ]"[144] This could be inferred to

---

[138] LB Wood Photos (GOV0002759) - (Remand 7321) – BC; LB Wood Photos (GOV0002760) - (Remand 7321) – BC.

[139] Sept. 12, 2019 Memorandum at 14.

[140] *See* 08-14-2018 - Report of Investigation - Factory Site Inspection on June 6 and June 7, 2018 (GOV0010083 - GOV0010087) - (Remand 7321) (Site Visit Report).

[141] *Id.*

[142] *Id.* at GOV0010084.

[143] *Id.*

[144] *Id.*

**PUBLIC VERSION**

connect those from CBP [                    description of an event

], but given [

description of personnel and an event                              ].

Although the [    name    ] recollection and the [    name    ] report

complemented each other on almost every point, one apparent contradiction with the [

description of the company and an event

].”[145] [    name    ] provides no source for this information as to whether it was based on

personnel seeing this [

description of the company                    ]. The photographs taken during the

June 2018 site visit do not depict this [    description of personnel    ].[146]

In a section which [

description of an event                    ]” [  name  ] describes that [

description of an event along with date and amounts

] in merchandise.[147] [        name        ] notes that [

description of the company and an event which occurred

].[148] Importantly, [  name  ] highlights that [

description of an event occurring at the company                    ].”[149] [    name    ]

noted [

description of an event occurring at the company during visit

].”[150] Note that it appears there is a typo in the previous sentence (i.e., the “not”), given the

---

[145] *Id.* at GOV0010085.
[146] LB Wood Photos (GOV0002759) - (Remand 7321) – BC; LB Wood Photos (GOV0002760) - (Remand 7321) – BC.
[147] Site Visit Report at GOV0010084-85.
[148] Site Visit Report at GOV0010085.
[149] *Id.*
[150] *Id.*

context. Because [

description of an event

] claims that it was produced at LB Wood. This sentence, as well as the observations about the [

description of an event occurring at the company visit

] in a report dated within months of the site visit seems to provide a contemporaneous account of the visit, which InterGlobal has previously noted as a limitation in the evidence CBP relied on to find evasion.[151]

The report corroborates the observations made by the [                    description of personnel                    ], later documented in emails discussed below, including directly incorporating findings by CBP personnel: [

description of an event at the company

]"[152] [     name     ] noted similar observations as had the [     name     ], including a [

description of an event at the company

].[153]

Beyond confirming certain findings of the [     name     ], the report refers to [

description of company                    ]{.}[154] This is consistent with LB Wood's

RFI response, which indicates that it is [

description of the company                    ].[155] LB Wood affirmed that, in

---

[151] *Id.*; *Letter from InterGlobal, Re: EAPA 7970 (Remand 7321) – Respondent Interglobal Forest LLC's Written Arguments And Rebuttal Evidence*, dated Apr. 11, 2024 (InterGlobal Written Arguments from First Remand) at 13-14.
[152] Site Visit Report at GOV0010085.
[153] *Id.*
[154] *Id.* at GOV0010084-85.
[155] LB Wood RFI at Exhibit 2. The "[ company ]" portion of its name indicates [ company ] is located in [ location ] City, China. *Cf.* LB Wood RFI at Exhibit 12.1, pages 6, 73, which likewise show that [     names of companies and location     ]. [ company ]'s ownership and close relationship with LB Wood is reflected in

addition to its ownership role, "[

description of company                                               ]{.}"[156] InterGlobal began

importing from [          company          ] and so had a longstanding relationship with the

company.[157] InterGlobal implied that [      company      ] referred InterGlobal to [   company   ]

affiliate LB Wood.[158] InterGlobal's first entry into the United States from LB Wood arrived in

April 2018, only a few months after the January 2018 AD Order and [

description of an event                    ] noted by [    name    ] report.[159] When combined with

the [                    description of an event at company                         ], CBP's

findings regarding LB Wood's affiliation and close partnership with [

description of company                         ] signals, at minimum, commingling of Chinese-

and Cambodian-origin plywood.

> 6.  *4/12/2019 Emails between [      names of individuals      ] Re LB Wood
>      (GOV0010006–GOV0010011).*

Further substantiating that LB Wood had limited production capacity, in GOV0010006 to

GOV0010007, the [      name      ] states that photographs of the facility from [

date and conversation                         ]."[160] In response, another CBP employee with

the [

---

that LB Wood's general manager [   name   ] has an email address with an [   company   ] domain, [
email address                    ]. LB Wood claimed he also had an LB Wood email address; however, it was general
and not personalized, [      email address      ]. *See* American Pacific RFI at Exhibit 3; *see also* LB Wood RFI at 1.
[156] *See* LB Wood RFI at 7.
[157] *See* 06-17-2019 - NTAG - InterGlobal Entries Report - (7321) – BC (included in the EAPA 7321 record).
InterGlobal stated it "had been purchasing plywood from [
description of company             ]" *See* InterGlobal RFI at 6.
[158] American Pacific RFI at 6.
[159] *See* 06-17-2019 - NTAG - InterGlobal Entries Report - (7321) – BC (included in the EAPA 7321 record); Site
Visit Report at GOV0010085.
[160] *See* 04-12-2019 – Email from [      names      ] Re LB Wood (GOV0010006 – GOV001007) – (Remand
7321).

description of an event

].”[161] Likewise, GOV0010008-GOV0010011 include emails on the same chain indicating that

the [                    description of company                    ].”[162] The [

description of company                    ].”[163] These messages document CBP personnel's

recollections under a year after the site visit took place and thus should be accorded more weight

than declarations submitted by InterGlobal years after the purported events contained therein,

especially in light of their harmony with [      description      ] recorded in the [   name   ]

report, explained above.

> **7.** *5/21/2019 Email from [    individual names    ] Re LB Wood Followup*
> *(GOV0010012–GOV0010015).*

Emails at GOV0010012–GOV0010015 are communications between the [

description of personnel                    ].[164] In them, [

description of an event

].”[165] After reviewing the [    description of an event    ] employee noted that it showed that

LB Wood "[          description of product          ].”[166] And that [

description of a process

].”[167] These comments are in harmony with the observations of both the [    names    ]

report that there was an [          description of production          ] during the June

---

[161] *Id.*

[162] *See* 04-12-2019 – Email from [          individual names          ] Re LB Wood (GOV0010008 –
GOV0010011) – (Remand 7321) (internal quotation marks omitted).

[163] *Id.*

[164] *See* 05-21-2019 – Email from [          individual names          ] Re LB Wood (GOV0010012 – GOV0010015) –
(Remand 7321).

[165] *Id.*

[166] *Id.*

[167] *See id.*

2018 site visit, as well as [

description of a conversation                                    ], discussed above.

Note that even after viewing this [

description of an event at the company

].[168]

### 8. LB Wood Video (GOV0010209)

This video, which purports to be a [

description of the company visit

].[169] The video was supplied by [                description of process                ]

of the merchandise it was importing into the United States purportedly from LB Wood.[170] It

opens with a man in a [

description of an event                                    ]."[171] This timing is

substantiated through the metadata, which indicates "[            date            ]."[172] The [

description of an event

]."[173]

Next, the [

description of an event

]."[174] A [            product            ] is seen in the background.[175] The

---

[168] *See id.*
[169] LB Wood Process Video (GOV0010209) - (Remand 7321) - BC.mov.
[170] *See* 05-21-2019 – Email from [    names of individuals    ] Re LB Wood (GOV0010012 – GOV0010015) – (Remand 7321).
[171] LB Wood Process Video (GOV0010209) - (Remand 7321) - BC.mov; *see also* InterGlobal's March 18, 2026 Letter at 3 in which InterGlobal also asserted the video was filmed on April 21, 2019.
[172] *Id.*
[173] LB Wood Process Video (GOV0010209) - (Remand 7321) - BC.mov.
[174] *Id.*
[175] *Id.*

representative proceeds closer to the facility where [          products          ] are seen.[176] [

description of an event

].[177] The video depicts that the [

description of an event                                    ].[178] Several other employees are seen [

description of an event                              ].[179] The representative then walks into what

appears to be a [          description of inside the company          ].[180] According to the

representative, [                              description of an event at the company

] is manning it.[181]

    The representative indicates that some of the plywood [

description of the product                              ]."[182] He further says that there is a "[

description of the product                                    ]."[183] The narrator indicates the

"[                              description of production

]."[184] The video pans to what appears to be [          description of the product          ]

on it.[185] The facility, says the representative, now has [                    description of the product

].[186] [                    description of the product                    ].[187] The narrator

explains that LB Wood [

description of the event                              ].[188] [

---

[176] *Id.*
[177] *Id.*
[178] *Id.*
[179] *Id.*
[180] *Id.*
[181] *Id.*
[182] *Id.*
[183] *Id.*
[184] *Id.*
[185] *Id.*
[186] *Id.*
[187] *Id.*
[188] *Id.*

**PUBLIC VERSION**

description of an event                              ].[189] [

procedure description                                    ].[190] [

    procedure description                        ] into the product.[191]

[

procedure description                            ].[192] [

    machine description                          ].[193] [

machine description                              ].[194] The representative notes the [

procedure description                              ][195] [

machine description                              ].[196] According to [

     procedure description

][197] [                                    procedure description

].[198] Then they are reportedly moved into a [

     procedure description

---

[189] *Id.*
[190] *Id.*
[191] *Id.*
[192] *Id.*
[193] *Id.*
[194] *Id.*
[195] *Id.*
[196] *Id.*
[197] *Id.*
[198] *Id.*

].[199] Next, [                                procedure description

] process.[200] [                                machine description

] in the factory.[201] [

procedure description                    ].[202] [

procedure description                    ] from that location.[203]

While this video does show [

status description

], it was filmed [                date                ]. The POI started on June 5, 2018.[204] The

material therefore does not clarify or negate the findings from that 2018 site visit, including the

observations of [            two individual and one entity            ], and the prior determination

that the facility had inadequate production capacity at the time of the site visit. Further, this video

was more aligned with demonstrating production related to [

status description

].[205] Even if LB Wood fixed its [ type of machine ] machine and [                event

description    ] and production capacity after the June 2018 site visit, that does not alter the fact

that it had inadequate production capacity and so was exporting Chinese-origin merchandise

during some or much of EAPA 7321's POI.[206] InterGlobal, like [ company ], could have

submitted such a [ video type ] video or have provided other evidence demonstrating the

equipment and workflow of the factory relevant to its merchandise and covering the start of the

---

[199] *Id.*
[200] *Id.*
[201] *Id.*
[202] *Id.*
[203] *Id.*
[204] *See* Notice of Initiation of Investigation and Interim Measures – EAPA Consol. Case 7321 (Oct. 1, 2019) (NOI).
[205] *See* LB Wood Process Video (GOV0010209) - (Remand 7321) - BC.mov.
[206] The POI was June 5, 2018, to June 29, 2020.

40

POI. It did not do so despite multiple claims that it had inspectors monitoring the process and declarations recalling such purported monitoring provided years later and only on remand of the initial Final Determination.

### IV. Written Arguments

Only InterGlobal submitted written arguments. Its written arguments begin with the caveat that they are "submitted under protest and under compulsion of an arbitrary and capricious deadline set by…CBP that {InterGlobal} cannot meaningfully comply with because the Second Remand Administrative Record remains materially incomplete."[207] CBP has already explained above why it denied InterGlobal's request for an extension and its attempts to add further documentation to the record beyond what was contemplated by the Court's Order.[208] CBP must be afforded the ability to set time limitations on submissions to meet the Court's deadline for filing the remand redetermination.

Many of the arguments InterGlobal raises in its written arguments are identical to issues raised in the prior remand, which were addressed at that time, and the additional documents added to the record in this remand do not materially affect that analysis. For starters, InterGlobal attempts to relitigate what is required of CBP to determine whether there is evasion based on substantial evidence.[209] CBP's interpretation of the substantial evidence standard can be found in its prior remand redetermination and CBP continues to apply that standard here.[210] CBP's application of the substantial evidence standard has been upheld most recently in the Court's July

---

[207] Written Arguments at 2.
[208] *Supra* at 5-10.
[209] Written Arguments at 9-10.
[210] Remand Redetermination at 29-30.

41

9, 2025 decision, which affirmed that CBP's weighing of the evidence "was reasoned decision making, not an agency run amok" as InterGlobal tried to suggest.[211]

Next, InterGlobal indicates "{v}eneers are significantly different products from plywood, so when {veneers} are made into plywood, a substantial transformation takes place, and where the plywood is made is the [ status description ].[212] InterGlobal seems to be implying that the merchandise it imported was made from Chinese veneers manufactured into plywood in Cambodia. Substantial transformation is not relevant under the circumstances here presented. As explained in the prior remand redetermination, which conveyed CBP's prior dismissal of this argument, a substantial evidence analysis is not appropriate because LB Wood failed to "[

procedure description                                             ]…{which} prevents CBP from ascertaining whether the production allegedly occurring in Cambodia involves a substantial transformation of the raw materials, such that the country of origin can be considered Cambodia, and not China."[213] InterGlobal cannot simply claim that all the material it imported from China consisted of veneers, which was then transformed into plywood in Cambodia without providing CBP the raw material importation records and LB Wood's production capacity, as well as records to substantiate this, over the POI.

To that end, InterGlobal highlights that the dispositive factual issue is "LB Wood's capability to manufacture plywood."[214] And it quickly jumps to this being "the same dispositive factual issue that was in Richmond II."[215] Not so. As articulated above, while it is true that the production capacity of LB Wood was in some way relevant to both this EAPA case and the

---

[211] American Pacific Plywood II at 15.
[212] Written Arguments at 11, 37.
[213] Remand Redetermination at 53-54 (quoting Admin. Review at 19).
[214] Written Arguments at 11.
[215] Id.

*Richmond* litigation, there are several critical differences, explained above. The *Richmond* litigation related to—as its name suggests—Richmond's entries of merchandise and therefore presented the specific question of whether Richmond's entries of plywood purportedly sourced from LB Wood were in fact produced there and not merely Chinese plywood that was transshipped. In support of its case, Richmond provided voluminous documentation and actively participated in discovery wholly separate from, and involving administrative and judicial procedures quite different from, this EAPA case, which is based on an administrative record. In contrast, this EAPA investigation is, in relevant part, focused on whether InterGlobal's entries of plywood during the POI were produced in Cambodia or whether even some of the covered merchandise was produced in China and transshipped through Cambodia during the POI. During this EAPA investigation, and in two subsequent remand proceedings, InterGlobal had the opportunity to submit evidence that would trace its specific entries to production in Cambodia, but it has not done so and instead is attempting to get a windfall from another importer's efforts providing detailed evidence. This is despite the ability of parties to the EAPA investigation to submit voluntary factual information during the investigation.[216]

Again, in EAPA proceedings, unlike protest litigation, decision-making is limited to the administrative record—not robust discovery as in protest litigation. Congress declared it so. Based on 19 U.S.C. § 1517 and 19 U.S.C. § 1484, Congress intended for companies suspected of evasion of AD/CVD orders to bear the burden of proving the admissibility, classification, and applicable duties relevant to their entries, among other requirements. Specifically, pursuant to 19 U.S.C. § 1517, CBP promulgated regulations delineating what is to be considered during an EAPA investigation and what constitutes record evidence. The regulations at 19 C.F.R. §

---

[216] 19 C.F.R. § 165.23.

43

165.21(a) provide that "CBP will maintain a record for purposes of making a determination as to evasion…and conducting an administrative review" and describe what the record is to contain. Notably, CBP will place on the record certain information submitted by the parties as well as "materials *obtained and considered* by CBP during the course of an investigation…."[217]

The CBP EAPA team conducting the investigation placed information it obtained and considered on the administrative record. As noted above, and in the lead analyst's declaration, documents related to the *Richmond* litigation were not included in the EAPA administrative record as that information was not provided to or considered by the EAPA team.[218] And, as also stated in its prior remand redetermination, CBP reiterates that under 19 U.S.C. § 1484, "the burden is on the Importer to be aware of the supply chain of its merchandise and to provide such information to CBP to allow CBP to determine the country of origin and classification of merchandise in an entry."[219] InterGlobal has now had multiple chances to provide full information as to its supply chain but it has again failed to do so.

InterGlobal's assertion that CBP's stipulation in the *Richmond* litigation is based on "*identical* facts and analysis" to those in the evasion determination as to InterGlobal in this EAPA proceeding, which InterGlobal calls "literally, copy-and-pasted," is simply incorrect.[220] The facts are not identical because Richmond's entries are not the same as InterGlobal's entries. Contrary to InterGlobal's assertions, CBP did not "recant{} its allegations of transshipment against LB Wood" but rather determined based on analysis of records disclosed during the separate *Richmond* protest litigation that LB Wood produced the merchandise at issue, which

---

[217] *Id.* § 165.21(a) (emphasis added).
[218] Lead Analyst's Declaration.
[219] Remand Redetermination at 34.
[220] Written Arguments at 12.

44

Richmond had entered.[221] InterGlobal (or LB Wood) could have provided information to CBP in a similar manner to Richmond to show the production process, use of raw materials, and how raw material inputs traced to specific entries of merchandise. It did not. The 2018 site visit and references to this EAPA investigation being considered in the *Richmond* litigation as part of voluminous discovery, including submissions by another importer tied to its specific entries, does not mean that the *Richmond* litigation somehow resolves the EAPA investigation in any manner. Richmond was not a party to this EAPA case. And whether LB Wood could produce some Cambodian-origin plywood is not in question. The question is whether all of InterGlobal's specific entries during the POI were produced in Cambodia by LB Wood. The record evidence says no.

InterGlobal argues that CBP "suppressed" relevant facts related to Richmond from the record. Again, this is erroneous. As noted above, Congress clearly had different expectations for how an administrative EAPA investigation would be conducted versus how protest litigation would be handled. The information CBP considers in an EAPA investigation is the information before the team actually conducting the investigation.[222] CBP is not, as InterGlobal claims, justifying the "opposite determinations" by "ignore{ing} the facts, and mak{ing} up its own."[223] To explain this conclusion, InterGlobal points to discovery responses in *Richmond*, which are not on the record of this administrative proceeding.[224] Since they are not on the record, they are not able to be considered by CBP here. InterGlobal's reference to the prior remand redetermination is also unavailing. The only reference to Richmond's merchandise is in footnote 86, which

---

[221] *Id.*
[222] 19 C.F.R. § 165.21.
[223] Written Arguments at 12.
[224] *Id.*, citing (Case 1:21-cv-00318-JAL Documents 36-2, 36-10, 36-11, 43-1 (CBP's Responses to Richmond's Discovery Requests)).

indicates that [    document type    ] cited by Mr. Winn in his declaration were "included in

production documents for goods that were [                    event description

] despite the inspectors working for InterGlobal," with [                    event description

][225] If anything, this shows that CBP bifurcated evidence as to Richmond and as to InterGlobal,

given that it was InterGlobal's entries that were under investigation. CBP has articulated why it

has found evasion as to InterGlobal numerous times and explains above why the additional

information placed on the record in this remand does not change the result.

InterGlobal again raises the Declarations of Kurt Winn, Chief Operating Officer of

InterGlobal, and Fu Wenjie, production manager for LB Wood's Cambodian factory. CBP has

already exhaustively addressed these declarations and their weight in the prior remand

redetermination and will not therefore restate herein.[226] CBP's analysis as to these declarations

was discerned to be "reasoned decision making" by the Court.[227] Nothing has changed as a result

of the additional photographs or information added to the record because that information is

either consistent with CBP's prior findings in this case, or is explained by timing differences.

InterGlobal now submits two additional declarations—of Kenny Zian, InterGlobal's lead

inspector in Cambodia, and Ti Lao, another InterGlobal inspector in Cambodia.[228] Mr. Zian's

declaration was made in [ country ] and discussed how he has worked for InterGlobal as an on-

site inspector in Asia since [ year ].[229] Mr. Zian noted that [ company ] informed him of LB

Wood in December 2017 and he then informed other InterGlobal personnel of LB Wood's

pricing.[230] Mr. Zian stated that almost every shipment of plywood InterGlobal imported from LB

---

[225] *Id.* at 16, FN 86.
[226] Remand Redetermination at 14-18.
[227] American Pacific Plywood II at 15.
[228] *See* 03-19-2026 - IGF - Declaration of Kenny Zian – (EAPA 7321) (Zian Declaration); *see also* 03-26-2026 – IGF – Rebuttal Docs K Zian Decl. (EAPA 7321).
[229] *Id.*
[230] *Id.*

**PUBLIC VERSION**

Wood from June 2018 to August 2019 was UV coated.[231] This corroborates the [ position ] statement that [ individual ] saw packaged plywood at LB Wood's facility on June 6, 2018, that had InterGlobal's company name on it and indicated it was [ procedure ].[232] Mr. Zian claims he visited LB Wood and viewed its UV coating line functioning in 2018.[233] He resubmitted several photographs contained in InterGlobal's October 2019 RFI response that were taken at LB Wood's factory on March 17, 2018.[234] These photographs did not show a functioning UV line.[235] However, InterGlobal added two photographs to Mr. Zian's declaration, purportedly from March 17, 2018, that showed a functioning UV coating machine.[236] Although InterGlobal and LB Wood had the opportunity and the motive to provide these two photographs during the original investigation, neither did so. It is odd that InterGlobal would have had any photographs of a functioning [ description ] at LB Wood from that timeframe and yet opted not to provide them to the record during the EAPA 7321 investigation. This suggests that the March 17, 2018 date on these recently provided photographs is likely not authentic. Similarly, InterGlobal provided a photograph appended to Mr. Zian's declaration that also purported to show a functioning UV coating machine on July 6, 2018.[237] Again, InterGlobal and LB Wood had the opportunity and motive to provide this photograph during the original EAPA 7321 investigation but did not do so. The fact that these photographs originated from InterGlobal records but were not previously provided indicates that their dates are likely not authentic.

However, even if those photographs' dates were authentic, which CBP does not concede, in such a scenario, it is logical that LB Wood would have made its [ machine type ] machine

---

[231] *Id.*
[232] *See* Sept. 12, 2019 Memorandum at 14.
[233] Zian Declaration.
[234] *Id.* at Exhibit 4; *see also* InterGlobal RFI at Exhibit 2.
[235] *Id.*
[236] *See* Zian Declaration at Exhibits 1-2.
[237] *Id.* at Exhibit 3.

functional for its customer visit so that it could claim to the customer that it was producing UV-coated products there. However, CBP's June 2018 site visit appears to have been a surprise visit and, thus, the [ individual and entity ] statements and photographs much more reliably show that LB Wood's [ machine type ] machine was not being used when it did not have a customer visit or a video to film. Additionally, InterGlobal and LB Wood have an economic incentive to portray the [ description ] as functional, whereas the [ individual and entity ] had no such incentive and were, therefore, impartial observers. Thus, the [ individual ] statements and photographs and the [ entity ] site visit report are much more credible than InterGlobal and LB Wood's claims. Finally, as previously noted above, the documents LB Wood has provided in this case have not been reliable. Therefore, LB Wood's claims surrounding the functionality and use of its [ machine type ] machine at this stage of the case are likely unreliable as well.

InterGlobal added another declaration, made by [ name ], to the record.[238] Mr. [ name ] has worked for InterGlobal as an on-site inspector in Asia since [ year ] and his supervisor is Kenny Zian.[239] Mr. [ name ] claimed to have visited LB Wood in March 2018, July 2018, December 2018, and each month from January 2019 to August 2019.[240] He claims LB Wood was fully functional during these visits.[241] However, even if his statements about LB Wood's functionality are accurate, his statements do not take LB Wood's production capacity into account. The [ individual ] acknowledged that LB Wood "[                                        status description ]."[242] Correspondingly, LB Wood appeared to also recognize that it did not have enough equipment/production capacity relative to its export quantities and so LB Wood added

---

[238] *See* 03-19-2026 – IGF - Declaration of [ name ] – (EAPA 7321) ([ name ] Declaration); *see also* 03-26-2026 - IGF - Rebuttal Docs Ltr re [ name ] {*sic*} Decl. (EAPA 7321).
[239] *See* [ name ] Declaration.
[240] *Id.*
[241] *Id.*
[242] *See* 04-12-2019 – Email from [                        names                    ] (GOV0010008 – GOV0010011) – (Remand 7321).

additional machinery, purportedly in October 2018, which was well into the EAPA 7321 POI.[243] Additionally, it is not unlikely that LB Wood ran some of its machinery to give the appearance of functionality during his Mr. [ name ]'s visits. The June 6, 2018 site visit appears to have been a surprise visit and so it more accurately shows that LB Wood had not recently run its machinery and that, if the machinery was functioning, LB Wood lacked enough machinery and personnel to produce the amount of plywood it exported.[244]

Mr. [ name ] also claims he performed a final inspection on all plywood before InterGlobal accepted it before shipment; he implied he performed the final inspection during the January 2019 to August 2019 timeframe.[245] However, even if this claim is accurate, those final inspections were well after the 2018 site visit.[246] He also provided a number of inspection reports from June 2019 and July 2019, which are also well after the June 2018 site visit.[247]

InterGlobal further references that alongside LB Wood, it "submitted voluminous evidence for the record of EAPA 7321 documenting LB Wood purchased sufficient raw materials, possessed sufficient machinery, and hired sufficient employees to produce, at their Cambodian plants, the volume of plywood sold to {InterGlobal}."[248] CBP has already explained how this is not the case, in its final determination, administrative review decision, and remand redetermination, summarized above, and has analyzed in this remand redetermination how this conclusion is not altered by the additional documents added to the record during these proceedings.[249]

---

[243] *See* LB Wood RFI at Exhibit 14.
[244] *See* Sept. 12, 2019 Memorandum at 14-21.
[245] *See* [ name ] Declaration.
[246] *Id.*
[247] *Id.*
[248] Written Arguments at 13.
[249] Determination at 3-10; Admin. Review at 14-16, 19-20, 21-22; Remand Redetermination 5-6, 13-29, 33-38, 40-45, 48-55.

InterGlobal attempts to diminish the testimony of the [ individual ], stating that the "probative value" of "tens of thousands of pages of raw material invoices and production reports" with the declarations and "reports of numerous witnesses" covering many months "outweighs a few misleading emails" authored by the [ individual ] "memorializing [ duration ] visit."[250] CBP has articulated above why the [ individual ] testimony, which is bolstered by the [ individual ] communications and the [ entity ] report, is informative, particularly where other purported testimony claiming to relate to the beginning of the POI was not submitted in the initial investigation and only upon remand. CBP has further noted inconsistencies with submitted declarations, including with regards to [ document type ], and the duration of time that elapsed between purported site visits and recordings of observations.[251] CBP further explained the value of unannounced visits in obtaining accurate information about a facility's regular operations.[252]

InterGlobal goes so far as to indicate that "recently disclosed emails…show [ individual ] was misleading the decision-makers in her own agency by providing false reports of what she observed and withholding evidence."[253] However, there is no indication that the [ individual ] "misled" decision-makers or had any incentive to do so. As such, InterGlobal's claim is simply untrue. The observations of the [ individual ] were largely corroborated by the [ entity ] report completed [ duration ] of the visit, and where there were discrepancies, CBP has explained them above.

And this is not the end; InterGlobal accuses CBP of "racist, elitist epithets" that "underscore the extreme bias CBP has towards finding evasion," taking issue with CBP's

---

[250] Written Arguments at 14-15.
[251] Remand Redetermination at 16-17, 49.
[252] *Id.* at 24.
[253] Written Arguments at 14-15.

characterization of LB Wood's production capabilities.[254] Specifically, InterGlobal points to

language from the [ individual ] indicating that plywood could be made out of "[

tree species and country                          ]"[255] InterGlobal leaps to the conclusion that CBP

believes Cambodians are "too simple and unsophisticated, and incapable of neatly gluing sheets

of wood together."[256] This is false. As discussed above, CBP's determination is based on the lack

of evidence that LB Wood had the production capacity and produced all of the plywood imported

by InterGlobal during the POI. CBP does not dispute that LB Wood had some capacity to

produce plywood as a general matter. Statements by the [ individual ], who as noted previously

in the last remand redetermination has expertise in wood products, are informed by years of

experience in the industry, including typical capabilities of facilities in various countries.[257]

Indeed, InterGlobal itself recognizes differences in sophistication of certain facilities when it

expresses, as a justification for inconsistencies highlighted by CBP in LB Wood's

documentation, that "{a}dministrative errors in record-keeping are commonplace in developing-

nation manufacturing operations…."[258] No authority is cited for this assertion.

Proffering a conspiracy theory, InterGlobal proclaims that "CBP was secretly behind the

Coalition's complaint," which to InterGlobal "proves that CBP had already pre-determined that

LB Wood" was evading the Orders.[259] To get there, InterGlobal highlights text at the beginning

of the [ entity ] report, which notes that a year before the EAPA allegation was filed, CBP

"reported" to [

---

[254] *Id.* at 15.
[255] *Id.*
[256] *Id.*
[257] Remand Redetermination at 24. The [ individual ] indicated that LB Wood "[
status description                ]." *See* 04-12-2019 – Email from [                          names                          ]
(GOV0010008 – GOV0010011) – (Remand 7321).
[258] Written Arguments at 31.
[259] *Id.* at 15.

scenario claim                          ].[260] InterGlobal entirely misunderstands the [ individual ]

report. As noted above, the 2018 site visit was part of a [ program type ].[261] [ entity ] was

separately investigating AD/CVD evasion. CBP's EAPA investigation was not initiated until

after receipt of the Coalition's allegation.[262] InterGlobal forgets that the Department of

Homeland Security (DHS) may have myriad investigations into any manner of trade remedies

and penalties at any given time, which may involve different groups of personnel. CBP explains

above that it is unclear who provided such a report to [ entity ] and why, based on the record

evidence. Regardless, CBP's determination in this EAPA case is based upon the record evidence.

The team responsible for the EAPA investigation were not involved in the 2018 site visit, which

predated the EAPA allegations, or in any reporting to [ entity ] that prompted participation in the

2018 site visit.

InterGlobal claims that the [      company      ] video "eviscerates" CBP's case.[263] This

video was taken on April 19, 2019, and the period of investigation for this EAPA case was June

5, 2018 through the pendency of the investigation.[264] As discussed above, regardless of the

processes it demonstrates, it does not rebut the June 2018 site visit observations by DHS

personnel, which occurred 10 months prior. In fact, internal CBP emails added to the record in

this remand surrounding the video establish that [      event description      ] after the 2018 site

---

[260] *Id.* at 15; 32-33.
[261] *See* Sept. 13, 2019 Memorandum at 83, 91. [
program description                              ]
[262] *See* 19 U.S.C. § 1517(b)(1); *see also* 19 C.F.R. § 165.15; *see also* CBP Memorandum, "Initiation of Investigation for EAPA Case Number 7321 – InterGlobal Forest, LLC," dated June 26, 2019; *see also* CBP Memorandum, "Initiation of Investigation for EAPA Case Number 7323 – American Pacific Plywood, Inc.," dated June 26, 2019; *see also* CBP Memorandum, "Initiation of Investigation for EAPA Case Number 7327 – U.S. Global Forest, Inc.," dated June 26, 2019.
[263] Written Arguments at 17.
[264] *See* NOI at 2; *see also* 19 C.F.R. § 165.2.

**PUBLIC VERSION**

visit.[265] InterGlobal claims CBP "denied {this video's} existence" and "lied about its contents."[266] However, pursuant to 19 C.F.R. § 165.23(b), InterGlobal had the opportunity to voluntarily add the video or other similar evidence to the administrative record of EAPA 7321 but chose not to do so.

InterGlobal asserts that the video and contemporaneous photographs depict "[ quantity and item type ]" which InterGlobal claims contradicts the conclusion that LB Wood has no [ status description                    ]"[267] InterGlobal drastically exaggerates the quantity because, while [ quantity and item type ] are present, there are not "[ quantity ]" as InterGlobal claims.[268] Regardless of the exact quantity, the presence of such materials was already a fact on the record in the underlying investigation. Having [ item type ] does not mean that a company has a working [ item type ] that is in operation producing plywood. A far cry from "eviscerate{ing}" CBP's determination, the video actually reaffirms that the focus of the video was on Richmond's merchandise, as described above.[269] And the video was taken well into the period of investigation at a different point in time from the site visit conducted by the [ individual ]. CBP did not "suppress" evidence. The video was not provided to the EAPA team prior to this remand. And it is accurate that the visit was for [ program type ] status.[270] As explained above, [ individual ] was conducting [                        proceeding description ]. Not all investigations into AD/CVD-related issues are EAPA investigations.

---

[265] *See* 05-21-2019 – Email from [                names                ] Re LB Wood (GOV0010012 – GOV0010015) – (Remand 7321); *see also* LB Wood RFI at Exhibit 14.
[266] Written Arguments at 16.
[267] *Id.* at 18.
[268] *See LB Wood Process Video (GOV0010209) - (Remand 7321) - BC.mov* at 37:08-39:00 (showing that there are [ quantities ]).
[269] *Id.* at 39:00 (showing [          item description          ] on them).
[270] Written Arguments at 18; *see also* Sept. 13, 2019 Memorandum at 83, 91.

**PUBLIC VERSION**

InterGlobal raises that CBP's declaration was not signed under penalty of perjury.[271] This is irrelevant but inconsequential. The certification may not include the exact language that it was "signed under penalty of perjury," but it does indicate that it "is true and correct to the best of {the declarant's} knowledge, information, and belief," and is an attestation before the Court of factual accuracy.[272]

InterGlobal also takes issue with CBP deleting rebuttal documents that InterGlobal submitted during the remand.[273] But CBP explained to InterGlobal the reason for the deletion—as explained above, rather than submitting information designed to rebut the new evidence placed on the record, InterGlobal attempted to refile the existing administrative record as well as numerous docket filings in the *Richmond* case. Beyond allegations of CBP supposedly suppressing evidence, "lying about the site visit," and deleting information InterGlobal attempted to place on the record erroneously, InterGlobal alleges that CBP refused to confer on InterGlobal's documentation submission and closed the record.[274] As noted above, InterGlobal attempted to go to the Court during these proceedings without first consulting CBP, and CBP generally does not conduct meetings to discuss record evidence with parties. CBP clearly explained to InterGlobal the scope of the remand and what documents would be accepted. The Court's Order, as noted above, specifically contemplated adding materials related to the 2018 site visit that the lead analyst had asked colleagues about during the underlying investigation—not the full universe of documents filed in the *Richmond* cases and all exchanged discovery.

---

[271] Written Arguments at 19.
[272] Lead Analyst's Declaration.
[273] Written Arguments at 19.
[274] *Id.*

InterGlobal repeats several times in its written arguments that CBP determined that LB Wood could not manufacture plywood.[275] This is incorrect.[276] CBP found and continues to find that LB Wood had some capacity to make plywood but that InterGlobal was unable to show that LB Wood had the capacity to fulfill all of InterGlobal's orders that were entered into the United States during the POI.

InterGlobal states that CBP "has not identified…a single piece of Chinese-origin plywood that was allegedly transshipped through Cambodia."[277] Further, InterGlobal takes issue with CBP not identifying the Chinese factory that was the source of the transshipped merchandise.[278] This is not a requirement to find evasion. However, CBP did identify LB Wood's

[                                    three company names                                    ] as the suppliers of the overwhelming majority of LB Wood's "raw material".[279] As noted above, [ company ] is a Chinese producer of plywood.[280] Moreover, CBP also has noted commingling of products as LB Wood.

InterGlobal reduces CBP's determination to a mere "guess."[281] InterGlobal notes that CBP is "conflat{ing}" Chinese-origin veneers that it contends are lawful inputs and Chinese-origin finished plywood that would be covered under the Orders.[282] Further, the written arguments draw the conclusion that CBP points to the sourcing of raw materials from China as evidence of transshipment.[283] This misses the full analysis. InterGlobal states that just because

---

[275] *Id.*
[276] *Id.*
[277] *Id.* at 21.
[278] *Id.* at 23.
[279] Determination at 6.
[280] *Id.* at 3.
[281] Written Arguments at 22.
[282] *Id.* at 24.
[283] *Id.* at 25.

all plywood may not be able to be proven as Cambodian, it does not mean that it was Chinese.[284]

Importers should be able to demonstrate the supply chain of their merchandise and their entries

to substantiate claimed entry values, merchandise classification, and duties owed, as discussed

above per 19 U.S.C. §§ 1517 and 1484. InterGlobal has failed to do this and attempts to shift the

burden back onto CBP despite CBP articulating substantial evidence of transshipment.

InterGlobal notes that the [ individual ] observation of [ tree species ] plywood at LB

Wood does not constitute evidence of evasion.[285] Again, InterGlobal cherry-picks evidence out

of context. The observations of the [ individual ], concludes InterGlobal, are not enough to find

evasion based on an unannounced site visit that lasted [ duration ].[286] InterGlobal reiterates the

same argument from the prior remand that the site visit had no contemporaneous notes or a

report from the [ individual ].[287] Instead, InterGlobal seeks to rely on declarations crafted years

after the events described therein. InterGlobal raises some of the same arguments about its

declarants being best positioned to speak to the facility's operations and production

capabilities.[288] InterGlobal states that the [ individual ] positions were also "subjective" as [

individual ] did not test the plywood or count the number of employees or "measure production

output."[289] InterGlobal again claims that the [ entity ] report contradicts the [ entity ] account.

This also is erroneous. All of these arguments are addressed above, including that the [ entity ]

report provides a more contemporaneous account of the June 2018 site visit. CBP is not required

to conduct complex production calculations when the importer or manufacturer does not provide

sufficient documentation demonstrating capacity.

---

[284] *Id.*
[285] *Id.* at 26.
[286] *Id.* at 27.
[287] *Id.*
[288] *Id.* at 33.
[289] *Id.*

InterGlobal alleges that CBP's conclusion on production capacity is "{b}uilt on {s}peculation" and that no calculations were done.[290] And it argues that the third-party video deserves "enhanced weight." This is flawed for several reasons. First, it was not available to the EAPA team during the underlying investigation; second, it was a video created at the direction of another importer focused on its own entries; and third, it was made well after the start of the POI. InterGlobal raises issues about reliance on trade data and evidence of Chinese ownership.[291] These arguments have been exhaustively addressed in the prior remand decision.[292]

InterGlobal raises that payroll sheets listing [        company name        ] are easily explainable as it is a sister company that shares the same facility as LB Wood.[293] However, two dozen other payroll sheets listed another company's name "[        company name ]" as well, which shows that InterGlobal's unsubstantiated explanation is incorrect.[294] These payroll sheets' references to other companies, coupled with their payroll amount not matching the balance sheet, instead indicates that LB Wood obtained paper copies of these payroll sheets from other companies and imposed its company name on them. The purpose would be to obtain documents with other employees' names to create the appearance that LB Wood had more employees than it actually had to demonstrate it had enough employees to produce the quantities LB Wood exported. The fact that LB Wood did not have enough employees was reflected in the [ individual ] statement that "This is a sophisticated product coming from a factory that barely had any employees or much manufacturing."[295]

---

[290] *Id.* at 28.
[291] *Id.* at 30.
[292] Remand Redetermination at 20-23, 28-30.
[293] Written Arguments at 31.
[294] *See* LB Wood RFI at Exhibit 10, pages 4-7, 9, 11, 15, 17, 21-22, 24, 26, 29, 33-34, 38, 41, 45, 47, 49, 53, 57, 60, 64, 66, 68, 71-72, which denote "[        company name        ]" and pages 112, 114, and 117, which denote "[ company name ]."
[295] *See* Sept. 12, 2019 Memorandum at 14.

Despite InterGlobal's accusation that CBP was inappropriately assessing LB Wood's sophistication given its presence in Cambodia, InterGlobal states that such "{a}dministrative errors in record-keeping are commonplace in developing-nation manufacturing operations" and do not indicate evasion.[296] However, these purported record-keeping errors were not inadvertent errors. This is corroborated by the fact that LB Wood attempted to cover up its affiliation with its [                     two company names                     ] and so create the false impression it was sourcing from unrelated parties. As discussed earlier, LB Wood also made false statements about its parent company [ company ]'s role as its supplier and sales company. Thus, the record demonstrates that LB Wood's "errors," such as the payroll sheets with two other company names on them, were not inadvertent but part of its attempts to mislead CBP.

Again, InterGlobal raises the cancellation of CBP's site visit to LB Wood during the COVID-19 pandemic and claims that since such a visit was the "very mechanism by which it could have confirmed or refuted LB Wood's production claims," CBP is unable to use the lack of capacity evidence against it.[297] This too was fully addressed in the prior remand and so it will not be readdressed here.[298] Similar to arguments made in the first remand, InterGlobal raises that CBP treated its own observations as trustworthy and "insulated them from scrutiny" while dismissing the evidence presented by LB Wood and InterGlobal as "self-serving, unreliable, biased, duplicative, or subjective."[299] CBP previously expressed how it weighed the evidence and why, in the Final Determination and the prior remand, which was upheld by the Court.

InterGlobal misinterprets numerous facts to fit its narrative. First, it claims that the EAPA investigation was "initiated by CBP's own referral to [ entity ] one year before the Coalition"

---

[296] Written Arguments at 31.
[297] *Id.* at 31.
[298] *Id.* at 44-45.
[299] *Id.* at 32.

**PUBLIC VERSION**

filed its allegation.[300] Next, it takes the leap that given this, "CBP had already concluded that LB Wood was transshipping before the 'fact-finding' began." Not so. As indicated in the Final Determination and the prior remand redetermination, the EAPA investigation was initiated after receipt of the Coalition's allegation.[301] And as explained above, DHS's purpose for visiting LB Wood in 2018 was wholly separate from EAPA. InterGlobal ignores that DHS may have various trade investigations ongoing at any given time based on a variety of reasons. In other words, not all law enforcement action related to AD/CVD involves EAPA.

InterGlobal attempts to again indicate that the Wenjie declaration should be weighed highly because Mr. Wenjie is the General Manager of LB Wood and has direct knowledge of the facility's operations and capacity and notes that the [ individual ] comments were subjective. However, as the EAPA 7321 determination stated, machinery production figures are unreliable when they originate from company personnel estimates and lack substantiating evidence due to company officials' significant incentive for bias.[302] The likelihood of this bias is corroborated in that LB Wood made false statements to CBP about its [            company name            ]'s role as its sales company and as its supplier both via itself and via its affiliated [ two company names ]. In contrast, the [ individual ] had no incentive for bias, and thus, [ individual ] observations are reliable, unbiased, and authoritative. As addressed above and in the prior remand redetermination,[303] LB Wood specifically takes issue with the [ individual ] not directly counting the employees or testing the origin of the plywood or measuring production output. These arguments are unpersuasive. As noted, the purpose of CBP's prior visit was a [

---

[300] *Id.* at 32-33.
[301] Remand Redetermination at 3; NOI.
[302] Determination at 7.
[303] Written Arguments at 33.

59

program type ].[304] The [ individual ] has expertise in identifying types of wood and products made from wood.[305] As part of that expertise, the [ individual ] emails reveal that [ individual ] viewed LB Wood as more of a [ building type ] than a producer.[306]

## V.    COMMENTS FROM THE PARTIES TO THE INVESTIGATION

### A.    Comments from the Alleger

In its Comments, the Alleger submits that CBP complied with the Remand Order, and that CBP correctly found that neither the supplemented record nor the *Richmond* litigation compels a negative evasion determination.[307] CBP concurs with the Alleger's comments.

### B.    Comments from InterGlobal

InterGlobal submitted its comments under protest, objecting that CBP must complete the administrative record, as well as taking issue with CBP setting a 4,000-word limit for each party's comments on the draft remand redetermination.[308] As discussed at length above, CBP has complied with the court's Remand Order and the administrative record is complete. CBP imposed the word limit given the limited time available to file the remand redetermination and believes that approximately 15 pages of comments is sufficient for the parties to express their arguments pertinent to the draft remand redetermination. CBP also notes that InterGlobal had many opportunities to provide information for CBP's consideration, and it had already submitted

---

[304] *See* Sept. 13, 2019 Memorandum at 83, 91.
[305] Determination at 6-7.
[306] *See* 04-12-2019 – Email from [                names                ] Re LB Wood (GOV0010006 – GOV001007) – (Remand 7321); *see also 04-12-2019 – Email from [          names          ] Re LB Wood (GOV0010008 – GOV0010011) – (Remand 7321).*
[307] Coalition for Fair Trade in Hardwood Plywood, Comments on the Draft Remand Redetermination Coalition for Fair Trade in Hardwood Plywood, June 10, 2026 (hereinafter, Alleger's Comments).
[308] Interglobal Forest LLC, Written Comments to the draft Remand Redetermination in Compliance with Order to Remand from the U.S. Court of International Trade to Customs and Border Protection in American Pacific Plywood, Inc., et al., v. United States, Consolidated Court No. 1:20-cv-03914 (ECF 158) dated February 27, 2026, June 10, 2026 (hereinafter, InterGlobal's Comments).

written arguments totaling 52 pages in the instant remand, which CBP responded to in detail above.

InterGlobal argues that CBP did not comply with the Remand Order.[309] As discussed at length above, CBP complied with the court's mandate by placing the additional documents on the administrative record, as well as analyzing the impact of the *Richmond* litigation on the final determination in this matter.

InterGlobal contends that CBP failed to explain how LB Wood simultaneously had the capacity to produce plywood exported to Richmond but not the plywood exported to InterGlobal.[310] InterGlobal faults CBP for being unable to distinguish between plywood that is produced in Cambodia by LB Wood and plywood produced in China.[311] However, that is exactly the issue that CBP identified in this investigation, i.e., that the Cambodian-origin merchandise was commingled with Chinese-origin merchandise. The burden is on the importer to submit such information to CBP to allow it to identify the country of origin of merchandise.[312] In this case, the information submitted by InterGlobal was insufficient to allow CBP to make such a determination. InterGlobal puts a lot of emphasis on information that Richmond submitted to support its protest;[313] however, InterGlobal failed to avail itself of the opportunity to submit such information in this investigation. Instead of submitting declarations (only upon remand) and relying on photos and video of LB Wood's facility (largely submitted on remand and/or by other entities), InterGlobal could have submitted information tracing its entries to production in LB Wood's facility in Cambodia. InterGlobal has not done so.

---

[309] *Id.* at 1-2.
[310] *Id.* at 2-3.
[311] *Id.*
[312] 19 U.S.C. § 1484.
[313] *See, e.g.,* InterGlobal's Comments at 3-4, 7.

**PUBLIC VERSION**

InterGlobal continues to maintain that the *Richmond* litigation was based on the same facts as this EAPA investigation, and that CBP's distinction between the two cases is "fictional."[314] As explained above, while the record of this EAPA investigation was part of the discovery in the *Richmond* litigation, Richmond also developed a record that was independent of the EAPA investigation, namely, the work of a market research firm, and documentation tracing Richmond's entries to production at LB Wood.[315]

InterGlobal further contends that the site visit report [ description ] CBP's findings in this EAPA investigation.[316] As explained above, the Report of Investigation does not address the actions of any [                                report description                                ].[317] Further, in the report [

report description[318]

].[319] There is no inconsistency here with the findings of the EAPA investigation. While InterGlobal states that [ event description ],[320] the fact that [ entity ] may not have considered a [ event description ] does not mean that a civil investigation under EAPA had no merit.

---

[314] *Id*. at 3-4.
[315] *See supra* notes 53-55.
[316] InterGlobal's Comments at 5-6.
[317] *See supra* note 139, Site Visit Report.
[318] *See supra* at 33 for discussion on addition of {not}.
[319] *See supra* note 149.
[320] InterGlobal's Comments at 5.

InterGlobal further argues that CBP had a predetermined outcome for the 2018 site visit.[321] Even if as part of the [ program type ] CBP was following up on a suspicion of evasion and conducting a site visit to obtain facts, that is not predetermination, but rather a standard investigative activity of a law enforcement agency. InterGlobal also takes issue with CBP cancelling the 2020 verification at LB Wood's facility arguing that it was deliberate and that CBP "knew the visit would conclusively confirm LB Wood's production claims, and destroy any chance for CBP to execute its predetermined evasion determination."[322] This is a baseless allegation. On May 8, 2020, InterGlobal and LB Wood stated the following to CBP:

> We would like to clarify with you whether CBP intends to extend the written arguments deadline further, until a verification may take place and a verification report may be placed on the record? Alternatively, if this is to proceed without verification in light of the serious health risks to all those who would need to travel to make that possible, we believe it is appropriate to set a briefing schedule starting no earlier than May 20, 2020.[323]

CBP responded that "{w}e note that since verification was initially postponed in February 2020, the difficulties pertaining to travel and the accompanying health risk have not diminished. Therefore, CBP will not proceed with a verification in this investigation."[324] Thus, the 2020 verification was cancelled due to the global COVID-19 pandemic and the associated travel restrictions and health risks.[325]

InterGlobal believes that the 2019 LB Wood Video produced in the *Richmond* litigation is a "smoking gun" that the agency deliberately suppressed.[326] Baseless allegations of agency misconduct aside, CBP reviewed the video in detail in this remand. As explained above, CBP

---

[321] *Id.* at 6.
[322] *Id.*
[323] *See* CBP Document, "Response to IGF Request Extension of the Written Arguments Deadline," dated May 8, 2020.
[324] *Id.*
[325] *Id.*
[326] InterGlobal's Comments at 6-7.

63

**PUBLIC VERSION**

concluded that the video was aligned with demonstrating production for [ company ] and even if

LB Wood fixed its [ machine type ] machine and [        event description        ] and

production capacity after the June 2018 site visit, that does not alter the fact that LB Wood had

inadequate production capacity and so was exporting Chinese-origin merchandise during some

or much of EAPA 7321's POI.[327] As explained above, while the video depicts production at the

same manufacturer, LB Wood, that exported products to both Richmond and InterGlobal, the

evidence on the record in this EAPA investigation suggests that Chinese-origin merchandise was

commingled with merchandise that was produced by LB Wood in Cambodia. And while

Richmond was able to trace its imports specifically to production in Cambodia, InterGlobal has

not done so, nor has InterGlobal submitted evidence specific to InterGlobal that would contradict

CBP's findings.

InterGlobal also revives the argument that only Chinese one- or two-ply veneers were

present at the LB Wood facility and thus no covered merchandise was transshipped through

Cambodia.[328] As explained above, aside from its unsubstantiated claims, neither InterGlobal nor

LB Wood has submitted evidence to show that all the material imported from China consisted of

one- or two-ply veneers that were then transformed to plywood at LB Wood's facility in

Cambodia.[329] Without such raw material import evidence, InterGlobal's claims do not have any

merit.

InterGlobal's claim that CBP did not conduct a calculation of LB Wood's production

capacity is likewise meritless.[330] When information is available on the administrative record,

CBP does conduct a detailed calculation of a manufacturer's production capacity. However, no

---

[327] *See supra* note 205.
[328] InterGlobal's Comments at 8.
[329] *See supra* at 41.
[330] InterGlobal's Comments at 9-10.

such information was provided to CBP in this investigation, e.g., a detailed listing of machines, objective evidence of the machines' capacities, the inventory in/out, daily employee rolls, hours worked, and the times that the machines were on. Such information would have allowed CBP to calculate capacity, but neither LB Wood nor InterGlobal submitted such information. The information that was available on the record was riddled with inconsistencies, which as explained in detail in the final determination, did not allow CBP to determine whether InterGlobal's entries were produced in Cambodia. InterGlobal further argues that CBP "judges the entire two-year period of investigation by a single visit on essentially its first day (the POI began June 5, 2018), while ignoring that LB Wood's capacity [ description ] over that period."[331] As discussed above, CBP relied on the site visit because that was the evidence that was available on the record, and the evidence that was submitted by the parties contained discrepancies or was incomplete, and thus was not reliable. Further, even if LB Wood's capacity [ description ] over the POI, that would not negate the fact that Chinese-origin plywood was being transshipped during the earlier part of the POI to compensate for a lack of adequate production at LB Wood.

InterGlobal claims to have identified errors in the draft remand redetermination. First, InterGlobal claims that CBP "manufactured [    quantity    ]" when it compared "[ document type and amount ] to [                    document type and amount ], labeled [                    amount and percentage                    ] multiplied it by LB Wood's roughly [ number ] employees, and announced that [ number ] employees were fabricated (Determination at 8)."[332] However, CBP's arithmetic and the corresponding conclusion were not "manufactured." The intent of the calculation resulting in a discrepancy of [

---

[331] *Id.* at 10.
[332] Determination at 10-11.

number ] employees was to make the variance between the payroll sheets and the payroll amount on the balance sheet more tangible:

1) The number of LB Wood employees for each month from June 2018 to September 2019 was averaged, leading to an average of [ number ] employees per month.

2) The difference amount, [ number ], divided by Payroll Sheets amount, [ number ], equals [ number ] percent.

3) The difference as a percentage of the payroll sheets amount, [ number ] percent, was multiplied by the average number of LB Wood employees, [ number ], to determine that the difference was the equivalent of about [ number ] employees.[333]

The above calculations are derived from figures in LB Wood's own documents. Thus, any inconsistency originated in LB Wood's documents. As CBP has repeatedly shown, LB Wood's documents are not reliable. Reflecting this, many of the payroll sheets listed the unaffiliated companies [                                     two company names                                     ], which indicates that they likely functioned as a source of ghost employees whose wages caused variation between the payroll sheets and the balance sheet. The fictitious employees' wages appear to have inflated the payroll amount on the payroll sheets, which is the likely reason that the payroll sheets amount was notably higher than the balance sheet.

Second, InterGlobal claims that CBP relied on a discrepancy in the warehouse entries that InterGlobal had already explained away. It is true that in its 2020 determination, CBP stated "{s}ome of this difference {between warehouse-in tickets and warehouse-out tickets} may come from LB Wood withdrawing veneer sheets from existing inventory. In the absence of record documents indicating LB Wood's existing inventory, it is uncertain whether the difference is due

---

[333] *Id.* at 8.

66

to existing inventory or whether it is a discrepancy."[334] However, CBP has re-evaluated the record evidence pursuant to the remand and noticed LB Wood omitted multiple shipments from [ two company names ] from the import shipment list it provided to CBP.[335] Because LB Wood omitted these import shipments from the list it provided to CBP, it is reasonable to conclude that LB Wood also omitted the corresponding warehouse-in tickets when it provided warehouse-in tickets to CBP.[336] LB Wood's omission of requested evidence is corroborated in that LB Wood did not provide the sales or import documents for its import shipments from [ two company names ].[337] These withholdings of evidence point towards InterGlobal attempting to conceal the true warehouse-in and warehouse-out figures.

Next, InterGlobal claims that CBP "read affiliate names on [ document type ] as proof of forgery."[338] InterGlobal's claim that [          two company names          ] are co-located affiliates of LB Wood is false. InterGlobal has not presented any evidence whatsoever indicating LB Wood is affiliated with those two companies or that it is co-located with *any* other company. LB Wood also never mentioned any co-located companies and never referred to [ two company names          ] as affiliates until briefly mentioning without further substantiation that [      company name      ] is a "sister company sharing the same facility" as LB Wood, in its written arguments in this remand.[339] Furthermore, in the video and photographs on the record, no [ item type ] are visible in storage or being produced at LB Wood's facility, which would be expected if [   company name   ] was co-located with LB Wood.[340] Moreover,

---

[334] *Id.*
[335] *See supra* at 22-23.
[336] *See id.*; *see also* LB Wood Supplemental RFI at Exhibits SQ1-1 and SQ1-2.
[337] *See supra* at 22-23.
[338] InterGlobal's Comments at 11.
[339] Written Arguments at 30.
[340] *See* LB Wood Process Video (GOV0010209) - (Remand 7321); *see also* LB Wood Photos (GOV0002759) - (Remand 7321); *see also* LB Wood Photos (GOV0002760) - (Remand 7321); *see also* Sept. 12, 2019 Memorandum at 14-21.

67

LB Wood provided a chart of affiliates that lists LB Wood, [ company name and number ] other companies; however, it does not list [        two company names        ].[341] Thus, record evidence indicates that [            two company names            ] are not LB Wood affiliates and so they had no legitimate reason to appear on LB Wood's payroll sheets.

The [ two individuals ]'s statements reflect that LB Wood "barely had any employees" and was "[        status description        ]."[342] Corroborating that, the photographs from CBP's June 2018 site visit do not portray many employees at LB Wood's facility.[343] Consequently, after the site visit, LB Wood had an incentive to show CBP that it had enough employees to produce the amount of plywood it exported during the POI. As part of those efforts, LB Wood provided payroll documents with two other unaffiliated company names at the top. Thus, these facts make it much more reasonable (than what InterGlobal claims) to conclude that LB Wood hastily made an attempt to pass two other companies' employees off as its own to appear it had more employees than it actually had. Such surreptitious document creation is consistent with LB Wood's other omissions and false statements.

Finally, InterGlobal has identified what seemed to have been typographical errors in the draft remand redetermination, which have been corrected in this final decision.

**VI. CONCLUSION**

At the end, InterGlobal has now had three separate opportunities to submit evidence to CBP demonstrating that all of its plywood imported into the United States was manufactured in Cambodia. It could have taken advantage of those opportunities and, like Richmond, submitted

---

[341] *See* LB Wood RFI at Exhibit 2. The chart also does not mention LB Wood's [                          two company names        ].

[342] *See* Sept. 12, 2019 Memorandum at 14-21; *see also* 04-12-2019 - Email from [        two names        ] Re LB Wood (GOV0010008 - GOV0010011) - (Remand 7321) at 2.

[343] *See* Sept. 12, 2019 Memorandum at 14-21; *see also* LB Wood Photos (GOV0002759) - (Remand 7321); *see also* LB Wood Photos (GOV0002760) - (Remand 7321).

68

evidence to CBP tracing InterGlobal's specific imports to production in Cambodia. It could have also conducted due diligence and hired a market research firm to visit the LB Wood factory. It has not done so. Instead, InterGlobal has chosen to rely on another unaffiliated company's submissions in an unrelated matter and has flooded the administrative record with thousands of pages of irrelevant information in an attempt to obscure the issues.

After considering the entire administrative record, including the information placed on the record on remand, CBP continues to find that substantial evidence on the record exists that InterGlobal entered covered merchandise into the customs territory of the United States through evasion.

/s/ VICTORIA Y CHO

Digitally signed by
VICTORIA Y CHO
Date: 2026.06.29
13:16:29 -04'00'

Victoria Cho
Director
Enforcement Operations Division
Trade Remedies Law Enforcement Directorate
Office of Trade
U.S. Customs and Border Protection

/s/ ALICE A KIPEL

Digitally signed by ALICE
A KIPEL
Date: 2026.06.29
14:22:07 -04'00'

Alice A. Kipel
Executive Director
Regulations and Rulings
Office of Trade
U.S. Customs and Border Protection